IN THE UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF MARYLAND, NORTHERN DIVISION

MARLOW HUMBERT,

    Plaintiff,

       v.                  CIVIL NO.: WDQ-11-0440

MARTIN O'MALLEY, *et al.*,

    Defendants.

\*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*

## MEMORANDUM OPINION

Marlow Humbert sued Maryland Governor Martin O'Malley and
others,[1] alleging violations under 42 U.S.C. § 1983 and other
claims. Pending are motions to dismiss by the City and Dixon
(ECF No. 6); O'Malley (ECF No. 7); and the Police Department,
Bealefeld, and Caldwell (ECF No. 15).[2] For the following

---

[1] The other Defendants are the Mayor and City Council of
Baltimore City (collectively the "City"); former Mayor Sheila
Dixon; the Baltimore City Police Department (the "Police
Department"); Baltimore City Police Commissioner Frederick
Bealefeld; Baltimore City Police Officers Chris Jones, Keith
Merryman, Caprice Smith, Dominick Griffin, Michael Brassell, and
John and Jane Does 1-20; Police Department supervisors Richard
and Jane Roes 1-20; and Police Department Laboratory Technician
Cinese Caldwell.

[2] Humbert's "Application for Order Enlarging Time to Respond to
Defendant Martin O'Malley's Motion to Dismiss," ECF No. 30, will
be denied as moot. Humbert has responded to O'Malley's motion.
ECF No. 16. The Court will not allow a surreply memorandum.
*See* Local Rule 105.2(a) (D. Md.) ("Unless otherwise
ordered by the Court, surreply memoranda are not permitted to be
filed.").

reasons, O'Malley's motion will be granted, the City and Dixon's motion will be granted in part and denied in part, and the Police Department, Bealefeld, and Caldwell's motion will be granted in part and denied in part.

I. Background[3]

Defendant O'Malley became Baltimore mayor in December 1999 and introduced a plan to reduce crime. Compl. ¶ 17.

In March 2005, then-Police Commissioner Leonard Hamm started a program in which officers tallied their enforcement statistics, "from parking citations to felony arrests." William Wan, *Critics Assail Police Policy*, Baltimore Sun, Mar. 29, 2005, at 1B (*cited* in Compl. ¶¶ 41-42). Each month, the numbers were compared with averages from the officers' squads and shifts and the 27 lowest-performing officers "were reassigned, at least temporarily, to another district and told to improve." *Id.*

The same month, the Police Department halted another program that one of the Police Department's lieutenants had started. *Id.* That program gave officers in that lieutenant's district performance scores, ranging from one point for a traffic citation to 10 points for a gun arrest; at the end of each week, sergeants tallied the points for their assigned

---

[3] For the Defendants' motions to dismiss, the well-pled allegations in Humbert's complaint are accepted as true. *See Mylan Labs., Inc. v. Matkari*, 7 F.3d 1130, 1134 (4th Cir. 1993).

squads. *Id.* A spokesman said the Police Department ended the program, which began in February 2005, to avoid the appearance of a quota system. *Id.* Maryland law prohibits the Police Department from establishing quotas or using an officer's number of arrests or citations as a "primary criterion for promotion, demotion, dismissal, or transfer." Md. Code Ann., Pub. Safety § 3-504 (*cited in* Compl. ¶ 40). The Police Department can, however, use "quantitative data for arrests . . . in evaluating performances" and assess the proportion of arrests made by an officer or group of officers. *Id.*

On January 17, 2007, O'Malley became governor and Defendant Dixon became mayor. Compl. ¶¶ 17, 19. That same year, Defendant Jones "was championed for closing [100 percent] of his cases" and promoted. Compl. ¶ 43.

On April 30, 2008, a woman[4] told police that she had been raped and robbed at her home in Baltimore's Charles Village neighborhood. Compl. ¶ 47. Her account matched other reported attacks in the area: a black man approached her as she walked home, pushed her through the front door to her home, held a gun to her head, demanded money, and raped her. Compl. ¶¶ 1, 45, 47. The Victim described the assailant as a well-spoken black

---

[4] Humbert names the woman in his complaint. Because she is not a party to the lawsuit, however, the Court will refer to her as the "Victim."

man who was five-foot-eight-inches tall, weighed 160 pounds, and wore a face mask. Compl. ¶ 48.

Defendant Caldwell processed the crime scene. ¶ 52. She found no physical evidence of a rape or robbery but took pictures of a wallet and bank card found on the loveseat where the Victim reportedly had been raped. Compl. ¶¶ 52, 54, 56. Caldwell's report stated that the assailant put on a mask and pair of gloves after entering the Victim's house and raped her before asking if she had money. Compl. ¶ 49.

On the night of the alleged rape, Defendant Griffin took the Victim to a hospital for a physical examination and to collect DNA samples. Compl. ¶ 61. The medical exam found evidence of vaginal penetration but no vaginal or anal bruising or bleeding. Compl. ¶ 62.

Police canvassed the area around the Victim's home for possible eye witnesses. Compl. ¶ 63. Three neighbors who were home at the time of the reported attack neither saw nor heard anything. Compl. ¶ 64. Police reviewed footage from a surveillance camera attached to the Baltimore Lab School and facing the Victim's home. Compl. ¶ 66. The footage showed the Victim but no one matching her description of the assailant. *Id.*

In early May 2008, the Police Department determined that one person, dubbed the "Charles Village Rapist," was responsible

4

for the neighborhood's series of robberies and sexual assaults. Compl. ¶ 45. Police released a composite sketch of the suspect. Compl. ¶ 69.

