IN THE UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF MARYLAND, NORTHERN DIVISION

|  |  |
|---|---|
| MARLOW HUMBERT, | * |
| Plaintiff, | * |
| | * |
| v. | *   CIVIL NO.: WDQ-11-0440 |
| | * |
| MARTIN O'MALLEY, *et al.*, | * |
| Defendants. | * |

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

MEMORANDUM OPINION

Marlow Humbert sued several police officers and others[1] for constitutional violations under 42 U.S.C. § 1983 and state law claims. ECF No. 1. Pending are five police officers' motions for summary judgment and to strike Humbert's response in opposition. ECF Nos. 74, 120. No hearing is necessary. Local Rule 105.6 (D. Md. 2011). For the following reasons, the motion

---

[1] Humbert sued: (1) Baltimore City police officers Chris Jones, Keith Merryman, Caprice Smith, Dominick Griffin, and Michael Brassell, in their individual and official capacities (together, the "police defendants"); (2) Martin O'Malley, individually and in his official capacity as Governor of the State of Maryland and former Mayor of the city of Baltimore; (3) the Mayor and City Council of Baltimore City; (4) Sheila Dixon, the former Mayor of Baltimore City, individually; (5) the Baltimore City Police Department (the "Police Department"); (6) Frederick Bealefeld, individually and in his official capacity as Police Commissioner of the Police Department; (7) Cinese Caldwell, individually and in her official capacity as a Baltimore City laboratory technician and police officer; and (8) Baltimore City police officers John and Jane Does 1-20s and Baltimore City police supervisors Richard and Jane Roes 1-20s, in their individual and official capacities. ECF No. 1 at 8-14.

for summary judgment will be granted in part and denied in part, and the motion to strike will be denied.

I. Background[2]

A. Report and Investigation of Rape

On April 29 or 30, 2008,[3] a woman[4] told police that she had been raped at her home in Baltimore's Charles Village neighborhood.[5] *See* ECF No. 74-2 at 3; Pl. Exs. A at 1, E at 17, I. She was interviewed by Sergeant Jones and Detective Griffin shortly thereafter. *See* ECF No. 74-2 at 3. The Victim reported that, while walking home from the store, she had observed a man standing on a porch near her home. *See id.* She walked past the man, opened her front door, turned around, and discovered that he had followed her into her apartment. *See id.* The man put on a white face mask and black gloves and placed a black handgun to

---

[2] The facts are taken from the police defendants' motion for summary judgment, ECF No. 74, Humbert's opposition, ECF No. 121, the police defendants' reply, ECF No. 136, and their supporting exhibits. In reviewing a motion for summary judgment, the nonmovant's evidence "is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

[3] The record lists both dates in various places. *See, e.g.*, ECF No. 74-2 at 3; Pl. Ex. A at 1.

[4] Although the woman is referred to by name in the parties' submissions, because she is not a party to the lawsuit the Court will refer to her as the "Victim."

[5] This was one of a series of sexual assaults in the Charles Village area during the spring of 2008. *See* Pl. Exs. D at 23, F at 19-20.

her head. *See id.* He demanded money, but she told him she had no money. *See id.* The man then pushed her onto a nearby couch and raped her. *See id.* He told her that he had a condom on, but she did not remember him stopping to put on the condom. *See id.* He then ordered her to go into the basement and took her cell phone. *See id.* However, when she told him she had a young son and needed the phone to call someone to pick him up, the man apologized and left the phone in the home. *See id.* He then left through the front door. *See id.*

The Victim described her assailant as a fairly well-spoken black man in his early to mid-30s, five-foot-seven to five-foot-nine inches tall,[6] and wearing a blue T-shirt with a pink logo and tennis shoes.[7] *See id.* After taking her statement, Detective Griffin accompanied the Victim to the hospital for a medical examination. *See* ECF No. 74-2 at 4; Pl. Ex. E at 18. A

---

[6] Humbert is five-foot-five inches tall and has noticeable cosmetic problems with his teeth. ECF No. 136-10 at 16; *see* Pl. Ex. C at 47-48.

[7] In a declaration dated January 24, 2013, the Victim avers that her description "[c]learly" did not describe Humbert. Pl. Ex. A at 1, 3. She also states that officers "insisted" repeatedly that the man who raped her was homeless, but she "insisted" in return that she "knew nothing about the life circumstances of the man who raped [her]." *Id.* at 1. Detective Griffin testified that he did not remember suggesting to her that her assailant might be homeless. Pl. Ex. E at 18. Detective Smith said only that one of the leads given to her to investigate was a homeless man. Pl. Ex. D at 27. Humbert was homeless when the rape occurred. ECF No. 136-10 at 10-11.

laboratory technician searched the Victim's home for physical evidence, but none was recovered. Pl. Ex. K.

Over the next few days, officers interviewed the Victim's neighbors but were unable to locate any witnesses to the crime. *See* ECF No. 74-2 at 4-5. They reviewed surveillance footage from exterior cameras on a school located across the street from the Victim's home. *See id.* at 3, 5. Although the cameras captured the Victim walking down the street on the night of the rape, no other "persons of interest were observed prior to seeing the victim or after the incident." *See id.* at 5. Also, the porch on which the Victim saw the man initially was not visible on the video, and the video moved so that parts of the surveillance area were not shown for minutes at a time. *See id.* at 3, 5; Pl. Ex. C at 32.

After the attack, the Victim--a trained artist--completed a sketch of her attacker. Pl. Ex. A at 1. The Victim declares that officers told her "they were unsatisfied with the subject matter," and she had to complete a composite with a police sketch artist.[8] *Id.* Detectives Smith and Brassell and Sergeant Jones testified that the Police Department would not allow victims to create sketches in lieu of creation of a composite by

---

[8] Detectives Smith and Griffin testified that they were unaware that the Victim had created her own sketch. Pl. Exs. D at 34, E at 19-20.

4

a police sketch artist. *See* Pl. Exs. C at 66-69, D at 34, G at 11.

On May 1, 2008, Detective Griffin and Sergeant Jones took the Victim to meet with Detective Brassell, a sketch artist.[9] ECF No. 74-2 at 5. Detective Brassell completed a composite sketch that was reproduced on flyers which were distributed in the area around the Victim's home. *See id.* The Victim declares that "the features of [her] assailant from [her] sketch" and her "communications with the sketch artist were not incorporated into the composite sketch." Pl. Ex. A at 1. However, Detective Brassell noted that all sketches are graded by the witness from one to 10, and only sketches graded seven and above are used to identify suspects. *See* ECF No. 136-8 at 18-22.

On May 5, 2008, Detective Smith met with the Victim and showed her 45 photos of registered sex offenders. *See* ECF No. 74-2 at 6; Pl. Ex. D at 37-40 & #4.[10] After reviewing the book of photos, the Victim stated that two of the photos resembled

---

[9] Detective Brassell testified that, if a victim produced a sketch of her attacker, he would not see the sketch because it would "defeat[] the purpose of [his] drawing." Pl. Ex. G at 12. Further, the composite that he produced would be under the "total control" of the witness--the officers on the case would not contribute any feedback on the drawing. *Id.* at 14-16. He also noted that only "[v]ery rarely" would the detectives on the case follow up with him on whether the drawing produced any leads. *Id.* at 13.

[10] Documents identified by "#" indicate an exhibit to a deposition.

her attacker but did not identify either of them as her attacker. *See* ECF No. 74-2 at 6; Pl. Ex. D at #4, #5. She declares that she told the officers that she needed to see suspects in person and hear their voices to identify her attacker. Pl. Ex. A at 2.

On May 7, 2008, a police officer[11] stopped Humbert on the street near the Victim's home and photographed him. *See* ECF No. 136-10 at 31; Pl. Exs. C at 42, D at #6. After the stop, the officer placed Humbert "on a list of potential suspects due to the similarities between [his] likeness and the composite." *See* ECF No. 74-5 at 7.

On May 8, 2008, Detectives Smith and Griffin showed the Victim an array of photos[12] which included "photos of men who had been arrested in the area for other offenses[,] those identified from leads from the composite flyer," and Humbert's photo.[13] ECF Nos. 74-2 at 9, 74-5 at 7. The Victim wrote on Humbert's photo "that's him," *see* ECF No. 136-7 at 1-2, but her reaction to Humbert's photo is otherwise disputed. The investigative notes, and the testimony of Smith and Griffin, maintain that the Victim

---

[11] This officer is not a named defendant. *See* ECF No. 74-5 at 7.

[12] When Humbert's counsel asked Detective Smith if she used a "mug book of sorts" to show the Victim the photos, she responded "I think you're using jargon." Pl. Ex. D at 43.

[13] The Victim declares that neither of the photo arrays she was shown displayed skin tone, which prevented her from making a positive identification. Pl. Ex. A at 2.

6

saw Humbert's photo, pointed at it, and said "that's him." *See*
ECF No. 74-2 at 9; Pl. Exs. D at 48 & #6, E at 24.  The notes
and Detective Griffin also state that the Victim became
emotional when she saw the photo, but the officers encouraged
her to review the rest of the photographs, and the Victim again
affirmed that the pictured man was her attacker. *See* ECF No.
74-2 at 9; Pl. Ex. E at 34-35.  However, the Victim declares
that she saw Humbert's photo, said that "might" be him, and told
the officers that she wanted to see "all the people who might
have been my attacker in person and to hear their voices."  Pl.
Ex. A at 2.  She declares that she was "made to sign something,
and despite my protests, was assured that it was just
procedure." *Id.*  She also declares that the officers told her
that no arrests would be made until she saw the suspects in
person and heard their voices. *Id.*  Detectives Smith and
Griffin testified that they did not remember the Victim
requesting to see the suspect in person or to hear his voice.[14]
Pl. Exs. D at 44, E at 24.

