IN THE UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF MARYLAND, NORTHERN DIVISION

|                          |   |                          |
|--------------------------|---|--------------------------|
| MARLOW HUMBERT,          | * |                          |
|                          | * |                          |
|     Plaintiff,           | * |                          |
|                          | * |                          |
|     v.                   | * | CIVIL NO.: WDQ-11-0440   |
|                          | * |                          |
| MARTIN O'MALLEY,         | * |                          |
|     et al.,              | * |                          |
|                          | * |                          |
|     Defendants.          | * |                          |

\* \* \* \* \* \* \* \* \* \* \* \* \*

MEMORANDUM OPINION

Marlow Humbert sued several police officers and others[1] for constitutional violations under 42 U.S.C. § 1983 and state law claims. ECF No. 1. Pending is Humbert's motion to allow testimony by contemporaneous transmission. ECF No. 160. No hearing is necessary. Local Rule 105.6 (D. Md. 2014). For the following reasons, the motion will be granted.

---

[1] Humbert sued: (1) Baltimore City police officers Chris Jones, Keith Merryman, Caprice Smith, Dominick Griffin, and Michael Brassell, in their individual and official capacities (together, the "police defendants"); (2) Martin O'Malley, individually and in his official capacity as Governor of the State of Maryland and former Mayor of the City of Baltimore; (3) the Mayor and City Council of Baltimore City; (4) Sheila Dixon, the former Mayor of Baltimore City, individually; (5) the Baltimore City Police Department (the "Police Department"); (6) Frederick Bealefeld, individually and in his official capacity as Police Commissioner of the Police Department; (7) Cinese Caldwell, individually and in her official capacity as a Baltimore City laboratory technician and police officer; and (8) Baltimore City police officers John and Jane Does 1-20s and Baltimore City police supervisors Richard and Jane Roes 1-20s, in their individual and official capacities. ECF No. 1 at 8-14.

I. Background[2]

On April 30, 2008, a woman[3] told police that she had been raped at her home in Baltimore's Charles Village neighborhood.[4] *See* ECF No. 160 at 3.  The Victim reported that, when she entered her home, an unknown man had approached her from behind, and forced her inside.  *Id*.  The man pointed a black handgun at her head.  *Id*.  He demanded money, but she told him she had none.  *Id*.  The man then pushed her onto a nearby couch and raped her.  *Id*.  The Victim described her assailant as a fairly well-spoken black man in his early to mid-30s, five-foot-seven to five-foot-nine inches tall, and wearing a blue T-shirt with a pink logo, a white face mask, black cotton gloves, and tennis shoes.[5]  *Id*. at 3-4.

_____

[2] For the purpose of this motion, this Memorandum Opinion presents a summarized version of the facts from Humbert's motion, the Victim's declarations attached to the motion, ECF No. 160, and the police defendants' opposition, ECF No. 161. The facts of this case are stated more fully in the Memorandum Opinion, Civil No. WDQ-11-440, 2014 WL 1266673 (D. Md. March 25, 2014).

[3] Although the woman is referred to by name in the parties' submissions, because she is not a party to the lawsuit the Court will refer to her as the "Victim."

[4] This was one of a series of sexual assaults in the Charles Village area during the spring of 2008.  *See* ECF No. 160 at 3.

[5] In a declaration dated January 24, 2013, the Victim avers that her description "[c]learly" did not describe Humbert.  ECF No. 158 at 15.  She also states that officers "insisted" repeatedly that the man who raped her was homeless, but she "insisted" in

After the attack, the Victim--a trained artist--completed a sketch of her attacker. *Id.* at 4. Investigating officers informed the Victim that she had to complete a composite with a police sketch artist. *Id.* The Victim declares that "the features of [her] assailant from [her] sketch" and her "communications with the sketch artist were not incorporated into the composite sketch." *Id.*

A few days later, officers met with the Victim and showed her two photo books of potential suspects. *Id.* After reviewing the book of photos, the Victim stated that two of the photos resembled her attacker, but she did not identify either as her attacker. *Id.* She declares that she told the officers that she needed to see suspects in person and hear their voices to identify her attacker. *Id.*

On May 8, 2008, officers showed the Victim an array of photos that included Humbert's photo. *Id.* The Victim declares that she saw Humbert's photo, said that "might" be him, but was unsure. *Id.* She declares that she was "made to sign something, and despite my protests, was assured that it was just procedure." *Id.* at 5. She also declares that the officers told her that no arrests would be made until she saw the suspects in

return that she "knew nothing about the life circumstances of the man who raped [her]." *Id.*

person and heard their voices.  *Id*.  The Victim "was shocked"
when she learned that Humbert had been arrested.  *Id*.