On May 1, 2008, Defendants Griffin and Jones interviewed the Victim at the Police Department headquarters. Compl. ¶ 70. The Victim said her assailant was already inside when she arrived home; he then pulled out a handgun, and put on a white mask. Compl. ¶ 71. Jones asked if the assailant wore gloves; the Victim said yes. Compl. ¶ 72. The Victim, an art student, created a composite sketch. Compl. ¶ 80. Police took the Victim to Defendant Brassel to sketch a version which included features reported by other victims of the Charles Village Rapist. *Id.*

State law requires the Police Department to comply with U.S. Department of Justice standards on eyewitness identifications. Md. Code Ann., Pub. Safety § 3-506 (*cited in* Compl. ¶ 79). These standards warn police to "evaluate[] with caution" a witness's identification using a "mug book," a collection of photos of previously arrested people.[5]

On May 4, 2008, police arranged a photo line-up of 45 registered sex offenders from which the Victim picked two as her

---

[5] U.S. Department of Justice, Eyewitness Evidence: A Guide for Law Enforcement, October 1999, *available at* www.ncjrs.gov/pdffiles1/nij/178240.pdf (*cited in* Compl. ¶ 79).

possible assailant. Compl. ¶ 82. Police never investigated those men. Compl. ¶ 83. Police showed the Victim a second photo line-up. Compl. ¶ 85. The Victim identified Humbert as her possible attacker and asked to see him in a line-up and to hear his voice. *Id.* Police denied this request. Compl. ¶ 88.

Police received several tips over the next few days. Compl. ¶¶ 193-196. On May 5, 2008, a man told police that he heard two other men talking at a local grocery store about how "the rapist" had recently gotten out of jail. Compl. ¶ 193. On May 6, 2008, a woman told police that she had been attacked on an elevator in the 1300 block of St. Paul Street but that her assailant had freckles and a nose that differed from the man depicted in the sketch of the Charles Village Rapist. Compl. ¶ 194. On May 7, 2008, police visited the home of a woman who called to say the composite sketch looked familiar, but she was not at home. Compl. ¶ 195. That same day, police visited the home of another woman who reported being followed into her home by a drunken person in March 2008. Compl. ¶ 196. She also was not at home. *Id.* No records show that police followed up on any of the tips. Compl. ¶¶ 193-196.

On May 8, 2008,[6] the Police Department prepared a wanted poster naming Humbert the Charles Village Rapist and warning

---

[6] The reference in Humbert's complaint to May 8, 2009, appears to be an error. Compl. ¶ 93.

that he was "armed and dangerous." Compl. ¶ 93. On May 9, 2008, police obtained a warrant to arrest him. Compl. ¶ 95. On May 10, 2008, Defendant Smith arrested Humbert, and the Police Department closed the case. Compl. ¶ 97.

After waiving his *Miranda* rights, Humbert told police they had arrested the wrong person. Compl. ¶ 98. Police did not investigate Humbert's alibi. Compl. ¶ 99. Humbert never received copies of the photos that Caldwell took at the crime scene. Compl. ¶ 58. Reported attacks continued in Charles Village after Humbert's arrest. Compl. ¶¶ 109-110.

On May 12, 2008, Defendant Jones applied for a search and seizure warrant, swearing that the Victim had made a positive identification of Humbert. Compl. ¶ 101. Jones omitted the Victim's request to see Humbert in a line-up and to hear his voice. *Id.* A judge issued a warrant for Humbert's DNA. *Id.*

On May 27, 2008, a Police Department laboratory report found the DNA of at least two unknown persons in the Victim's underwear and at least two more on her stockings. Compl. ¶ 102. On June 2, 2008, a second laboratory report found that "Humbert [was] excluded as a contributor or source of the DNA" found on the Victim's underwear and nylons. Compl. ¶ 104. On June 30, 2008, additional DNA samples were taken from the Victim. Compl. ¶ 106.

On September 27, 2008, the *Baltimore Sun* reported that police told crime lab technicians not to follow up on DNA found at crime scenes in at least six open homicide and sexual assault cases and three closed burglary cases. Justin Fenton, *Criminals' DNA Ignored*, Baltimore Sun, Sept. 27, 2008, at 1A (*cited in* Compl. ¶ 112).

On December 15, 2008, a laboratory report confirmed the findings of the earlier DNA analyses: at least two unknown DNA samples were found in the Victim's underwear, two more unknown DNA samples were found on her nylons, and Humbert was excluded as a contributor of the DNA. Compl. ¶ 107.

On July 2, 2009, Baltimore news station WBAL-TV reported that the former chief of the Police Department's internal disciplinary system, fired in April of that year, had accused the department of corruption.[7] Joann Branche said there were "back-door deals in punishment" and "cases that should be punished were dismissed."[8]

---

[7] WBAL-TV 11 News, *Former City Official: Police Dept. Full of Corruption*, July 2, 2009, *available at* www.wbaltv.com/news/19931461/detail.html (*cited* in Compl. ¶ 44).

[8] *Id.*

In late July 2009, Humbert was released.[9]  Just before his release, the Victim told the State's Attorney's office that she would not cooperate in Humbert's prosecution, because police had denied her requests to see Humbert in a line-up or hear his voice, and she was unsure if Humbert was her assailant.  Compl. ¶ 91.

On February 17, 2011, Humbert sued, alleging battery, false arrest, abuse of process, malicious prosecution, intentional infliction of emotional distress, and conspiracy to commit those torts; negligence; and violations of 42 U.S.C. § 1983, 42 U.S.C. § 1985, and the Maryland Declaration of Rights.  On March 15, 2011, O'Malley, Dixon, and the City filed their motions to dismiss.  ECF Nos. 6, 7.  On April 15, 2011, Bealefeld, Caldwell, and the Police Department filed their motion to dismiss.[10]  ECF No. 15.  On April 19, 2011, Humbert opposed O'Malley, Dixon, and the City's motions to dismiss.[11]  ECF. No. 16.  On May 3, 2011, Humbert opposed Bealefeld, Caldwell, and the Police Department's motion to dismiss.  ECF No. 21.  On May 16, 2011, O'Malley replied to Humbert's opposition.  ECF No. 26.