_____

[14] Detective Smith also testified that, even if the Victim
requested a physical line-up, she did not believe that she could
"facilitate that request" because she had never seen a physical
line-up done at the Police Department.  Pl. Ex. D at 45.
Sergeant Jones confirmed that he had never seen the Police
Department conduct physical line-ups. *See* ECF No. 136-6 at 31,
40.

B. Humbert's Arrest

On May 9, 2008, Detective Smith applied for an arrest warrant for Humbert.[15] ECF No. 74-4 at 4-5. The warrant application summarized the Victim's description of the rape and noted that, during the investigation, "the victim completed a sketch of the suspect [that] was disseminated throughout the community." *Id.* at 5. The application then stated that the sketch resulted in "[s]everal leads . . . one of which [led] to Marlow Humbert." *Id.* His photograph was then shown to the Victim, "along with several other similar photographs, when the victim positively identified him as her attacker."[16] *Id.* Based on this application, a judge issued a warrant for Humbert's arrest. Pl. Ex. Q.

---

[15] Detective Smith testified that she wrote the warrant application herself, but Sergeant Jones--her supervisor--and Detective Griffin--her partner--would have relayed to her some of the information that she included in the application. Pl. Ex. D at 53-54. They also likely would have discussed "whether or not there was a positive identification." *Id.* at 52. However, Detective Smith stated that there was no indication on the warrant that a supervisor had reviewed the warrant application. *Id.*

[16] Detective Smith testified that, if the Victim had requested to see a physical and voice line-up, she still would have considered the Victim's selection of the photo as reflected in the investigative notes (stating "that's him and pointing at it) a "positive identification." *See* Pl. Ex. D at 50-51. She also agreed with Humbert's counsel that the Victim's identification was the only evidence in the warrant application specific to Humbert. *See id.* at 55-56.

8

On May 10, 2008, Officer Larry Smith[17] arrested Humbert.
ECF Nos. 74-2 at 10, 74-4 at 1. Detective Merryman interviewed
Humbert, who waived his *Miranda* rights. Pl. Ex. R. Humbert
denied any wrongdoing and "ended the interview by stating he had
nothing more to say and he was going to get a good lawyer." ECF
No. 74-2 at 10-11.

The Victim declares that, after she learned Humbert was
arrested, "she called the investigators and again told them that
[she] could not identify anyone until [she] was able to see the
men in person and hear their voices." Pl. Ex. A at 2. She was
told "it was procedure to make arrests absent a witness'
identification of a potential suspect." *Id.*

C. Post-Arrest Investigation

On May 14, 2008, pursuant to a search warrant, officers
obtained oral swabs of Humbert's DNA. ECF No. 74-2 at 11. They
were submitted to the police crime lab with the request that the
lab compare them to DNA evidence recovered from the Victim. *Id.*

In a report dated May 27, 2008,[18] the Police Department
crime lab found the DNA of at least two unknown persons in the
Victim's underwear and at least two more on her stockings. Pl.

---

[17] This Officer Smith is not a named defendant.

[18] Sergeant Jones noted that the date on the report indicates the
date the report was generated, not the date it was sent to the
investigator or the State's Attorney's Office. *See* ECF No. 136-
6 at 45-47.

Ex. M. In a report dated June 2, 2008 and addressed to
Detective Griffin,[19] "the crime lab excluded [Humbert] as the DNA
contributor to the Sample taken from [the Victim]." *Id.*; ECF
No. 74-5 at 8. In a second report dated December 15, 2008 and
also addressed to Detective Griffin, Humbert was again excluded
as a DNA contributor to the sample taken from the Victim.[20] Pl.
Ex. N.

Another victim--who had been raped on March 30, 2008 on
Bolton Street in Baltimore--had told officers that her attacker
used a Trojan Magnum condom in a gold foil wrapper during the
rape. *See* ECF Nos. 74-3 at 3, 74-8 at 1-2. On March 31, 2008,
Detective Elkner[21] discovered a condom wrapper matching that
description near the victim's home, and she confirmed that it

---

[19] Detective Griffin testified that he would not automatically
send DNA reports to the State's Attorney's Office upon receipt,
because he "would assume that everything [he has], the State's
Attorneys have, so they would already have it. Because if it's
sent to [him], it's sent to them." *See* Pl. Ex. E at 14.
However, if the State's Attorney's Office requested a copy of
the report, he would send it, even if he was awaiting a second
set of results. *See id.* at 15-16. Detective Smith similarly
noted that, in her experience, "the State's Attorneys call the
DNA labs themselves and get the results." *See* Pl. Ex. D at 64-
65.

[20] Detective Merryman also received a copy of this report. Pl.
Ex. F at 12-14. He testified that he passed the results on to
the lead detective in the case, Detective Smith. *See id.* at 14-
15. He also noted that he had very little involvement with the
investigation overall. *See id.* at 16.

[21] Detective Elkner is not a named defendant in this case.

was the same type her attacker had used. *See* ECF Nos. 74-3 at 3, 74-8 at 4; Pl. Ex. C at 36-38. On May 14, 2008, she viewed Humbert's picture in a photo array and said he looked "30%-80%" like her attacker. ECF Nos. 74-5 at 4, 74-8 at 12. In a report dated June 10, 2008, Humbert's DNA was identified on the condom wrapper, along with the DNA of two other unknown individuals. *See* ECF No. 136-11 at 13-14. Humbert was not charged with this rape[22] or the rape of a third victim who also viewed Humbert's picture and said he strongly resembled her attacker. *See* ECF Nos. 74-5 at 4, 74-8 at 13.

D. Humbert is Charged

Assistant State's Attorney Tan was assigned to prosecute Humbert for the rape of the Victim. ECF No. 74-6 at 1. On June 23, 2008, Humbert was arraigned on one charge of rape and pled not guilty. ECF No. 74-7 at 1, 5.

The Victim attended the arraignment. Pl. Ex. A at 2. There is conflicting evidence about her actions there. The Victim declares that she told officers at the arraignment that she "could not identify Mr. Humbert and that after seeing him in person, [she] had even more doubt as to whether he was [her]

---

[22] Assistant State's Attorney Joakim Tan told investigators that, because of "the lack of indisputable DNA evidence from the recovered condom," and the relative weakness of the victim's identification, there was insufficient evidence to prosecute Humbert on this rape charge. *See* ECF No. 74-8 at 12-13.

11

attacker." *Id.* In contrast, in an affidavit dated October 25, 2012 (the "October Affidavit"), Tan avers that the Victim "expressed certainty that Mr. Humbert was her attacker at [the] arraignment." ECF No. 74-6 at 1. However, in a declaration dated January 24, 2013 (the "January Declaration"), Tan states that, at the arraignment, the Victim nodded at him from the audience. Pl. Ex. B. at 1. He took this gesture to be a positive identification of Humbert "against the backdrop of the investigator's assertions that the victim had made a positive identification of Mr. Humbert as her attacker." *Id.* He states that the investigators never told him "that the victim was unable to make a positive identification" and was even less sure about her identification after attending the arraignment. *Id.*

According to a transcript of the arraignment proceeding, Tan told the Court in the presence of defense counsel that he had heard--but had not confirmed--that Humbert's DNA did not match any DNA recovered from the Victim but did match another pending rape case. ECF No. 74-7 at 3. In the October Affidavit, however, Tan avers that he could "not remember the date [he] became aware" that Humbert was excluded as a DNA contributor. ECF No. 74-6 at 1. Finally, in the January Declaration, Tan states that he is "unable to state for certain if the investigators informally informed [him] about the DNA

12

results," because of "the erosion of time," but he did not receive the formal reports until May 2009. Pl. Ex. B at 1.

The evidence is unclear about how the DNA results affected Tan's decision to continue to pursue charges against Humbert. In the October Affidavit, Tan notes that "[g]iven the nature of the case, a rape that allegedly occurred with a condom, the lack of matching DNA may not be dispositive of a lack of probable cause as long as [the Victim] was still able to testify with certainty of Mr. Humbert's identity." ECF No. 74-6 at 1. He states that he decided to drop the charges against Humbert, because he "learned from the victim that she was not sure she could identify Mr. Humbert." *Id.* at 2. "That together with the lack of witnesses and DNA analysis that excluded Mr. Humbert as a contributor created reasonable doubt in [his] mind." *Id.* However, in the January Declaration, Tan declares he would have dismissed the case against Humbert "shortly following the receipt" of the DNA results *or* information about the Victim's uncertainty of her attacker's identity. Pl. Ex. B at 1. He also states that he could not drop the charges against Humbert until he received the formal DNA reports.[23] *Id.*

---

[23] Tan declared that he requested these reports from investigators but did not receive them until May 11, 2009. Pl. Ex. B at 1. Sergeant Jones noted that sometimes conflict occurs between the Police Department and the State's Attorney's Office about disclosure of evidence to the State's attorneys. *See* Pl. Ex. C at 85.

The Victim declares that Tan called her "just prior to when the charges against Mr. Humbert were dropped," and she told him that she was unsure that Humbert was her attacker. Pl. Ex. A at 3. She had not spoken to Tan before this phone call, and had "believed that [her] repeated concerns that [she] voiced about [her] inability to identify [her] assailant were being communicated to Mr. Tan." *Id*.

On May 19, 2009, the DNA reports were mailed to Humbert's counsel. ECF No. 74-2 at 12. On July 30, 2009, Tan "chose to nolle prosequi the case against Mr. Humbert," and Humbert was released. *See* ECF No. 74-6 at 2.