Assistant State's Attorney Tan was assigned to prosecute
Humbert for the rape of the Victim.  *Id*.  The Victim attended
Humbert's June 23, 2008 arraignment.  *Id*.  She declares that she
told officers at the arraignment that she "could not identify
Mr. Humbert and that after seeing him in person, [she] had even
more doubt as to whether he was [her] attacker."  *Id*.  The
Victim further declares that Tan first called her "just prior to
when the charges against Mr. Humbert were dropped," and she told
him that she was unsure that Humbert was her attacker.  *Id*.

After the rape and police investigation, the Victim
received psychotherapy and--in 2010--was diagnosed with Post
Traumatic Stress Disorder ("PTSD").  *Id*. at 6.  She declares
that "whenever she thinks about returning to Maryland, she
becomes scared and has overwhelming and debilitating feelings of
anxiousness, helplessness, and [many] of the other emotions she
experienced at the time of her rape."  *Id*.  The Victim further
declares that her symptoms have been "compounded by the recent
conduct of the [police defendants'] counsel."  *Id*.

About five years after the Victim was raped, she received a
phone call from the police defendants' counsel.  *Id*.  The Victim
characterizes the phone call as "aggressive, accusatory, and

abusive." *Id.*[6]  The police defendants' counsel avers that "the conversation was cordial, and [the Victim] was forthcoming with information."  ECF No. 161 at 8.[7]

On or about August 14, 2013, an unknown investigator showed up at the side door of the Victim's home.  ECF No. 160 at 7.[8] The Victim's seven-year old son answered the door.  *Id.*[9]  The investigator represented the Defendants, but stated that "talking to him would increase Mr. Humbert's settlement."  *Id.* The Victim told the man "that if he wanted to talk to [her], he

---

[6] The Victim declares that the police defendants' counsel initially "did not identify himself," and asked if Humbert's counsel had "threaten[ed] [her]?"  *Id.* at 6.  He stated that "[her] testimony did not match up with the evidence" and that he was "just trying to get justice."  *Id.*  After identifying himself, the Victim "expressed [her] disappointment that he called her" on the fifth anniversary of her rape; "[h]e then hung up" without apologizing.  *Id.*

[7] The police defendants' counsel "acknowledges that he inadvertently called [the Victim]" around the five year anniversary of her rape, "and when [the Victim] pointed this out, he apologized profusely."  ECF No. 161 at 7-8.  He states that he "did not berate [the Victim], did not ask if [Humbert's counsel had] threatened her, did not say that her statement did not 'match up,' and did not hang up abruptly."  *Id.* at 8.

[8] The Victim declares that, because the man came to the side door, she "believe[d] that he had been watching her."  ECF No. 160 at 7.  Because of her rape, the Victim lives in a house that is not easily accessible.  *Id.*  Her "front door is barricaded but looks functional from the outside," and the side door is not visible "unless you had seen someone access it."  *Id.*  That "[t]he unknown man somehow knew not to come to the front door and knew about the side door, . . . scared [her]."  *Id.*

[9] The Victim's son, who has autism, "knows nothing about the rape," and she "intends to keep it that way."  *Id.*  The Victim homeschools her son.  *Id.* at 8.

would have to speak to [her] lawyer." *Id*. at 20.   After consulting with her attorney, the Victim declined to speak to the investigator.   *Id*.

That the perpetrator "is still at large [has] robbed [the Victim] of her sense of safety and security in the State of Maryland"; she declares that "she will never feel safe or secure in Baltimore or any other area in or around Maryland." *Id*. at 8.   After the rape, the Victim moved to Flint, Michigan, "with the intention of never coming back." *Id*.