---

[9] Tricia Bishop, "DNA evidence clears man of rape charge," *Baltimore Sun*, August 12, 2009, at 8A (*cited in* Compl. ¶ 115). Humbert does not provide the date of his release.

[10] The Court had extended the time these Defendants had to respond to Humbert's complaint.  ECF No. 9.

[11] The Court had extended the time Humbert had to respond to the motions.  ECF Nos. 13, 14.

On May 20, 2011, Dixon and the City filed their reply. ECF No. 28. On May 25, 2011, Bealefeld, Caldwell, and the Police Department filed their reply. ECF No. 29.

II. Analysis

A. Standard of Review

Under Fed. R. Civ. P. 12(b)(6), an action may be dismissed for failure to state a claim upon which relief can be granted. A Rule 12(b)(6) motion tests the legal sufficiency of a complaint, but does not "resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." *Presley v. City of Charlottesville*, 464 F.3d 480, 483 (4th Cir. 2006).

The Court bears in mind that Rule 8(a)(2) requires only a "short and plain statement of the claim showing that the pleader is entitled to relief." *Migdal v. Rowe Price-Fleming Int'l, Inc.*, 248 F.3d 321, 325–26 (4th Cir. 2001).

Although Rule 8's notice-pleading requirements are "not onerous," the plaintiff must allege facts that support each element of the claim advanced. *Bass v. E.I. Dupont de Nemours & Co.*, 324 F.3d 761, 764–65 (4th Cir. 2003). These facts must be sufficient to "state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

To present a facially plausible complaint, a plaintiff must do more than "plead[] facts that are 'merely consistent with' a defendant's liability"; the facts as pled must "allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) (*quoting Twombly*, 550 U.S. at 557). The complaint must not only allege but also "show" that the plaintiff is entitled to relief. *Id.* at 1950 (*quoting* Fed. R. Civ. P. 8(a)(2)).

"[W]he[n] the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the com-plaint has alleged--but it has not show[n]--that the pleader is entitled to relief." *Id.* (citation and internal quotation marks omitted).

The Court "should view the complaint in a light most favor-able to the plaintiff," and "accept as true all well-pleaded allegations," *Mylan Labs., Inc. v. Matkari*, 7 F.3d 1130, 1134 (4th Cir. 1993), but the Court is "not bound to accept as true a legal conclusion couched as a factual allegation," *Papasan v. Allain*, 478 U.S. 265, 286 (1986), or "allegations that are mere[] conclus[ions], unwarranted deductions of fact, or unreasonable inferences," *Veney v. Wyche*, 293 F.3d 726, 730 (4th Cir. 2002) (citation and internal quotation marks omitted).

B. Defendants' Motions to Dismiss

11

Humbert alleges that the City and Police Department had a policy or custom of requiring police to fabricate evidence, withhold exculpatory evidence, and make illegal arrests -- or that the City and Police Department were deliberately indifferent to such unconstitutional abuses -- in violation of 42 U.S.C. § 1983.[12]  Compl. 37-40.  He asserts that the Defendants obstructed justice, tampered with witnesses, and conspired to deprive him of equal protection, privileges, and immunities under the law, in violation of 42 U.S.C. § 1985. Compl. 43-46.  Humbert also alleges that all the Defendants except the City and the Police Department conspired to violate his rights under the Maryland Declaration of Rights, and committed battery, false arrest, abuse of process, malicious prosecution, intentional infliction of emotional distress, conspiracy to commit those torts, and negligence.  Compl. 55-70.

1. § 1983 (Counts 1-3, 7-10)

Section 1983 provides a remedy against any person who, acting under color of law, deprives another of constitutional rights.  42 U.S.C. § 1983.  It "is not itself a source of substantive rights, but merely provides a method for vindicating

---

[12] He also alleges that the Defendants violated the statute by using suggestive identification procedures, withholding exculpatory evidence, failing to investigate other suspects, and falsely arresting and maliciously prosecuting him.  Compl. 41-43, 46-54.

federal rights elsewhere conferred." *Albright v. Oliver*, 510
U.S. 266, 271 (1994) (internal quotation marks and citation
omitted).

Humbert alleges that the Defendants violated his rights
under the Fourth and Fourteenth Amendments through false arrest,
malicious prosecution, an unduly suggestive identification
process, the failure to investigate, withholding exculpatory
evidence, and a policy or custom of requiring such
unconstitutional practices and providing inadequate training to
police. Compl. 37-54.

              a. The City and Police Department's Liability

A municipality may be liable under § 1983 only if "the
municipality *itself* causes the constitutional violation."[13]
Liability may arise because of a policy or custom that is
"fairly attributable to the municipality" and the "moving force"
behind the constitutional violation. *Spell v. McDaniel*, 824
F.2d 1380, 1387 (4th Cir. 1987). A municipal policy may consist
of written ordinances and regulations, or "certain affirmative
decisions of individual policymaking officials." *Carter v.
Morris*, 164 F.3d 215, 218 (4th Cir. 1999) (internal citations
omitted). Municipal custom exists when "a particular practice

---

[13] *City of Canton v. Harris*, 489 U.S. 378, 385 (1989) (emphasis
in original). A municipality cannot be liable under a theory of
*respondeat superior*. *Monell v. Dep't of Soc. Servs. of New
York*, 436 U.S. 658, 694 (1978).

is so persistent and widespread and so permanent and well settled as to constitute a custom or usage with the force of law." *Id.* Absent a direct policy or custom, municipal liability may be inferred from "deliberate indifference" to the risk of a constitutional violation because of "a known history of widespread constitutional deprivations on the part of city employees."[14]

Humbert alleges that the City and Police Department had a policy or custom of requiring police to make illegal arrests and fabricate and withhold evidence, and providing inadequate training, supervision, and discipline of police. Compl. 37-40. He also contends that the "final policymakers" knew of past unconstitutional practices, failed to remedy them, and were "deliberately indifferent" to the risk of future violations. Compl. 38-39.