E. Procedural History

On February 17, 2011, Humbert filed a 19-count complaint against the defendants. ECF No. 1. The following claims were asserted against the police defendants: (1) § 1983 claims for malicious prosecution (count three), suggestive identification procedures (count seven), failure to disclose exculpatory evidence and fabrication of inculpatory evidence (count eight), and false arrest and imprisonment (count ten), in violation of Humbert's Fourth and Fourteenth Amendment rights; (2) § 1983 claim for failure to investigate, in violation of Humbert's Fourteenth Amendment rights (count nine); (3) violations of

Articles 24[24] and 26[25] of Maryland's Declaration of Rights (count eleven); (4) battery (count twelve); (5) false arrest and imprisonment (count thirteen); (6) abuse of process (count fourteen); (7) negligence (count fifteen); (8) negligent failure to warn (count sixteen); (9) malicious prosecution (count eighteen); and (10) intentional infliction of emotional distress ("IIED") (count nineteen).[26] ECF No. 1 at 45-47, 50-68, 70-74. Humbert also brought a § 1983 claim against, *inter alia*,[27] Jones for supervisory misconduct in violation of his Fourth and Fourteenth Amendment rights (count two). *Id.* at 44-45. On

---

[24] Article 24 provides that: "no man ought to be taken or imprisoned or disseized of his freehold, liberties or privileges, or outlawed, or exiled, or, in any manner, destroyed, or deprived of his life, liberty or property, but by the judgment of his peers, or by the Law of the land."

[25] Article 26 provides that:

> [A]ll warrants, without oath or affirmation, to search suspected places, or to seize any person or property, are grievous and oppressive; and all general warrants to search suspected places, or to apprehend suspected persons, without naming or describing the place, or the person in special, are illegal, and ought not to be granted.

[26] Humbert also asserted three counts of violations of 42 U.S.C. § 1985 against all defendants (counts four through six). ECF No. 1 at 47-50. In a previous opinion, the Court dismissed these counts for failure to state a claim. ECF No. 35 at 23-25.

[27] This count was also asserted against the Police Department, O'Malley, Bealefeld, Dixon, and Richard and Jane Roes. ECF No. 1 at 44.

April 19, 2011, the police defendants answered Humbert's complaint. ECF No. 17.

On March 27, 2012, the Court granted the defendants' motion to bifurcate the case and stay discovery on all claims except those asserted against the police defendants. ECF Nos. 52-53.

On April 3, 2013, the police defendants moved for summary judgment. ECF No. 74. On April 19, 2013, the Court stayed the deadline for Humbert to respond to the motion pending the close of discovery. ECF No. 87. On December 5, 2013, after the close of discovery, the Court ordered Humbert to file his opposition by December 20, 2013. ECF No. 115. On December 9, 2013, the Court approved the parties' joint stipulation extending the deadline to December 27, 2013. ECF No. 118.

On December 30, 2013, Humbert opposed the motion for summary judgment. ECF No. 119; Pl. Oppos. The same day, the police defendants moved to strike Humbert's opposition as untimely. ECF No. 120. On January 2, 2014, Humbert filed a notice of filing of lengthy memorandum and exhibits. ECF No. 121. On January 16, 2014, Humbert opposed the motion to strike. ECF No. 124. On March 12, 2014, the police defendants replied to Humbert's opposition to their motion for summary judgment. ECF No. 136.

II.  Analysis

A. Motion to Strike

Federal Rule of Civil Procedure 6(b)(1) provides that "[w]hen an act may or must be done within a specified time, the court may, for good cause, extend the time . . . on motion[28] made after the time has expired if the party failed to act because of excusable neglect."  To determine if the delay is excusable neglect, the court "consider[s] all relevant circumstances, including the danger of prejudice to the non-moving party, the length of the delay and its potential impact on judicial proceedings, the reason for the delay, including whether it was within the reasonable control of the movant, and whether the movant acted in good faith." *See Perry-Bey v. City of Norfolk, Va.*, 679 F. Supp. 2d 655, 658-59 (E.D. Va. 2010) (*quoting Pioneer Inv. Servs. Co. v. Brunswick Assocs. Ltd. P'ship,* 507 U.S. 380, 395, 113 S. Ct. 1489, 123 L.Ed.2d 74 (1993)).  The reason for the delay is the most important factor. *See Thompson v. E.I. DuPont de Nemours & Co., Inc.*, 76 F.3d 530, 534 (4th Cir. 1996).  "'Excusable neglect' is not easily demonstrated,"

---

[28] The Court will construe the tardy response to the summary judgment motion, and the opposition to the motion to strike which explains the reasons for the tardy filing, as a motion for an extension of time to file the response. *See, e.g.*, *Harty v. Commercial Net Lease LP Ltd.*, 5:09-CV-495-D, 2011 WL 807522, at *1 (E.D.N.C. Mar. 1, 2011) (construing "the filing of the [untimely] amended complaint and the notice of late filing as a motion for extension of time to file the amended complaint").

it should be found "only in the 'extraordinary cases where injustice would otherwise result.'" *Id.* (emphasis in original). The party seeking the extension has the burden of demonstrating excusable neglect. *Id.*

The police defendants moved for the Court to strike Humbert's opposition to their motion for summary judgment, because they assert Humbert had "no reason or excuse" for his untimely filing. ECF No. 120 at 3. In response, Humbert's counsel contends that he tried to upload the opposition through the Court's electronic filing system on December 27, 2013, but the documents would not upload, presumably because of their size. ECF No. 124 at 2. He then "immediately prepared" the filing and sent it out for delivery to the Court and the police defendants. *See id.* He asserts that "any delay in the Court's receipt of the Plaintiff's paper filing . . . was due to a weekend and New Year's Day." *See id.* On January 2, 2014, after the Court received the paper filing, the Clerk's office informed him that he needed to file a notice of lengthy memorandum and exhibits, which he filed that same day. *See id.*; ECF No. 121.

Here, Humbert's opposition was received in paper form by the Court on January 2, 2014--six days after the filing deadline. *See* ECF No. 121. There is no apparent bad faith on Humbert's part or prejudice to the defendants as a result of this relatively short delay. Also, there is no indication that

18

Humbert's counsel knew in advance that he might have technical difficulties uploading the filing. Finally, Humbert's counsel acted promptly to correct the problem by mailing paper copies of the filing to defense counsel and the Court. *See* ECF Nos. 119, 124 at 2. When, as here, counsel lacks advance notice of computer problems that caused a short delay in filing, and those problems were not in counsel's reasonable control, there is excusable neglect for the untimely filing. *See Fernandes v. Craine*, 538 F. App'x 274, 276 (4th Cir. 2013) (finding excusable neglect because nothing in the record suggested that counsel was aware of the computer problems that led to the untimely filing or "was willfully blind to the status of the electronic docket"); *Alamjamili v. Berglund Chevrolet, Inc.*, CIV.A.7:09CV00213, 2009 WL 4348386, at *2 (W.D. Va. Dec. 1, 2009) (finding excusable neglect when counsel's computer network unexpectedly failed, and the three-day delay in filing was short). The motion to strike will be denied.

B. Legal Standard for Summary Judgment

The Court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).[29] In considering the motion, the judge's function

___

[29] Rule 56(a), which "carries forward the summary-judgment standard expressed in former subdivision (c)," changed "genuine

19

is "not . . . to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson,* 477 U.S. at 249. A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248.

The Court must "view the evidence in the light most favorable to . . . the nonmovant and draw all reasonable inferences in [his] favor," *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 645 (4th Cir. 2002), but the Court must abide by the "affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial,"[30] *Bouchat v. Balt. Ravens Football Club,*

---

'issue' [to] genuine 'dispute,'" and restored the word "'shall' . . . to express the direction to grant summary judgment." Fed. R. Civ. P. 56 advisory committee's note.

[30] In his opposition to the police defendants' summary judgment motion, Humbert includes citations to, and quotations from, numerous newspaper articles that he contends provide factual support for his claims. *See, e.g.*, Pl. Oppos. at 23 & n.163. The police defendants argue that these articles are "inadmissible as evidence." *See, e.g.*, ECF No. 136 at 10. Humbert has not submitted these articles with his motion, and even if he had submitted them, in the Fourth Circuit "newspaper articles are inadmissible hearsay to the extent that they are introduced 'to prove the factual matters asserted therein.'" *United States v. ReBrook,* 58 F.3d 961, 967 (4th Cir. 1995) (affirming district court grant of defendants' motion to strike newspaper articles submitted by plaintiff in response to defendants' motion for summary judgment). Accordingly, the Court will disregard Humbert's references in his opposition to these unattached articles, and any facts derived solely from those articles.

20

*Inc.*, 346 F.3d 514, 526 (4th Cir. 2003) (citation and internal quotation marks omitted).

C. Section 1983 Claims

Section 1983 provides a remedy against any person who, acting under color of law, deprives another of constitutional rights. 42 U.S.C. § 1983. It "is not itself a source of substantive rights, but merely provides a method for vindicating federal rights elsewhere conferred." *Albright v. Oliver*, 510 U.S. 266, 271, 114 S. Ct. 807, 127 L.Ed.2d 114 (1994) (internal quotation marks and citation omitted).

The police defendants assert that they are entitled to qualified immunity on Humbert's § 1983 claims. ECF No. 74-1 at 11.