E. Procedural History

On February 17, 2011, Humbert filed a 19-count complaint. ECF No. 1.[10]  On November 28, 2011, the Court dismissed counts

---

[10] The following claims were asserted against the police defendants: (1) § 1983 claims for malicious prosecution (count three), suggestive identification procedures (count seven), failure to disclose exculpatory evidence and fabrication of inculpatory evidence (count eight), and false arrest and imprisonment (count ten), in violation of Humbert's Fourth and Fourteenth Amendment rights; (2) § 1983 claim for failure to investigate, in violation of Humbert's Fourteenth Amendment rights (count nine); (3) violations of Articles 24  and 26  of Maryland's Declaration of Rights (count eleven); (4) battery (count twelve); (5) false arrest and imprisonment (count thirteen); (6) abuse of process (count fourteen); (7) negligence (count fifteen); (8) negligent failure to warn (count sixteen); (9) malicious prosecution (count eighteen); and (10) intentional infliction of emotional distress ("IIED") (count nineteen). ECF No. 1 at 45-47, 50-68, 70-74.   Humbert asserted three counts of violations of 42 U.S.C. § 1985 against all defendants (counts four through six).   *Id*. at 47-50.   Humbert also brought a § 1983 claim against the Police Department, O'Malley, Bealefeld, Dixon, Jones, Richard, and Jane Roes for supervisory misconduct in violation of his Fourth and Fourteenth Amendment rights (count two).   *Id*. at 44-45.

four to six for failure to state a claim.  ECF Nos. 35-36.[11]  On

March 27, 2012, the Court granted the defendants' motion to

bifurcate the case and stay discovery on all claims except those

asserted against the police defendants.  ECF Nos. 52-53.  On

March 25, 2014, the Court granted the police defendants' motion

for summary judgment on all claims against Brassell and

Merryman, and granted summary judgment on counts two, seven,

eight, nine, ten, twelve, thirteen, fourteen, and nineteen for

Smith, Jones, and Griffin--the remaining police defendants.  ECF

Nos. 138-39.[12]

On November 18, 2014, Humbert moved to allow the Victim's

testimony by contemporaneous transmission.  ECF No. 160.

Humbert requests the Victim be permitted to "testify live from

the United States District Court for the Eastern District of

Michigan, using internet videoconferencing."  *Id*. at 10.[13]  On

December 1, 2014, the police defendants opposed Humbert's

motion.  ECF No. 161.  On December 10, 2014, Humbert replied.

ECF No. 162.

---

[11] The Court also dismissed all claims against O'Malley in his
official and individual capacity, and dismissed all claims
against Caldwell.  ECF No. 36.

[12] Thus, counts three, eleven, fifteen, sixteen, and eighteen
remain against Smith, Jones, and Griffin.  ECF No. 139.

[13] The Victim's video testimony would be given under oath, and
she would be subject to cross-examination.  ECF No. 160 at 10.

II.  Analysis

Federal Rule of Civil Procedure 43(a) provides that "[f]or good cause in compelling circumstances and with appropriate safeguards, the court may permit testimony in open court by contemporaneous transmission from a different location."[14]

The parties dispute whether there is "good cause" or "compelling circumstances" to merit contemporaneous transmission.  See ECF Nos. 160 at 9; 161 at 2.  Humbert contends that "serious medical and logistical reasons"-- including the Victim's PTSD, "fears and debilitating anxiety associated with the State of Maryland," and the home-schooling of her autistic son--prevent her from testifying in person.  ECF Nos. 160 at 11; 162 at 3-4.  The police defendants contend (1) they will suffer prejudice if the Victim "does not appear in person because [she] has changed her stories several times," and the police defendants want her demeanor to be visible to the jury, (2) the Victim's "subjective fear of the entire State of Maryland is emblematic of her evasive behavior,"[15] and (3) "it

_____

[14] In 1996, Rule 43(a) was amended to allow for contemporaneous transmission.  *See Scott Timber, Inc. v. United States*, 93 Fed. Cl. 498, 501 (2010).

[15] The police defendants are not opposed to prosecuting the case in Greenbelt, Maryland.  ECF No. 161 at 8.  However, no motion for a change of venue is before the Court.  *See* 28 U.S.C. § 1404(b) ("Upon motion, consent or stipulation of all parties, any action, suit or proceeding of a civil nature or any motion or hearing thereof, may be transferred, in the discretion of the

would be difficult and likely less effective to" question the Victim "about several documents" via contemporaneous transmission.  ECF No. 161 at 6-8.