The City and Police Department counter that Humbert has failed to allege sufficient facts linking them to unconstitutional policies or customs, or any deliberate indifference. ECF No. 28 at 5-6, 8; ECF No. 15, Exhibit 1, at

---

[14] *Bd. of Cnty. Comm'rs v. Brown*, 520 U.S. 397, 411 (1997); *Milligan v. City of Newport News*, 743 F.2d 227, 229-30 (4th Cir. 1984). *See also City of St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988) (plurality opinion) (liability for municipal "custom" aims to forestall "egregious attempts by local governments to insulate themselves from liability for unconstitutional policies" which they have ratified *sub silentio*).

14

6-8. The City also contends that it cannot be liable under §
1983 because it does not make policy for the Police Department
or have the power to hire or supervise its officers. ECF No. 6,
Ex. 1 at 5-7. "Unlike other municipal or county police
departments which are agencies of the municipality or county ...
the Baltimore City Police Department is a State agency."[15]

The Court will deny the City and Police Department's
motions to dismiss the § 1983 claims against them. As a
preliminary matter, the Court rejects the City's argument that
it cannot be liable for Police Department policies. Because of
the "strong practical links between the City and the [Police]
Department," this argument has been rejected in three other
cases.[16]

---

[15] ECF No. 6, Exhibit 1, at 5 (*quoting Clea v. Mayor & City
Council of Balt.*, 312 Md. 662, 668, 541 A.2d 1303, 1306 (1988)).

[16] *Wiley v. Mayor & City Council of Balt.*, 48 F.3d 773, 776 (4th
Cir. 1995) (*citing Hector v. Weglein*, 558 F. Supp. 194, 197-99
(D. Md. 1982) *and Wilcher v. Curley*, 519 F. Supp. 1, 3-4 (D. Md.
1980)); *Mason v. Mayor & City Council of Balt.*, Case No. HAR-95-
0041, 1995 WL 168037, at *4 (D. Md. 1995) ("the City maintains
sufficient practical knowledge of and control over the Police
Department to withstand dismissal of this § 1983 action"). *See
also Clea v. Mayor & City Council of Balt.*, 312 Md. 662, 670
n.5, 541 A.2d 1303, 1306-07 n.5 (1988) ("with regard to federal
law liability under 42 U.S.C. § 1983 . . . the Baltimore City
Police Department might well be regarded as a local government
agency"), *superseded by statute on other grounds as stated in
Balt. Police Dep't v. Cherkes*, 140 Md. App. 282, 780 A.2d 410
(2001)). The Fourth Circuit has not decided the merits of the
City's argument; in *Wiley*, the district court had not considered
the issue. *Wiley*, 48 F.3d at 776.

The facts alleged in Humbert's complaint make it plausible that the City and Police Department had a policy or custom requiring illegal arrests, or were deliberately indifferent to the risk of a constitutional violation. Humbert alleges that, around the time of his arrest, police told crime lab technicians not to follow up on DNA found at crime scenes in at least nine cases. Compl. ¶ 112. This allegation is "significant enough that even those individuals removed from the day-to-day operations" of the Police Department should have known about this police misconduct.[17] Humbert further alleges that officials continued to detain him until July 2009, even though DNA

---

That § 1983 claims against the City have been dismissed in two other cases does not dictate dismissal here. *See Carter v. Mayor & City Council of Balt.*, 164 F. Supp. 2d 509, 517-19 (D. Md. 2001), *vacated on other grounds*, 39 F. App'x 930 (4th Cir. 2002), *and Chin v. City of Baltimore*, 241 F.Supp.2d 546, 549-50 (D. Md. 2003). In *Carter*, the Court rejected the plaintiff's § 1983 claim against the City not as a matter of law but because the record did not establish that the City had an unconstitu- tional policy. *Carter*, 164 F. Supp. 2d at 518. The Court in *Chin* dismissed the plaintiff's claim by relying on *Carter* and by finding that the plaintiff had failed to allege sufficient facts to establish a custom or policy to deny the plaintiff's constitutional rights. *Carter*, 241 F. Supp. 2d at 549-50.

The City also argues that *Hector* and *Wilcher* have limited relevance because they dealt primarily with Eleventh Amendment immunity, not municipal liability under § 1983. ECF No. 28 at 6-8 & n.2. The Fourth Circuit in *Wiley*, however, made no such distinction when citing those cases. *Wiley*, 48 F.3d at 776.

[17] *Brown v. Tshamba*, Case No. RDB-11-0609, 2011 WL 2935037, at *7 (D. Md. July 18, 2011) (plaintiffs' allegations that the City knew or should have known about a police officer's two prior shootings, including one while he was drunk, were "significant enough" to survive motion to dismiss).

analyses in June and December 2008 excluded him as the source of the DNA found on his accuser's clothing; the officers in his case never investigated his alibi or two other men identified by his accuser as the possible assailant; police refused his accuser's request to see Humbert in a line-up or hear his voice; and in July 2009, the person who led the Police Department's internal disciplinary system during part of Humbert's detention publicly accused the department of failing to punish officers' misconduct. Compl. ¶¶ 44, 91, 99, 104, 107. Collectively, these allegations provide more than a mere "formulaic recitation of the elements of a cause of action,"[18] even if Humbert may not ultimately prevail on his claim.[19] Thus, the Court will deny the City and Police Department's motions to dismiss Humbert's § 1983 claims.