Government officials performing discretionary functions are shielded from liability for civil damages under § 1983 when their conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan,* 555 U.S. 223, 231, 129 S. Ct. 808, 815, 172 L. Ed. 2d 565 (2009) (internal quotation marks and citation omitted) (*citing Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S. Ct. 2727, 73 L.Ed.2d 396 (1982)). Qualified immunity "protects law enforcement officers from 'bad guesses in gray areas' and ensures that they are liable only 'for transgressing bright lines.'" *Wilson v. Layne*, 141 F.3d 111,

114 (4th Cir. 1998) *aff'd,* 526 U.S. 603, 119 S. Ct. 1692, 143 L.
Ed. 2d 818 (1999) (*quoting Maciariello v. Sumner,* 973 F.2d 295,
298 (4th Cir. 1992)). Humbert does not dispute that the police
defendants may assert a qualified immunity defense. *See* Pl.
Oppos. at 32-33.

To determine if the defendants are entitled to qualified
immunity, the Court must decide: (1) whether the facts that the
plaintiff has alleged or shown make out a violation of a
constitutional right; and (2) whether the right at issue was
"clearly established" at the time of the alleged misconduct.
*Pearson,* 555 U.S. at 232, 129 S. Ct. at 815-16. The district
court has discretion in deciding which prong of the qualified
immunity analysis should be addressed first. *Id.* at 236, 129 S.
Ct. at 818. When qualified immunity is asserted, the plaintiff
bears the burden of showing a constitutional violation occurred.
*Henry v. Purnell,* 501 F.3d 374, 377 (4th Cir. 2007); *Richter v.
Maryland,* 590 F. Supp. 2d 730, 739 (D. Md. 2008) *aff'd sub nom.
Richter v. Beatty,* 417 F. App'x 308 (4th Cir. 2011).

A constitutional right is clearly established "when its
contours are sufficiently clear that a reasonable official would
understand that what he is doing violates that right." *Ridpath
v. Bd. of Governors Marshall Univ.,* 447 F.3d 292, 313 (4th Cir.
2006) (*citing Hope v. Pelzer,* 536 U.S. 730, 739, 122 S. Ct.
2508, 2515, 153 L. Ed. 2d 666 (2002) (internal quotations and

punctuation omitted)). There are three ways in which law becomes clearly established in Maryland: (1) an authoritative decision by the United States Supreme Court; (2) an authoritative decision by the Fourth Circuit Court of Appeals; or (3) an authoritative decision by the Court of Appeals of Maryland. *Wilson*, 141 F.3d at 114. The defendants bear the burden of proof on whether the constitutional right was clearly established at the time of the alleged violation. *See Henry*, 501 F.3d at 378.

The Fourth Circuit has emphasized "the importance of resolving the question of qualified immunity at the summary judgment stage rather than at trial." *Wilson v. Kittoe,* 337 F.3d 392, 397 (4th Cir. 2003). *Wilson* recognizes, however, that "the qualified immunity question can . . . at times require factual determinations respecting disputed aspects of a defendant's conduct." *Id. (quoting Pritchett v. Alford*, 973 F.2d 307, 312 (4th Cir. 1992) (internal quotations and punctuation omitted)). "The importance of summary judgment in qualified immunity cases does not mean . . . that summary judgment doctrine is to be skewed from its ordinary operation to give substantive favor to the defense, important as may be its early establishment." *Id.*

1. Probable Cause

The police defendants argue that the plaintiff's § 1983

claims of malicious prosecution, suggestive identification

procedures,[31] and false arrest[32] fail because there was probable

[31] Humbert has not identified the source of his claim that the
Fourth Amendment protects him from "suggestive identification
procedures." *See* ECF No. 1 at 50. Although the Fourteenth
Amendment protects against unnecessarily suggestive
identification procedures, this right "only protect[s] . . .
against the admission of unconfronted and unreliable
identification evidence at trial." *Antonio v. Moore*, 174 F.
App'x 131, 134-36 (4th Cir. 2006) (affirming dismissal of claim
that suggestive identification procedure violated the Fourteenth
Amendment because defendant pled guilty to charged crime and was
not tried). Humbert was never tried on the charge of the rape
of the Victim. *See* ECF No. 74-6 at 2. Further, Humbert does
not show how the photo array used by the police defendants was
"unnecessarily suggestive." Humbert argues that Detective Smith
was unfamiliar with the term "mug book," and that *none* of the
photos shown to the Victim displayed skin tone. *See* Pl. Oppos.
at 16-18. However, this evidence does not establish that
Humbert's photo was emphasized to the Victim during the
identification procedure. *See, e.g.*, *Hogan v. Paderick*, 399 F.
Supp. 1014, 1018 (E.D. Va. 1975) ("The danger of
misidentification is increased when the police show the
eyewitness a series of photographs in which the image of a
single individual frequently recurs or is emphasized, or when
the police indicate that they have other evidence that the
person pictured committed the crime."). Accordingly, because
Humbert has not shown a constitutional violation with respect to
count seven, the defendants have qualified immunity and will be
granted summary judgment on this claim.

[32] Because Humbert was arrested pursuant to a warrant that he
acknowledges was "facially valid," his § 1983 false arrest claim
fails. *See* Pl. Oppos. at 33; *Waker v. Owen*, RWT 09CV2380, 2010
WL 1416145, at *4 (D. Md. Apr. 6, 2010) (*citing Porterfield v.
Lott,* 156 F.3d 563, 568 (4th Cir. 1998) ("[A] claim for false
arrest may be considered only when no arrest warrant has been
obtained.")); *Whitley v. Prince George's Cnty., MD*, PWG-12-3428,
2013 WL 3659949, at *5 (D. Md. July 11, 2013). Instead, his
claim that he was arrested without probable cause is properly

cause for Humbert's arrest. ECF No. 74-1 at 14-15. Humbert contends that the police defendants lacked probable cause to arrest him.[33] Pl. Oppos. at 33.

The Fourth Amendment prohibits unreasonable searches and seizures, and no warrant may issue without probable cause. "Probable cause to justify an arrest means facts and circumstances within the officer's knowledge that are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense."

---

pursued under count three (malicious prosecution). *Waker*, 2010 WL 1416145, at *4 (*citing Montgomery Ward v. Wilson,* 339 Md. 701, 724, 664 A.2d 916 (1995) ("[W]hile procuring a warrantless arrest by giving false information to a police officer may constitute false imprisonment, falsely procuring an arrest through wrongfully obtaining a warrant is ordinarily malicious prosecution."). The police defendants will be awarded summary judgment on count ten.

[33] Humbert also argues that summary judgment should be denied, because the testimony of the police defendants' expert witness, Charles Key, on, *inter alia*, whether the police defendants acted reasonably in determining that probable cause existed for Humbert's arrest, should be precluded. *See* Pl. Oppos. at 27-32. As neither party has submitted evidence from Key that is relevant to whether summary judgment is warranted on Humbert's claims, these arguments will not be considered now. Humbert may renew these arguments at trial. Further, in a footnote, Humbert "quests leave to obtain additional expert evidence and to [depose] Mr. Key" on his opinions of the "objective reasonableness" of the police defendants' actions if summary judgment is granted. *See* Pl. Oppos. at 32 n.195. If Humbert wishes to reopen discovery, he must file a motion with the Court. *See* Fed. R. Civ. P. 7(b)(1) ("A request for a court order must be made by motion.").

*United States v. Dickey-Bey,* 393 F.3d 449, 453 (4th Cir. 2004)

(*quoting Michigan v. DeFillipo,* 443 U.S. 31, 37, 99 S. Ct. 2627,

61 L. Ed. 2d 343 (1979) (internal quotations omitted)). To

determine if there was probable cause to arrest, the Court

considers only "facts and circumstances known to the officer at

the time of the arrest."[34] *Wilson,* 337 F.3d at 398 (internal

quotations and punctuation omitted). Probable cause does "not

require officials to possess an airtight case before taking

action," and officers "must be given leeway to draw reasonable

conclusions" from information. *Taylor v. Farmer,* 13 F.3d 117,

121-22 (4th Cir. 1993). Probable cause requires more than "bare

suspicion," but "less than evidence necessary to convict."

*Pleasants v. Town of Louisa,* 524 F. App'x 891, 897 (4th Cir.

2013) (internal quotations omitted). To establish a § 1983

malicious prosecution claim, Humbert must show that "he was

seized without probable cause and that he obtained a favorable

---

[34] In their motion, the police defendants rely on evidence of
Humbert's guilt obtained after Humbert's arrest to justify his
pretrial detention, such as his identification by other rape
victims and the presence of his DNA on a condom wrapper found
near the home of a rape victim. *See, e.g.,* ECF No. 74-1 at 7 &
n.1. However, as this information was not known to officers
when the arrest warrant was obtained, it cannot be considered in
determining whether there was probable cause for his arrest.
*See Wilson,* 337 F.3d at 398.

26

termination of the proceedings against him."[35]  *Pinder v.*
*Knorowski*, 660 F. Supp. 2d 726, 735-36 (E.D. Va. 2009).

### a. Warrant as Written

Humbert was arrested pursuant to a warrant. Pl. Ex. Q.  In
the warrant application, Detective Smith swore that Humbert was
identified as a suspect following the release of a composite
sketch created by the Victim, and that the Victim "positively
identified" Humbert as her attacker when she was shown his
picture in a photo line-up. ECF No. 74-4 at 5.  Humbert argues
that, "[e]ven assuming . . . that the[se] facts . . . were
true," the warrant was not supported by probable cause. *See* Pl.
Oppos. at 34-35.  However, the positive identification of a
suspect by a witness is generally sufficient to establish
probable cause for an arrest, unless officers have reason to
believe the witness is unreliable or have other exculpatory
evidence.[36]  *See Bailey v. Town of Smithfield, Va.*, 19 F.3d 10,
at *3, *6 (4th Cir. 1994) (finding that a single positive
identification of the defendant as the robber from a photo array

---

[35] Humbert has shown that he obtained a favorable termination of
the proceedings, because the charges against him were *nol
prossed*. *See De Ventura v. Keith,* 169 F. Supp. 2d 390, 398-99
(D. Md. 2001).