The Fourth Circuit Court of Appeals has not stated a test for determining what constitutes "good cause" or "compelling circumstances";[16] however, district courts in the Fourth Circuit--and elsewhere--permit contemporaneous transmission in civil cases.  *See Lopez v. NTI, LLC*, 748 F. Supp. 2d 471, 480 (D. Md. 2010) (collecting cases).

The Advisory Committee Notes to the 1996 Amendments to Rule 43(a) state that good cause and compelling circumstances are

---

court, from the division in which pending to any other division in the same district.").

[16] In *United States v. Kivanc*, 714 F.3d 782, 791 (4th Cir. 2013), the Fourth Circuit affirmed a district court's decision not to permit contemporaneous transmission of testimony by a witness living in Turkey.  At a hearing before a magistrate judge, the parties presented conflicting evidence on whether the witness's medical conditions--including kidney stones, hypertension, and fainting--prevented long-distance travel.  *Id*.  The magistrate judge concluded--and the district court affirmed--that nothing in the case led to the conclusion that the witness was unable to travel.  *Id*.  The Fourth Circuit also affirmed the district court's decision not to permit the defendant to testify from Turkey, agreeing that it "would make a mockery of our system of justice."  *Id*.  *Cf. United States v. Baker*, 45 F.3d 837 (4th Cir. 1995) (affirming the use of video conferencing during a civil commitment hearing).  In *Baker*, the Fourth Circuit rejected the respondent's contention that appearing at his civil commitment hearing violated his constitutional due process and statutory rights.  *Id*. at 840.  The Fourth Circuit observed, *inter alia*, that video conferencing "does not preclude the respondent from confronting and conducting cross-examination of the witnesses."  *Id*. at 843.

most likely to arise "when a witness is unable to attend trial for unexpected reasons, such as accident or illness." Fed. R. Civ. P. 43 (a) Advisory Committee Notes on 1996 Amendments.[17] "Other possible justifications for remote transmission must be approached cautiously," as "[t]he very ceremony of trial and the presence of the factfinder may exert a powerful force for truthtelling," and "[t]he opportunity to judge the demeanor of a witness face-to-face is accorded great value in our tradition." *Id.* The Fourth Circuit has cautioned that "video conferencing may render it difficult for a factfinder in adjudicative proceedings to make credibility determinations and to gauge demeanor." *Rusu v. U.S. I.N.S.*, 296 F.3d 316, 322 (4th Cir. 2002) (*citing United States v. Baker*, 45 F.3d 837, 844–46 (4th Cir. 1995); *Edwards v. Logan*, 38 F.Supp.2d 463, 467 (W.D. Va.1999)).[18]

Notwithstanding the Advisory Committee Notes' guidance that inconvenience alone is insufficient,[19] travel cost and

---

[17] *See also Tharpe v. Lawidjaja*, No. 6:12-CV-00039, 2013 WL 5939702, at *2-3 (W.D. Va. Nov. 5, 2013).

[18] In *Rusu*, the Fourth Circuit declined to reverse a district court's decision to permit video conferencing during an asylum hearing, finding that the petitioner had not established prejudice arising from any due process violation. 296 F.3d at 324.

[19] *See* Fed. R. Civ. P. 43(a) Advisory Committee Notes; *see also F.T.C. v. Swedish Match N. Am., Inc.*, 197 F.R.D. 1, 2 (D.D.C.

inconvenience have justified contemporaneous transmission in

cases involving domestic[20] and international travel.[21]   However,

as Humbert asserts, "[i]t is the destination and not the travel"

underlying the Victim's inability to testify in person.   ECF No.

162 at 4.

Here, Humbert has demonstrated good cause and compelling

circumstances.   At least one court has permitted contemporaneous

transmission when a witness would feel highly uncomfortable

appearing in court.   *See Parkhurst v. Belt*, 567 F.3d 995, 1003

(8th Cir. 2009) (affirming use of videoconferencing when child

victim of sexual abuse testified at trial against her biological

---

2000) (observing that "courts are much more receptive to this
new technology than the Advisory Committee").