---

[18] *Twombly*, 550 U.S. at 555.

[19] *Iqbal*, 129 S. Ct. at 1949; *Twombly*, 550 U.S. at 556 ("a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable"). *See also Tshamba*, 2011 WL 2935037, at *5 (denying Police Department's motion to dismiss a § 1983 claim even though the complaint "[did] not specifically detail" how the Police Department allegedly mishandled an officer's past misconduct; "such evidence [would] become available through discovery"); *White v. Van Duncan*, Case No. 10-0014, 2010 WL 2813492, at *2 (W.D.N.C. July 15, 2010) (allowing police misconduct case to reach discovery phase when plaintiff alleged that sheriff knew about a pattern of similar illegal events involving his subordinates; the allegations, if true, stated a claim under § 1983).

b. Dixon and Bealefeld's Liability

Humbert has sued Dixon and Bealefeld in their official and individual capacities,[20] alleging that they improperly supervised the Police Department and conspired to withhold exculpatory evidence, ignore tips about other suspects, use an unduly suggestive identification procedure, and falsely arrest and maliciously prosecute Humbert. Compl. 40-43, 46-54. Dixon and Bealefeld counter that the allegations fail to show that either personally participated in any harm against Humbert or had the requisite knowledge or authority to redress others' misconduct. ECF No. 6, Ex. 1 at 6-7; ECF No. 15, Ex. 1 at 9-11.

Although *respondeat superior* liability is not available in § 1983 cases,[21] a defendant may be held accountable for another's misconduct under a theory of supervisor liability. To prevail under this theory, a plaintiff must show:

> (1) that the supervisor had actual or constructive knowledge that his subordinate was engaged in conduct that posed "a pervasive and unreasonable risk" of constitutional injury to citizens like the plaintiff; (2) that the supervisor's response to that knowledge

---

[20] An "official capacity suit is, in all respects other than name, to be treated as a suit against the entity." *Kentucky v. Graham*, 473 U.S. 159, 166 (1985)). "[T]o establish personal liability in a § 1983 action, it is enough to show that the official, acting under color of state law, caused the deprivation of a federal right." *Id.*

[21] *Love-Lane v. Martin*, 355 F.3d 766, 782 (4th Cir. 2004) ("there is no respondeat superior liability under § 1983).

> was so inadequate as to show "deliberate indifference to or tacit authorization of the alleged offensive practices,"; and (3) that there was an "affirmative causal link" between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff.

*Shaw v. Stroud*, 13 F.3d 791, 799 (4th Cir. 1994). This theory recognizes that "supervisory indifference or tacit authorization of subordinates' misconduct may be a causative factor in the constitutional injuries they inflict." *Id.* at 798 (internal quotation marks omitted). "[T]here is no limit to the reach of supervisory liability and it can extend 'to the highest levels of state government . . . by pinpointing the persons in the decisionmaking chain whose deliberate indifference permitted the constitutional abuses to continue unchecked.'" *Brown*, 2011 WL 2935037, at *6 (quoting *Shaw*, 13 F.3d at 798).

The police commissioner supervises the "affairs and operations" of the Police Department.[22] The Baltimore City mayor appoints the police commissioner, subject to the city council's approval, and has the sole power to fire the commissioner for cause.[23] This Court has recognized the mayor and city council's "involvement in and knowledge of the affairs of the [Police Department]." *Mason*, 1995 WL 168-37, at *3.

---

[22] *Mayor & City Council of Balt. v. Clark*, 404 Md. 13, 25, 944 A.2d 1122, 1129 (2008); Code of Public Local Laws of Baltimore City § 16-4.

[23] *Id.* at 16, 944 A.2d at 1124; Code of Public Local Laws of Baltimore City § 16-5.

The Court will deny Bealefeld and Dixon's motions to dismiss the § 1983 claims. Humbert has properly alleged that Bealefeld had actual or constructive knowledge of officers' misconduct, such as ordering crime lab technicians not to follow up on DNA found at crime scenes. That the police allegedly did so in at least nine cases makes it plausible that Bealefeld had a "policy of inaction" with respect to his subordinates' DNA collection and processing. *See Brown*, 2011 WL 2935037, at *6. Because Humbert's constitutional harm involved continued detention despite exculpatory DNA evidence, he has sufficiently pled an affirmative causal link between Bealefeld's inaction and his injury. *See Shaw*, 13 F.3d at 799. The allegations of police misconduct are so significant that even the mayor should have known about it. *See Brown*, 2011 WL 2935037, at *7. Accordingly, the Court will deny the motions to dismiss the § 1983 claims against Bealefeld and Dixon.

c. O'Malley's Liability

Humbert brought the same claims against O'Malley in his individual and official capacities. Compl. 40-43, 46-54. O'Malley counters that (1) the Eleventh Amendment to the federal constitution shields him against the suit in his official capacity, and (2) he lacked any supervisory authority over the Police Department to be liable in his individual capacity. ECF No. 7, Ex. 1 at 3-7.

20

A suit against a state official in his official capacity
"is no different from a suit against the State itself." *Will v.
Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989). Under the
Eleventh Amendment, a private litigant cannot sue a state in
federal court,[24] unless the state has expressly waived immunity[25]
or Congress has "unequivocally expressed its intent to abrogate
the immunity."[26] Maryland has not waived immunity,[27] nor has
Congress abrogated it.[28] Thus, the Court must dismiss all
Humbert's claims against O'Malley in his official capacity.[29]

Humbert's claims against O'Malley in his individual
capacity also must fail. The police commissioner, not the

---

[24] *E.g.*, *P.R. Aqueduct & Sewer Auth. v. Metcalf & Eddy, Inc.*, 506
U.S. 139, 144 (1993).