[36] The police defendants' evidence is that the Victim
unequivocally identified Humbert as her attacker by pointing at
his picture and stating "that's him." *See* ECF No. 74-2 at 9;
Pl. Exs. D at 48 & #6, E at 24.

sufficed to establish probable cause for arrest); *United States v. Beckham*, 325 F. Supp. 2d 678, 687-88 (E.D. Va. 2004).[37] Also, as Humbert was identified as a suspect because he resembled a composite created by the Victim, the facts in the warrant application--if true--were more than sufficient to establish probable cause to arrest Humbert. *See, e.g., Shriner v. Wainwright*, 715 F.2d 1452, 1454 (11th Cir. 1983) (probable cause for arrest existed when suspect closely resembled composite sketch and was found shortly after the crime in the same area).

b. Material Omissions in Warrant Application

Humbert also argues that probable cause for his arrest was lacking, because of "fabrications and omissions" in the warrant application that were "necessary to the judicial determination" of probable cause. *See* Pl. Oppos. at 36. The police defendants contend that probable cause existed because of the Victim's identification of Humbert, "regardless of any qualifications [the Victim] wanted (or now wants) to place on her identification." *See* ECF No. 136 at 13-14. They also assert that it was the State's Attorney's responsibility "to follow up

---

[37] *See also Crouch v. City of Hyattsville*, CIV.A. DKC 09-2544, 2012 WL 6019296, at *6 (D. Md. Nov. 30, 2012) (*citing Beauchamp v. City of Noblesville, Indiana,* 320 F.3d 733, 743 (7th Cir. 2003) ("The complaint of a single witness or putative victim alone generally is sufficient to establish probable cause to arrest unless the complaint would lead a reasonable officer to be suspicious, in which case the officer has a further duty to investigate.")).

28

with [the Victim] on the adequacy . . . of the identification."
*Id.* at 14.

To show a constitutional violation, Humbert must prove that
an officer "deliberately or with a reckless disregard for the
truth made material false statements in his affidavit, or
omitted from that affidavit material facts with the intent to
make, or with reckless disregard of whether they thereby made,
the affidavit misleading." *Miller v. Prince George's Cnty., MD*,
475 F.3d 621, 626-31 (4th Cir. 2007) (*citing Franks v. Delaware,*
438 U.S. 154, 171, 98 S. Ct. 2674, 57 L. Ed. 2d 667 (1978);
*United States v. Colkley,* 899 F.2d 297, 300 (4th Cir. 1990)
(internal quotations and citations omitted)). To establish
"reckless disregard," the plaintiff may offer evidence to show
that the officer was "high[ly]" aware that her statements in the
warrant application were probably false or that she omitted
information that she knew would negate probable cause. *Id.* at
627.

False statements or omissions are material if they were
necessary to the judicial officer's determination of probable
cause. *Evans v. Chalmers*, 703 F.3d 636, 650 (4th Cir. 2012)
(*citing Franks*, 438 U.S. at 155-56, 98 S. Ct. 2674). To
determine materiality, the court "corrects" the warrant by
removing any inaccuracies and inserting recklessly omitted facts

and determines if the corrected warrant establishes probable cause. *Miller*, 475 F.3d at 628.

"[T]he Fourth Amendment right to be arrested only on probable cause is clearly established . . . ." *Smith v. Reddy*, 101 F.3d 351, 356 (4th Cir. 1996). Also, the law is "clearly established" that the Fourth Amendment prohibits officers from deliberately or recklessly making material omissions or misstatements in warrant applications if the warrant would otherwise lack probable cause. *Miller*, 475 F.3d at 632. "[A] reasonable officer cannot believe a warrant is supported by probable cause if the magistrate is misled by statements that the officer knows or should know are false." *Smith*, 101 F.3d at 355.

The police defendants' evidence shows that Detectives Smith and Griffin showed the Victim a photo line-up that included a picture of Humbert. ECF Nos. 74-2 at 9, 74-5 at 7. Viewing the evidence in the light most favorable to Humbert, the Victim selected Humbert's photo, told Smith and Griffin that it "might" depict her attacker, and then requested to see a physical and voice line-up of her suspected assailants. Pl. Ex. A at 2. She also indicated on the photo that she had identified Humbert as her attacker, but the officers "told [her] what to write." *Id*. These details were omitted from the warrant application, which

only stated that the Victim "positively identified" Humbert as her attacker.[38]  *See* ECF No. 74-4 at 5.

A tentative identification of a suspect by a witness is generally insufficient standing alone to establish probable cause.  *See, e.g.*, *Williams v. City of New York*, 10-CV-2676 JG LB, 2012 WL 511533, at *4-*5 (E.D.N.Y. Feb. 15, 2012).  However, the warrant application also established that Humbert was identified as a suspect based on a composite drawing produced by the Victim, which--depending on the degree of uncertainty in the identification and the degree of resemblance between Humbert and the composite--may be sufficient to establish probable cause in combination with a tentative identification.  *See, e.g.*, *Ramos v. Sedgwick Cnty. Sheriff's Dep't*, 785 F. Supp. 1457, 1458-63 (S.D. Fla. 1991) (finding that probable cause existed as a matter of law to arrest defendant when three officers stated that the defendant resembled the composite prepared by the

---

[38] Humbert also faults the police defendants for not investigating the suspects whom the Victim identified as "resembling" her attacker in the earlier photo line-up.  *See* Pl. Oppos. at 19.  However, the Victim declares that she told officers that she could not identify either man as her attacker and requested to see a physical line-up.  *See* Pl. Ex. A at 2. Moreover, "a police officer's failure to pursue potential exculpatory evidence is not in itself sufficient to negate probable cause."  *Smith v. Reddy*, 882 F. Supp. 497, 502 (D. Md. 1995) *aff'd,* 101 F.3d 351 (4th Cir. 1996) (*quoting Torchinsky v. Siwinski*, 942 F.2d 257, 264 (4th Cir. 1991) (internal quotations and punctuation omitted)); *see also United States v. Clenney*, 631 F.3d 658, 665 (4th Cir. 2011) ("[T]he protections of *Brady v. Maryland*, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963), do not apply to warrant application proceedings.").

victim, and the victim "expressed some doubts" but identified the defendant as her attacker and asked to see him "face-to-face with a hat on"). Accordingly, there is a genuine dispute of material fact about whether a "corrected" warrant would have established probable cause to arrest Humbert.

Also, there is some evidence that, if details of the Victim's identification were omitted from the warrant application, those omissions were reckless. Detective Smith testified that the warrant application relied on the Victim's description of the crime and her medical examination, the composite sketch, and the positive identification to establish probable cause. *See* Pl. Ex. D at 54-55. She agreed with Humbert's counsel, however, that the only evidence "specific" to Humbert was the identification. *See id.* at 56. She also acknowledged that a tentative identification of a suspect--in the manner of the Victim's responses to two of the photos at the first photo line-up--would not be sufficient to establish probable cause without consideration of other evidence. *See id.* at 59-60. This evidence is sufficient to create a triable issue of fact of Detective Smith's knowledge that, depending on the degree of uncertainty in the Victim's identification,[39] inclusion

---

[39] The uncontested evidence establishes, however, that Detective Smith would not have believed that a request for a physical and voice line-up negated probable cause if the Victim had

32

of these details would negate probable cause. Because a

reasonable officer would not believe that a warrant which

contained deliberate or reckless material omissions was

supported by probable cause, *see Miller*, 475 F.3d at 632, there

is a genuine dispute of material fact about Detective Smith's

entitlement to qualified immunity.

Further, Detective Griffin was present for the Victim's

identification of Humbert, and, along with Sergeant Jones,

contributed to the warrant application and likely discussed with

Detective Smith whether a positive identification of Humbert

occurred. *See* ECF Nos. 74-2 at 9, 74-5 at 7; Pl. Ex. D at 52-

54. Accordingly, there is a triable issue of fact about whether

Detective Griffin and Sergeant Jones participated in the

reckless omission of details that would negate the warrant's

probable cause. Detectives Smith and Griffin and Sergeant Jones

will be denied summary judgment on count three.[40]

However, there is no evidence that Detectives Brassell or

Merryman had any involvement with the decision to arrest Humbert

---

identified Humbert as her attacker by pointing at the picture
and stating "that's him." *See* Pl. Ex. D at 50-51.

[40] Article 24 is construed *in pari materia* with the Fourteenth
Amendment, *Barnes v. Montgomery Cnty., Md.*, 798 F. Supp. 2d 688,
700 (D. Md. 2011), and Article 26 is construed *in pari materia*
with the Fourth Amendment, *Scott v. State*, 366 Md. 121, 139, 782
A.2d 862, 873 (2001). Accordingly, Detectives Smith and Griffin
and Sergeant Jones will be denied summary judgment on count
eleven.

or with the warrant application. They were not present for the

Victim's identification of Humbert. ECF Nos. 74-2 at 9, 74-5 at

7. Detective Brassell only produced a composite sketch of

Humbert--there is no evidence he had any other involvement with

Humbert's case. *See, e.g.*, Pl. Ex. G at 13. Although Detective

Merryman participated in the investigation, there is no evidence

he knew the details of the Victim's identification of Humbert,

and Detectives Griffin's and Smith's investigative notes state

that the Victim unequivocally identified Humbert as her

attacker. *See, e.g.*, ECF No. 74-3 at 4; Pl. Ex. F at 5.