[20] *See Beltran-Tirado v. INS*, 213 F.3d 1179, 1186 (9th Cir.2000)
(telephonic testimony permitted for hearing in California when
witness was in Missouri); *Scott Timber, Inc.*, 93 Fed. Cl. at
499–501 (Oregon-based witness permitted to testify by
videoconferencing for Washington, D.C. trial); *Swedish Match N.
Am., Inc.*, 197 F.R.D. at 2 (Oklahoma-based witness permitted to
testify by videoconferencing for hearing in Washington, D.C.).
*But see Lopez*, 748 F. Supp. at 481 (costs associated with travel
from Virginia and Tennessee to trial in Maryland not
sufficiently prohibitive to establish good cause).   Witness
testimony via videoconferencing has also been permitted in
criminal cases.   *See United States v. Smith*, Criminal No.
1:09cr100, 2010 WL 5211498 (W.D.N.C. Dec. 16, 2010) (Oklahoma-
based expert permitted to testify by contemporaneous
transmission in North Carolina trial when expert would lose a
significant sum of money if forced to testify in person, and the
exact timing of testimony was unknown; court relied on Rule
43(a) for guidance).

[21] *See Lopez*, 748 F. Supp. 2d. at 480 (permitting low-income
plaintiffs residing in Honduras to testify via contemporaneous
transmission).

father).  Forcing the Victim to return to Maryland to
participate at trial may unnecessarily trigger her PTSD
symptoms, forcing her to relive "overwhelming and debilitating
feelings" associated with her rape.  ECF No. 162 at 3-4.[22]  Also,
her responsibilities toward her young child, *id.*,[23] justify her
testimony by contemporaneous transmission.[24]

The Court is mindful of the Fourth Circuit's caution that
jurors must be able to weigh witness credibility, *Rusu*, 296 F.3d
at 322.  As one judge in the District of Maryland has recently
noted, "with video-conferencing, a jury will . . . be able to

---

[22] Beyond the conclusionary assertion that the Victim's
"subjective fear of the entire State of Maryland is emblematic
of her evasive behavior," ECF No. 161 at 8, the police
defendants have not rebutted her reasons for not wanting to
return to Maryland.  *Compare Hamprecht v. Hamprecht,* No. 2:12-
CV-125-FTM-29, 2012 WL 1367534, at *1 (M.D. Fla. Apr. 19,
2012)(good cause and compelling circumstances not established
when witness stated he had fled to Germany after "an individual"
claimed "his group" had been hired to kill the petitioner, but
police reports and petitioner's subsequent behavior called his
account into question).

[23] *Compare Sallenger v. City of Springfield*, No. 03-3093, 2008 WL
2705442, at *1 (C.D. Ill. July 9, 2008) (permitting
contemporaneous transmission by Intensive Care Unit physician
whose "employment presents a very unique need for his presence
at work").

[24] This does not mean that every victim of crime will be able to
rely on Rule 43(a) to avoid testifying in person.  Relief under
Rule 43(a) is highly fact specific, and is the exception, not
the rule.  *See* Fed. R. Civ. P. 43(a) ("At trial, the witnesses'
testimony must be taken in open court *unless* a federal statute,
the Federal Rules of Evidence, these rules, or other rules
adopted by the Supreme Court provide otherwise.")(emphasis
added).

observe the witness'[s] demeanor and evaluate [her] credibility in the same manner as traditional live testimony," *Lopez*, 748 F. Supp. 2d at 480.[25]  The Victim will be testifying "in open court, under oath, and will face cross-examination"; to facilitate questioning, exhibits "can be presented in real time during the transmission."  ECF Nos. 160 at 12; 162 at 3-4.  The Court finds that the police defendants will not be prejudiced by contemporaneous transmission, and appropriate safeguards will be employed.

III. Conclusion

For the reasons stated above, Humbert's motion to allow testimony by contemporaneous transmission will be granted.

_12/16/14_
Date

_[signature]_
William D. Quarles, Jr.
United States District Judge

---

[25] *See also Swedish Match N. Am., Inc.*, 197 F.R.D. at 2 (videoconferencing is "equivalent to [the witness's] presence in court"); *Sallenger*, No. 03-3093, 2008 WL 2705442, at *1 ("Video conferencing allows the jury to view the witness as he testifies, and thus, it satisfies many of the goals of in-person testimony. . . .").  Given courtroom layout, the Victim may actually appear closer to the jury than she would sitting in the witness stand.