[25] *Coll. Sav. Bank v. Fla. Prepaid Postsecondary Ed. Expense Bd.*,
527 U.S. 666, 675-76 (1999).

[26] *Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 55 (1996)
(internal citation and quotation marks omitted).

[27] Md. Code Ann., State Gov't § 12-103(2) (Maryland Tort Claims
Act does not waive "any defense that is available under the
[Eleventh] Amendment to the United States Constitution").

[28] *See Quern v. Jordan*, 440 U.S. 332, 345 (1979) (§ 1983 does not
abrogate states' immunity under Eleventh Amendment).

[29] To the extent that Humbert has sued O'Malley in his former
official capacity as mayor, the claims still fail. *See* Fed. R.
Civ. P. 25(d) (when a defendant sued in his official capacity no
longer holds the office, "[t]he officer's successor is
automatically substituted as a party"); *Mathie v. Fries*, 121
F.3d 808, 818 (2d Cir. 1997) ("A claim against a person 'in his
former official capacity' has no meaning.").

governor, supervises the policies, practices, and actions of the Police Department. Code of Public Local Laws of Baltimore City § 16-4. The mayor, not the governor, appoints and has power to remove the police commissioner. *Id.* at § 16-5. Humbert has alleged no facts that link O'Malley personally to his arrest or any Police Department policy or custom. Thus, the Court will dismiss the § 1983 claims against O'Malley in his official and individual capacities.

### d. Caldwell's Liability

Humbert asserts the same § 1983 claims against lab technician Caldwell, *see* Compl. 41-43, 46-54, who counters that Humbert's complaint is "completely lacking of any factual allegations" to support those claims. ECF No. 15, Ex. 1 at 12. The Court agrees. Humbert has alleged only that Caldwell did her job: she processed the crime scene, found no physical evidence of rape or robbery, took pictures of a wallet and bank card, and wrote a report.[30] Compl. ¶¶ 49, 52, 54, 55. Humbert further alleged that the Defendants "wilfully ignored and/or were deliberately indifferent" that Caldwell found no evidence implicating Humbert and never provided pictures Caldwell took of the wallet and bank card. Compl. ¶¶ 55, 59. Nothing in the

---

[30] Humbert alleges that Caldwell's account stands "in stark contrast" to the Victim's initial report and the Defendants were aware of the "materially different" versions. Compl. ¶¶ 50, 51. This fails to suggest any wrongdoing by Caldwell.

complaint indicates that Caldwell had anything to do with events after her review of the crime scene. Accordingly, the Court will dismiss all the § 1983 claims against Caldwell in her official and individual capacities.

2. § 1985 (Counts 4-6)

Humbert alleges that all the Defendants conspired to violate his civil rights under subsections (2) and (3) of 42 U.S.C. § 1985. Compl. 43-46.

a. § 1985(2) (Counts 4 and 5)

Subsection (2) of § 1985 contains five clauses[31]; Humbert alleges violations of the first and fourth. Compl. 43-45.

The first clause of § 1985(2) provides a cause of action against those who "conspire to deter, by force, intimidation or threat, any party or witness in any court of the United States from attending such court, or from testifying to any matter pending therein, freely, fully and truthfully." 42 U.S.C. § 1985(2). Humbert asserts that the Defendants conspired to keep the Victim and members of the Police Department from testifying on Humbert's behalf or otherwise disclosing exculpatory information. Compl. 44-45. The Defendants argue that Humbert has not alleged facts sufficient to state a claim. ECF No. 6, Ex. 1 at 8-9; ECF No. 7, Ex. 1 at 1-2; ECF No. 15, Ex. 1 at 8-9,

---

[31] *Sellner v. Panagoulis*, 565 F. Supp. 238, 245 (D. Md. 1982), analyzes each clause.

12.  The Court need not consider Defendants' specific

contentions because Humbert lacks standing.[32]  Accordingly, the

Court will dismiss Count 5.

The fourth clause of § 1985(2) provides a cause of action

against those who "conspire for the purpose of impeding,

hindering, obstructing, or defeating, in any manner, the due

course of justice in any State or Territory, with intent to deny

to any citizen the equal protection of the laws."  42 U.S.C. §

1985(2).  A plaintiff must show that the defendants "were

motivated by racial or other class-based, invidiously

discriminatory animus."  *Sellner*, 565 F. Supp. at 246.[33]  Dixon

and the City argue that Humbert has failed to allege such

---

[32] *See Burch v. Snider*, 461 F. Supp. 598, 600 (D. Md. 1978) ("The
statute creates a cause of action for 'parties' only insofar as
they are themselves deterred from . . . testifying or attending
federal court.  The plain words of the statute do not give
parties a right to sue based on intimidation of their
witnesses.").  Humbert has not alleged that he was deterred from
testifying, or that the testimony would have occurred in federal
court.