Because Humbert has not shown that Detectives Merryman or

Brassell participated in any violation of his constitutional

rights related to the probable cause determination, they are

entitled to qualified immunity and will be granted summary

judgment on count three.

2. Disclosure of Exculpatory Evidence

Humbert contends that the police defendants violated his

constitutional rights by "willfully fail[ing] to produce

exculpatory material."[41] Pl. Oppos. at 37, 40. The police

---

[41] Humbert accuses the police defendants of concealing several
pieces of exculpatory evidence, including, *inter alia*, the
Victim's statement that she did not know if her attacker was
homeless and the fact that the Victim drew her own sketch. *See*
Pl. Oppos. at 40. However, he offers no evidence that any of
this allegedly exculpatory evidence was not disclosed to the
State's Attorney's Office. The January Declaration--the only
evidence to support Humbert's claim that exculpatory evidence

defendants argue that a police officer who withholds exculpatory evidence can only be liable under § 1983 when the failure to disclose violates the plaintiff's right to a fair trial, and Humbert never went to trial. ECF No. 74-1 at 7-8.

The Fourteenth Amendment prohibits states from depriving any person of his liberty without first affording him "due process of law" by means of a fair trial. U.S. Const. amend. XIV. To ensure procedural due process, *Brady v. Maryland,* 373 U.S. 83, 87 (1963) provides that "suppression by the prosecution of evidence favorable to an accused . . . violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." To prove a *Brady* violation, the accused must show that the evidence (1) is exculpatory or impeaching, (2) was suppressed by the Government, and (3) was material to his defense, i.e., he was prejudiced by the suppression. *See United States v. Moussaoui,* 591 F.3d 263, 285 (4th Cir. 2010).

Although *Brady* and its progeny do not address whether a police officer violates the Constitution by withholding evidence

was not disclosed--states only that investigators failed to disclose the DNA reports excluding Humbert as a DNA contributor and the Victim's uncertainties about the identity of her attacker. *See* Pl. Ex. B. Accordingly, to the extent that Humbert seeks to pursue count eight as to any other evidence-- except the DNA results and the identification--summary judgment is granted to the police defendants on that claim.

acquired during the course of an investigation,[42] the Fourth
Circuit has held that a police officer who withholds exculpatory
information from a prosecutor *can* be liable under § 1983,
*Goodwin v. Metts,* 885 F.2d 157, 162 (4th Cir. 1989), but only
when the officer's failure to disclose "deprived the § 1983
plaintiff[] of [his] right to a fair trial," *Taylor v. Waters,*
81 F.3d 429, 436 n.5 (4th Cir. 1996). As Humbert was never
tried on this rape charge, he has not stated a claim that the
police defendants violated his Fourteenth Amendment rights by
their alleged failure to disclose exculpatory evidence.[43] *See*
*Taylor*, 81 F.3d at 436 & n.5; *Hockett v. Acosta*, 2:03CV00012,
2004 WL 1242757, at *3 (W.D. Va. June 3, 2004) (finding no
Fourteenth Amendment violation when plaintiffs did not allege
that any favorable evidence was unavailable at their criminal
trial); *Windham v. Graham*, CIVA908CV1935PMDGCK, 2008 WL 3833789,
at *7-*9 (D.S.C. Aug. 14, 2008) (pretrial detainee who alleged

---

[42] *Jean v. Collins,* 221 F.3d 656, 659 (4th Cir. 2000) (en banc)
(Wilkinson, C.J., concurring in the judgment) (per curiam)
(*citing United States v. Agurs,* 427 U.S. 97 (1976); *Giglio v.
United States,* 405 U.S. 150 (1972); and *Brady,* 373 U.S. at 83).

[43] Further, to the extent that Humbert argues that police failure
to disclose exculpatory evidence violated his Fourteenth
Amendment rights because probable cause for his prosecution was
lacking, his claims fail. In *Albright*, 510 U.S. at 269, 114 S.
Ct. at 810, the Supreme Court held that there is no Fourteenth
Amendment right to be free from prosecution on less than
probable cause. *See Lambert v. Williams*, 223 F.3d 257, 261 (4th
Cir. 2000).

that police withheld favorable evidence had no cause of action under the Fourteenth Amendment because he had not yet been tried).[44]

The Fourth Amendment, rather than the Fourteenth Amendment, "define[s] the 'process that is due' for seizures of person or property in criminal cases, including the detention of suspects pending trial." *See Taylor*, 81 F.3d at 435-36 (*quoting Gerstein v. Pugh*, 420 U.S. 103, 125 n.27, 95 S. Ct. 854, 869 n.27, 43 L. Ed. 2d 54 (1975)); *Hockett*, 2004 WL 1242757, at *3 ("As to the pre-arrest suppression of evidence, it is established in this circuit that the 'Fourth Amendment provides all of the pretrial process that is constitutionally due to a criminal defendant in order to detain him prior to trial.'" (*quoting Brooks v. City of Winston-Salem, N.C.,* 85 F.3d 178, 184 (4th Cir. 1996)). Once probable cause has been determined by a neutral and detached magistrate, "the Fourth Amendment does not impose any further requirement of judicial oversight or reasonable investigation to render pretrial seizure reasonable." *See Taylor*, 81 F.3d at

---

[44] *See also Jean*, 221 F.3d at 659-60 (Police "failures to disclose" exculpatory evidence "do not implicate constitutional rights where no constitutional deprivation results therefrom. In this context, the constitutional deprivation must be defined as a deprivation of liberty without due process of law. In the absence of a cognizable injury, *such as a wrongful criminal conviction*, . . . no § 1983 remedy will lie.") (emphasis added) (Wilkinson, C.J., concurring in affirmance of judgment of district court by an equally divided en banc court).

436. Thus, an officer's failure to disclose exculpatory evidence after a suspect is arrested based on a determination of probable cause "does not render the continuing pretrial seizure of a criminal suspect unreasonable under the Fourth Amendment." *Id.* at 435-37 (holding that Fourth Amendment jurisprudence did not clearly render unconstitutional an officer's failure to disclose exculpatory evidence to the prosecution); *see also Bailey*, 19 F.3d at *6 (rejecting defendant's argument that officers have a *Brady*-like duty under the Fourth Amendment to disclose all exculpatory evidence when applying for a warrant).

Accordingly, Humbert has not established that the police defendants violated his clearly established Fourth Amendment rights by failing to disclose exculpatory evidence to the prosecution.[45] The police defendants are entitled to qualified

---

[45] Also, although there is evidence that Tan did not receive a copy of the DNA results until many months after the results were generated, *see* Pl. Ex. B at 1, the transcript of the arraignment shows that Tan knew the results on June 23, 2008--a little over a month from the date of Humbert's arrest and within a few weeks after the results were obtained. ECF Nos. 74-2 at 10, 74-5 at 8, 74-7 at 3; Pl. Ex. M. Further, Detectives Griffin and Smith testified that they believed prosecutors could request a copy of official DNA results from the crime lab directly. *See* Pl. Exs. D at 64-65, E at 14. Thus, there is no evidence that the police defendants deliberately failed to disclose exculpatory evidence to Tan, as there is uncontested evidence that Tan knew about the DNA reports many months before Humbert was released, and before Humbert was arraigned, and Detectives Smith and Griffin believed that Tan could obtain a copy of the report from the crime lab directly. *See* ECF No. 74-7 at 3.

immunity on count eight and will be granted summary judgment on
this claim.

   3. Failure to Investigate

  In the complaint, Humbert asserts that the police
defendants are liable under § 1983 for "deliberately and
recklessly fail[ing] to investigate adequately" potentially
exculpatory evidence. ECF No. 1 at 54-56. Although the police
defendants moved for summary judgment on all claims, neither the
police defendants nor Humbert specifically discusses the failure
to investigate claim. *See* ECF No. 74-1 at 15, 25; Pl. Oppos.

  Police officers may be liable under § 1983 for deliberate
or reckless failures to investigate "readily available
exculpatory evidence." *Savage v. Cnty. of Stafford, Va.*, 754 F.
Supp. 2d 809, 815-16 (E.D. Va. 2010) *aff'd sub nom. Savage v.
Sturdivant*, 488 F. App'x 766 (4th Cir. 2012) (*quoting
Torchinsky*, 942 F.2d at 264); *Wheeler v. Anne Arundel Cnty.*,
CIV. JFM-08-2361, 2009 WL 2922877, at *5 (D. Md. Sept. 8, 2009).
However, negligent police failures to investigate do not violate
the Fourteenth Amendment. *Wheeler*, 2009 WL 2922877, at *5.

  The police defendants have asserted qualified immunity on
all of Humbert's § 1983 claims, including the failure to
investigate claim. *See* ECF No. 74-1 at 15. There is no
evidence to suggest that any of the alleged failures to

investigate were deliberate or reckless.[46] As Humbert has the
burden of establishing a constitutional violation when qualified
immunity is asserted, *see Henry*, 501 F.3d at 377-78, the police
defendants are entitled to qualified immunity on count nine and
will be granted summary judgment on this claim.[47]

4. Supervisory Violations

Humbert also brings a separate claim against Sergeant Jones
asserting that--in addition to liability for his personal
participation in Humbert's malicious prosecution--he has
supervisory liability because he failed to adequately "train,
instruct, supervise, and discipline" his subordinates. *See* ECF
No. 1 at 45-47. The police defendants contend only that there
is no liability for supervisory violations, because there was
probable cause to arrest Humbert. *See* ECF No. 74-1 at 14-15.
Humbert does not discuss this claim specifically but argues
there was no probable cause for his arrest. *See* Pl. Oppos. at
33-44.