[33] *See also Scott v. Mountain Mission Sch.*, 809 F.2d 786, 1987 WL
36169, at *2 (4th Cir. 1987) (per curiam) (affirming district
court's dismissal of § 1985(2) claim for failure to allege a
racial or other class-based animus).  *Accord Daigle v. Gulf
State Utils. Co.*, 794 F.2d 974, 979 (5th Cir. 1986) (race or
class-based animus required for § 1985(2) conspiracy to deny
equal protection of the laws); *Harrison v. Springdale Water &
Sewer Comm'n*, 780 F.2d 1422, 1429 (8th Cir. 1985) (same); *Bretz
v. Kelman*, 773 F.2d 1026, 1029 (9th Cir. 1985) (same); *Williams
v. St. Joseph Hosp.*, 629 F.2d 448, 451 (7th Cir. 1980) (same);
*Dacey v. Dorsey*, 568 F.2d 275, 277 (2d Cir. 1978) (same), *cert.
denied*, 436 U.S. 906 (1978); *Brawer v. Horowitz*, 535 F.2d 830,
840 (3d Cir. 1976) (same); *Hahn v. Sargent*, 523 F.2d 461, 429
(1st Cir. 1975) (same), *cert. denied*, 425 U.S. 904 (1976).

animus. ECF No. 6, Ex. 1 at 9. Humbert concedes that some of
his § 1985 claims lack "allegations of racial or other class
based discrimination" and that this Court "will likely dismiss
the causes of action." ECF No. 20, Ex. 1 at 30. He is right.
Because Humbert has failed to allege race or class-based
discriminatory animus, the Court must dismiss Count 4 of his
complaint.

b. § 1985(3) (Count 6)

Like the fourth clause of subsection (2), subsection (3) of
§ 1985 requires the plaintiff to show that the conspiracy
involves two or more people "motivated by a specific class-
based, invidiously discriminatory animus." *Simmons v. Poe*, 47
F.3d 1370, 1376 (4th Cir. 1995). Humbert has failed to show
such animus, and the Court will dismiss Count 6.

3. State Law Claims (Counts 11-19)

Humbert asserts that all the Defendants except the City and
the Police Department conspired to violate his rights under the
Maryland Declaration of Rights, and committed battery, false
arrest, abuse of process, malicious prosecution, intentional
infliction of emotional distress, conspiracy to commit those
torts, and negligence. Compl. 55-70.

a. O'Malley's liability

Humbert asserts his state law claims against O'Malley in
his official and individual capacities. Compl. 55-70. The

Eleventh Amendment bars the official capacity claims.  *See supra* Part II.B.1.c.  O'Malley argues that he also enjoys immunity in his individual capacity, and Humbert has failed to allege sufficient facts to state a claim, in any event.  ECF No. 7, Ex. 1 at 5-7.

The Maryland Tort Claims Act "insulate[s] state employees generally from tort liability if their actions are within the scope of employment and without malice or gross negligence."[34] To establish malice, a plaintiff must show "evil or wrongful motive, intent to injure, knowing and deliberate wrongdoing, ill-will or fraud."  *Lee*, 384 Md. at 268, 863 A.2d at 311 (internal quotation marks and citation omitted).  Gross negligence is "something more than simple negligence."  *Newell v. Runnels*, 407 Md. 578, 638, 967 A.2d 729, 764 (2009) (internal quotation marks omitted).  "[A] wrongdoer is guilty of gross negligence . . . only when he inflicts injury intentionally or is so utterly indifferent to the rights of others that he acts as if such rights did not exist."  *Taylor v. Harford Cnty. Dep't of Soc. Servs.*, 384 Md. 213, 229, 862 A.2d 1026, 1035 (2004).  A

---

[34] *Lee v. Cline*, 384 Md. 245, 261, 863 A.2d 297, 307 (2004); Md. Code Ann., State Gov't § 12-105; Md. Code Ann., Cts. Jud. Proc. § 5-522(b).  Immunity under the Act encompasses constitutional torts and intentional torts, *Lee*, 384 Md. at 266, 863 A.2d 310, and applies irrespective of whether the state employee is sued in his official capacity or individually, *Higginbotham v. Pub. Serv. Comm'n*, 412 Md. 112, 130, 985 A.2d 1183, 1193 (2009).

plaintiff must not "rely on bare allegations," but "must point to specific evidence that raises an inference that the defendant's actions were improperly motivated."[35]

The Court will grant O'Malley's motion to dismiss the state law claims against him. Humbert argues that the Tort Claims Act provides no protection to O'Malley, because he has alleged that O'Malley acted with malice and/or gross negligence. ECF No. 16, Ex. 1 at 30. But Humbert's bare allegations do not suffice. He asserts that, as mayor, O'Malley introduced a policy that encouraged false arrests, and, as governor, O'Malley "is responsible for implementing programs and managing resources . . . to protect the public safety." Compl. ¶ 17. But nowhere does he show evil or wrongful motive, intent to injure, knowing and deliberate wrongdoing, ill-will, fraud, or utter indifference. *See Chinwuba*, 142 Md. App. at 382-83, 790 A.2d at 116; *Taylor*, 384 Md. at 229, 862 A.2d at 1035. Moreover, Humbert has pled no facts linking O'Malley personally to his constitutional injury. Accordingly, the Court will dismiss the state law claims against O'Malley in his individual capacity.

---

[35] *Chinwuba v. Larsen*, 142 Md. App. 327, 382-83, 790 A.2d 83, 116 (2002) (internal citations omitted), *rev'd in part on other grounds*, 377 Md. 92, 832 A.2d 193 (2003).

b. Bealefeld's liability

Humbert brings all the same claims against Bealefeld in his official and individual capacities. Compl. 55-70. Bealefeld argues that the claims fail because he is immune to the negligence claims, and *respondeat superior* does not apply. ECF No. 15, Ex. 1 at 11. Humbert counters that he has sufficiently pled malice and/or gross negligence to defeat immunity, and sufficiently pled conspiracy to establish Bealefeld's liability indirectly. ECF No. 20, Ex. 1 at 23-25.