---

[46] For example, Humbert contends that the police defendants "made
no effort to investigate the Plaintiff's whereabouts at the time
of the reported rape, despite the Plaintiff's repeated vehement
statements that he was innocent and had an alibi." Pl. Oppos.
at 22. However, Humbert has proffered no evidence that he told
officers he had an alibi. *See, e.g.*, ECF No. 136-10 at 20.

[47] As Detective Merryman and Officer Brassell have been granted
summary judgment on all of Humbert's § 1983 claims, they will be
granted summary judgment on count eleven (violations of Articles
24 and 26). *See supra* note 40.

The doctrine of *respondeat superior* does not apply in § 1983 actions. *See Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 691, 98 S. Ct. 2018, 2036, 56 L. Ed. 2d 611 (1978). To establish Sergeant Jones's liability for supervisory acts, Humbert must show: (i) Sergeant Jones had "actual or constructive knowledge that his subordinate was engaged in conduct that posed a pervasive and unreasonable risk of constitutional injury;" (ii) Sergeant Jones's response to this knowledge "was so inadequate as to show deliberate indifference to or tacit authorization of the alleged offensive practices;" and (iii) there was an affirmative causal link between the supervisor's inaction and the injury suffered by the plaintiff. *See Shaw v. Stroud,* 13 F.3d 791, 799 (4th Cir. 1994) (internal quotations omitted); *Slakan v. Porter,* 737 F.2d 368, 373 (4th Cir. 1984).

To establish a pervasive or unreasonable risk of harm, the plaintiff must produce "evidence that the conduct is widespread, or at least has been used on several different occasions and that the conduct engaged in by the subordinate poses an unreasonable risk of harm of constitutional injury." *Shaw*, 13 F.3d at 799. Ordinarily this burden cannot be satisfied by proof of a single incident or isolated incidents; instead, the plaintiff must show "continued inaction in the face of documented widespread abuses." *Id.* Supervisory liability

depends on a finding that the supervisor's subordinates violated the plaintiff's constitutional rights. *See, e.g.*, *Jackson v. Wiley*, 352 F. Supp. 2d 666, 683 (E.D. Va. 2004) *aff'd,* 103 F. App'x 505 (4th Cir. 2004).

As discussed above, Sergeant Jones participated in conversations with his subordinates Detectives Smith and Griffin about the identification of Humbert and other facts to include in the warrant application for Humbert's arrest. *See supra* Section II.C.1.b. There is a triable issue of fact about whether this warrant was supported by probable cause and whether it contained material omissions of fact, which creates a genuine dispute as to Sergeant Jones's liability for malicious prosecution. *Id.* However, there is no evidence of "widespread abuses" in determining probable cause for arrest warrant applications by Sergeant Jones's subordinates. Humbert has only produced evidence of a single incident related to his own arrest warrant. *See, e.g.*, *Willis v. Blevins*, 3:13CV278-HEH, 2013 WL 4430923, at *13 (E.D. Va. Aug. 16, 2013) (dismissing supervisory liability claim because the "Complaint references only one prior [unconstitutional] act by [the subordinate] of which [the supervisor] was or should have been aware"). Accordingly, Humbert has not produced evidence creating a genuine dispute of material fact that Sergeant Jones has supervisory liability for the deficiencies in the arrest warrant application, in addition

to his potential liability for his personal participation in obtaining the arrest warrant.[48]  Sergeant Jones will be granted summary judgment on count two.

D. Common Law Claims

In addition to the § 1983 claims, Humbert also brings several common law tort claims against the defendants under Maryland law.[49]

1. Malicious Prosecution

The police defendants contend that they are entitled to summary judgment, because "malicious prosecution can only be asserted when there is a lack of probable cause," and Humbert "has produced no evidence that the Defendant[s] acted with malice or for any other purpose other than to bring him to justice."  ECF No. 74-1 at 17.  Humbert argues that the police

---

[48] *Cf. Randall v. Prince George's Cnty., Md.*, 302 F.3d 188, 206-07 (4th Cir. 2002) (vacating jury verdict of supervisory liability because there was "no evidence [the defendant] knew about any propensity for unlawful action by his subordinates [or] that he had an opportunity to prevent recurrences;" evidence only supported bystander liability because defendant knew "his fellow officers were committing constitutional violations" and did nothing).

[49] Maryland applies the rule of *lex loci delicti* to determine the law to apply in tort cases.  *See, e.g., Philip Morris Inc. v. Angeletti*, 358 Md. 689, 750, 752 A.2d 200, 233 n.28 (2000). Under that rule, the court applies the law of the state "where the injury—the last event required to constitute the tort—occurred."  *Lab. Corp. of America v. Hood,* 395 Md. 608, 615, 911 A.2d 841, 845 (2006).  All the events in this suit occurred in Maryland.  *See, e.g.*, ECF No. 74-2 at 1; Pl. Ex. C at 20. Accordingly, Maryland law governs Humbert's common law claims.

defendants lacked probable cause, and malice can be inferred from that lack. *See* Pl. Oppos. at 43.

Malicious prosecution is "the unlawful use of legal procedure to bring about a legal confinement." *Montgomery Ward*, 339 Md. at 724, 664 A.2d at 927. The elements of malicious prosecution in Maryland are: "(a) a criminal proceeding instituted or continued by the defendant against the plaintiff, (b) termination of the proceeding in favor of the accused,[50] (c) absence of probable cause for the proceeding, and (d) 'malice', or a primary purpose in instituting the proceeding other than that of bringing an offender to justice." *Id.* at 714, 664 A.2d at 922. A person who obtains an arrest warrant "thereby initiates legal process against the person to be arrested[,]" and may be liable for malicious prosecution. *See id.* at 724, 664 A.2d at 927. The malice required for malicious prosecution "may be inferred from the lack of probable cause." *DiPino v. Davis*, 354 Md. 18, 55, 729 A.2d at 374 (1999) (*citing id.* at 717, 664 A.2d at 924 ("[A] plaintiff who has generated sufficient evidence of lack of probable cause to send the case to the jury is also entitled to have the jury consider the issue of malice.")).

---

[50] Humbert has shown that he obtained a favorable termination of the proceedings, because the charges against him were *nol prossed*. *Hines v. French*, 157 Md. App. 536, 554, 852 A.2d 1047, 1057 (2004).

Because there is a genuine dispute of material fact about whether the arrest warrant was supported by probable cause, and Detectives Smith and Griffin and Sergeant Jones participated in obtaining the warrant, summary judgment will be denied on count eighteen as to these defendants. *See supra* Section II.C.1.b.

However, as discussed above, there is no evidence that Detectives Brassell or Merryman had any involvement with the decision to arrest Humbert or with the warrant application. *See id.* They will be awarded summary judgment on count eighteen.

2. False Arrest and Imprisonment

The police defendants contend that "the Defendants had the legal authority to arrest the Plaintiff." ECF No. 74-1 at 16. Humbert argues that "there existed no legal justification to arrest" him. Pl. Oppos. at 42.

In Maryland, the torts of false arrest and imprisonment have the same elements: "'a deprivation of the liberty of another without [the defendant's] consent and without legal justification.'" *Montgomery Ward*, 339 Md. at 720-21, 664 A.2d at 925-26 (*quoting Great Atl. & Pac. Tea Co. v. Paul,* 256 Md. 643, 654, 261 A.2d 731, 738 (1970)); *Green v. Brooks*, 125 Md. App. 349, 366, 725 A.2d 596, 605 (1999). The law of arrest determines whether there was legal justification for the deprivation. *Montgomery Ward*, 339 Md. at 721, 664 A.2d at 926. Ordinarily, there is no cause of action for false arrest or

45

imprisonment when "the sole basis for the tort action is an
arrest made by a police officer pursuant to a warrant which
appears on its face to be valid."[51] *Id.* at 720-21, 723, 664 A.2d
at 925, 927 ("[T]he false imprisonment tort does not lie against
either the instigator or the arresting officer where the
plaintiff is not detained by the instigator and is arrested by a
police officer pursuant to a facially valid warrant.").
Instead, a defendant may pursue a cause of action for malicious
prosecution against the person who "falsely procur[ed his]
arrest through wrongfully obtaining a [facially valid] warrant."
*Id.* at 724, 664 A.2d at 927.

Here, Humbert was not arrested by the police defendants,
and he concedes that the arrest warrant was facially valid. Pl.
Oppos. at 33; ECF No. 74-4 at 1. Accordingly, the police
defendants will be awarded summary judgment on count thirteen.

3. Battery

The police defendants assert that they have no liability
for battery, because, as police officers, they "are permitted to
utilize what would otherwise be a battery in the course of a
lawful arrest." ECF No. 74-1 at 25. Humbert argues that,
although "there is no allegation that any officers used any

---

[51] Further, only the arresting officer may be liable for false
arrest. *Green*, 125 Md. App. at 370-71, 725 A.2d at 607 ("[T]he
common law tort of false arrest contemplates that the defendant,
through threats or actions, must create a present restraint of
liberty." (internal quotations omitted)).

physical force beyond handcuffing him," they can still be liable
for battery "in the absence of probable cause to arrest him."
*See* Pl. Oppos. at 48.

Under Maryland law, battery is defined as "an offensive,
non-consensual touching—the unlawful application of force to the
person of another."[52] *Katsenelenbogen v. Katsenelenbogen*, 365
Md. 122, 775 A.2d 1249, 1255 n.1 (2001) (internal quotations
omitted). Humbert "concedes" that the only force underlying his
battery claim was the force used to arrest him. *See* Pl. Oppos.
at 48. Because Humbert was arrested by Officer Larry Smith--who
is not a defendant in this case--his battery claim against the
police defendants fails. *See* ECF No. 74-4 at 1. The police
defendants will be granted summary judgment on count twelve.