Under the doctrine of *respondeat superior*, an employer may be jointly and severally liable for the torts committed by an employee acting within the scope of his employment. *S. Mgmt. Corp. v Taha*, 137 Md. App. 697, 719, 769 A.2d 962, 975 (2001), *vacated on other grounds*, 367 Md. 564, 790 A.2d 11 (2002). But a manager may only be liable for a subordinate's tortious conduct if he "participated in or directed the conduct." *Balt. Police Dep't v. Cherkes*, 140 Md.App. 282, 333, 780 A.2d 410, 440 (2001).

A civil conspiracy is a combination of two or more people who agree to accomplish an unlawful act or to use unlawful means to accomplish a legal act. *Green v. Wash. Suburban Sanitary Comm'n*, 259 Md. 206, 221, 269 A.2d 815, 824 (1970). A plaintiff may prove conspiracy circumstantially by the "nature of the acts complained of, the individual and collective interest of the

28

alleged conspirators, the situation and relation of the parties at the time of the commission of the acts, the motives which produced them, and all the surrounding circumstances proceeding and attending the culmination of the common design." *W. Md. Dairy v. Chenowith*, 180 Md. 236, 243-44, 23 A.2d 660, 664 (1942).

The Court will grant in part and deny in part Bealefeld's motion to dismiss. Humbert has sufficiently pled negligent hiring and supervision. Although a state employee cannot be held liable for ordinary negligence,[36] Humbert has alleged facts that show Bealefeld's indifference to his officers' mishandling of DNA evidence in at least nine cases.[37] This amounts to gross negligence sufficient to overcome Bealefeld's claim of immunity. Humbert has failed, however, to sufficiently plead Bealefeld's liability on the other state law claims. *Respondeat superior* does not apply, because Humbert has not alleged that Bealefeld was personally involved in or directed the unlawful acts. *See Cherkes*, 140 Md.App. at 333, 780 A.2d at 440. Humbert also has failed to allege an agreement necessary to plead civil

---

[36] *See Lee*, 384 Md. at 261, 863 A.2d at 307; *Newell*, 407 Md. at 638, 967 A.2d at 764.

[37] *See Taylor*, 384 Md. At 229, 862 A.2d at 1035.

conspiracy.[38]  *See Green*, 259 Md. at 221, 269 A.2d at 824. Accordingly, the Court will deny Bealefeld's motion to dismiss the negligent hiring and supervision claim but grant it as to the remaining state law claims.

> c. Dixon's Liability

Humbert brings the same state law claims against Dixon, *see* Compl. 55-70, who also argues that immunity, the lack of *respondeat superior* liability, and the absence of sufficiently pled facts require dismissal of the claims against her.  ECF No. 6, Ex. 1 at 9-11.  Humbert counters that Dixon is not entitled to immunity.  ECF No. 16, Ex. 1 at 34-36.

The Court will dismiss the state law claims against Dixon. As mayor, Dixon had the power to fire Bealefeld, but she lacked the authority to supervise or fire the officers who allegedly committed the torts against Humbert.[39]  Thus, the Court will dismiss the negligent hiring and supervision claim against

---

[38] Although conspiracy can be proven with circumstantial evidence, *see Chenowith*, 180 Md. at 243-44, 23 A.2d at 664, Humbert has alleged facts that tend to show that Bealefeld was deliberately or utterly indifferent to the officers' misconduct, not that he conspired to commit such unlawful acts.

[39] Although courts applying Maryland law have recognized the City's potential liability for police misconduct in § 1983 claims, *see, e.g.*, *Hector*, 558 F. Supp. at 197-99, they have consistently rejected liability in state tort claims, *see, e.g.*, *Clea*, 312 Md. at 669, 541 A.2d at 1306 ("it is clear that the Mayor and City Council of Baltimore would not be liable for [a police officer's] alleged tortious conduct").

Dixon. The other state law claims also must fail: Humbert has not alleged that Dixon was personally involved in the torts against him, or that she conspired to commit any of the torts.[40] *Respondeat superior* does not apply.[41] Thus, the Court will dismiss the state law claims against Dixon.

d. Caldwell's Liability

Humbert also asserts all the state law claims against Caldwell, except negligent hiring and supervision. Compl. 55-64, 66-70. Caldwell argues that Humbert has alleged no facts to support those claims. ECF No. 15, Ex. 1 at 12. The Court agrees. As with his § 1983 claims,[42] Humbert has failed to allege sufficient factual support for his state law claims against Caldwell. Thus, the Court will dismiss all state law claims against Caldwell in her official and individual capacities.

In sum, the Court will dismiss the § 1983 claims against O'Malley and Caldwell but not against the City, Police

---

[40] Humbert has alleged facts tending to show that the City and, therefore, Dixon were deliberately indifferent to a Police Department policy or custom of requiring false arrests and withholding and fabricating evidence. This falls short of pleading an agreement by Dixon to commit torts against Humbert. *See supra Green*, 259 Md. at 221, 269 A.2d at 824.

[41] *See Clea*, 312 Md. at 668, 541 A.2d at 1306 ("no liability ordinarily attaches to Baltimore City under the doctrine of respondeat superior for the torts of Baltimore City police officers acting within the scope of their employment").

[42] *See supra* Part II.B.1.d.

31

Department, Dixon, and Bealefeld; grant all the Defendants'
motions to dismiss as to the § 1985 claims; dismiss the state
law claims against O'Malley, Caldwell, and Dixon; and dismiss
all the state law claims against Bealefeld, except negligent
hiring and supervision.

III. Conclusion

For the reasons stated above, O'Malley's motion (ECF No. 7)
will be granted, the City and Dixon's motion (ECF No. 6) will be
granted in part and denied in part, and the Police Department,
Bealefeld, and Caldwell's motion (ECF No. 15) will be granted in
part and denied in part.

_____11/28/11_____
Date

_____
William D. Quarles, Jr.
United States District Judge