4. Abuse of Process

The police defendants contend that they are entitled to
judgment on this claim, because Humbert "has produced no
evidence that the Defendants utilized the criminal judicial

---

[52] In false arrest and imprisonment cases, in which there is no
claim of excessive force, "[i]f the plaintiffs' arrests
constituted a false imprisonment, then the physical force used
in effectuating the arrests would give rise to a cause of action
for assault and battery." *Ashton v. Brown*, 339 Md. 70, 119, 660
A.2d 447, 471 n.24 (1995). However, if the arrests were not
tortious, the plaintiff's battery claim fails. *Id.*; *Hines*, 157
Md. App. at 551, 852 A.2d at 1055 ("False imprisonment, false
arrest, and assault and battery can only occur when there is no
legal authority or justification for the arresting officer's
actions." (internal quotations omitted)).

process in any manner that would be considered irregular or unwarranted." ECF No. 74-1 at 18. Humbert argues that the arrest warrant application inaccurately described the Victim's identification of Humbert as "positive," and he was arrested on less than probable cause. *See* Pl. Oppos. at 44.

Abuse of process is concerned with "the improper use of the process in a manner not contemplated by law, after process has been issued."[53] *Palmer Ford, Inc. v. Wood*, 298 Md. 484, 513, 471 A.2d 297, 312 (1984). To prove liability for abuse of process under Maryland law, the plaintiff must establish that: (1) "the defendant wilfully used process after it has issued in a manner not contemplated by law;" (2) "the defendant acted to satisfy an ulterior motive;" and (3) "damages resulted from the defendant's perverted use of process." *One Thousand Fleet Ltd. P'ship v. Guerriero*, 346 Md. 29, 38, 694 A.2d 952, 956 (1997). A bad or improper motive to obtain the process is insufficient; instead, "[s]ome definite act or threat not authorized by the process, or aimed at an objective not legitimate in the use of the process is required." *See id.*[54] For example, if the defendant used

---

[53] In contrast, malicious use of process and malicious prosecution provides a remedy when a person "maliciously caus[es] criminal or civil process to issue for its ostensible purpose, but without probable cause." *Keys v. Chrysler Credit Corp.*, 303 Md. 397, 411, 494 A.2d 200, 207 (1985).

[54] *See also Palmer Ford*, 298 Md. at 512-13, 471 A.2d at 311 ("[T]he gist of the wrong is to be found in the uses to which

"criminal prosecution as a coercive tactic in the collection of a debt," the defendant may be liable for abuse of process. *See Palmer Ford*, 298 Md. at 513, 471 A.2d at 312.

There is no evidence that the police defendants misused Humbert's arrest warrant to achieve some collateral objective after it was issued. Instead, the evidence shows that the warrant was issued, Humbert was arrested, and charges against him were investigated and prosecuted until his release. *See, e.g.*, ECF No. 74-2. Although Humbert has offered evidence that the "*issuance* of the process" was improper, this evidence alone does not support a cause of action for abuse of process. *See One Thousand Fleet*, 346 Md. at 40, 694 A.2d at 957 (*citing Keys*, 303 Md. at 411, 494 A.2d at 207); *Savage v. Mayor & City Council of Salisbury*, CIV. CCB-08-3200, 2010 WL 3038953, at *6 (D. Md. July 30, 2010) (denying abuse of process claim arising out of allegedly false arrest, because the defendant did not produce "any evidence as to how the officers used process after it was issued for an illegitimate purpose"). The police defendants will be granted summary judgment on count fourteen.

---

the party procuring the process attempts to put it. If he is content to use the particular machinery of the law for the immediate purpose for which it was intended, he is not ordinarily liable, notwithstanding a vicious or vindictive motive. But the moment he attempts to attain some collateral objective, outside the scope of the operation of the process employed, a tort has been consummated.") (internal quotations omitted).

5. IIED

The police defendants contend that Humbert "has failed to establish facts which meet the 'high burden' embodied in the four elements of [IIED]." ECF No. 74-1 at 19. Humbert asserts that the police defendants turned him "into a pariah[,] arrested him without any probable cause[,]" and withheld "exonerating DNA evidence" from the prosecutor, which resulted in his "solitary confinement for fifteen months."[55] Pl. Oppos. at 45.

To state a claim for IIED, the complaint must show that the defendant intentionally or recklessly engaged in conduct that was extreme and outrageous, and the wrongful conduct caused the plaintiff severe emotional distress. *Batson v. Shiflett*, 325 Md. 684, 733, 602 A.2d 1191, 1216 (1992). The conduct must be "so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Id.* at 734, 602 A.2d at 1216.[56] In response to that conduct, "the plaintiff [must] show

[55] As discussed above, the evidence shows that Tan--the prosecutor in this case--was aware of the DNA results almost immediately after they were generated. *See supra* note 45.

[56] For example, a doctor knowingly exposed a nurse to an incurable sexually transmitted disease without warning her, a psychologist treating a patient for marital problems had sex with the client's wife, and an insurer forced a claimant to undergo a psychiatric examination for the sole purpose of harassing her and forcing her to abandon her claim or commit suicide. *Batson*, 325 Md. at 734, 602 A.2d at 1216 (*citing Figueiredo-Torres v. Nickel,* 321 Md. 642, 584 A.2d 69 (1991);

that he suffered "a severely disabling emotional response."
*Harris v. Jones*, 281 Md. 560, 570, 380 A.2d 611, 616 (1977).
Each element "must be satisfied completely before a cause of
action will lie." *Hamilton v. Ford Motor Credit Co.*, 66 Md.
App. 46, 502 A.2d 1057, 1063 (Md. Ct. Spec. App. 1986).

Even assuming the police defendants' conduct was "extreme
and outrageous," Humbert has offered no evidence of a "disabling
emotional response" as a result of that conduct. Accordingly,
"he has not established an essential element of the tort, and
his claim fails." *Williams v. Prince George's Cnty., MD*, 157 F.
Supp. 2d 596, 605 (D. Md. 2001) (denying IIED claim when
plaintiff failed to offer proof of a disabling emotional
response).

6. Negligence and Negligent Failure to Warn

The police defendants contend that they are entitled to
immunity on Humbert's negligence claims, because Humbert failed
to produce evidence that they acted with "actual malice." *See*
ECF No. 74-1 at 23. Humbert contends that the police defendants
were improperly motivated to solve the Victim's rape case, acted
without legal justification in arresting Humbert, and had "an

---

*B.N. v. K.K.,* 312 Md. 135, 538 A.2d 1175 (1988); *Young v.
Hartford Accident & Indemnity*, 303 Md. 182, 492 A.2d 1270
(1985)).

51

animus toward furnishing exculpatory evidence." *See* Pl. Oppos. at 47.

"Negligence is 'any conduct, except conduct recklessly disregardful of an interest of others, which falls below the standard established by law for protection of others against unreasonable risk of harm.'" *Mayor & City Council of Baltimore v. Hart*, 395 Md. 394, 410, 910 A.2d 463, 472 (2006) (*quoting Holler v. Lowery*, 175 Md. 149, 157, 200 A. 353, 357 (1938)). In Maryland, a public official is immune from tort liability in negligence if: "(1) he or she [is] a *public official;* and (2) his or her tortious conduct . . . occurred while performing *discretionary* acts in furtherance of official duties;[57] and (3) the acts [were] done without malice." *Williams v. Mayor & City Council of Baltimore*, 359 Md. 101, 140-41, 753 A.2d 41, 62 (2000) (emphasis in original). In this context, malice means "actual malice," *Shoemaker v. Smith*, 353 Md. 143, 163, 725 A.2d 549, 560 (1999), which is intentional conduct "without legal justification or excuse, but with an evil or rancorous motive influenced by hate, the purpose being to deliberately and willfully injure the plaintiff," *Thacker v. City of Hyattsville,*

---

[57] "[A]ctions of police officers within the scope of their law enforcement function are quintessential discretionary acts." *Williams v. Prince George's Cnty.*, 112 Md. App. 526, 550, 685 A.2d 884, 896 (1996) (*citing Robinson v. Bd. of County Comm'rs*, 262 Md. 342, 346-47, 278 A.2d 71 (1971)).

135 Md. App. 268, 762 A.2d 172, 189 (Md. Ct. Spec. App. 2000).
Although actual malice may not be inferred from a lack of
probable cause alone, it may "be inferred from an arrest that
was so lacking in probable cause and legal justification as to
render [the defendant officers'] stated belief in its existence
unreasonable and lacking in credibility." *McDaniel v. Arnold*,
898 F. Supp. 2d 809, 850 (D. Md. 2012) (*citing Thacker*, 135 Md.
App. at 308, 762 A.2d at 193-94).

There is a triable issue of fact on the existence of
probable cause to arrest Humbert, and on the reasonableness of
Detectives Smith's and Griffin's and Sergeant Jones's beliefs
that probable cause existed. *See supra* Section II.C.1.b.
Accordingly, there is a triable issue of fact on whether these
officers are entitled to qualified public immunity on Humbert's
negligence claims, and they will be denied summary judgment on
counts fifteen and sixteen.[58]

---

[58] As there is no evidence Detective Merryman or Officer Brassell
had any involvement with the decision to arrest Humbert or the
drafting of the warrant application, or failed to disclose
exculpatory evidence, they will be granted summary judgment on
counts fifteen and sixteen. *See supra* Section II.C.1.b, notes
41, 45.

III. Conclusion

For the reasons stated above, the police defendants' motion for summary judgment will be granted in part and denied in part, and the police defendants' motion to strike will be denied.

_____3/25/14_____
Date

_____
William D. Quarles, Jr.
United States District Judge