IN THE UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF MARYLAND, NORTHERN DIVISION

MARLOW HUMBERT,                    *

     Plaintiff,                   *

        v.                       *        CIVIL NO.: WDQ-11-0440

CHRISTOPHE JONES,                  *
     et al.,                      *

     Defendants.                  *

\*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*

MEMORANDUM OPINION

    Marlow Humbert sued Christophe Jones, Caprice Smith, and
Dominick Griffin (the "police defendants") for constitutional
violations under 42 U.S.C. § 1983 and state law claims.  ECF No.
1.  A jury trial was held from April 14, 2015 to April 20, 2015.
Pending are (1) legal issues reserved for post-trial
determination,[1] (2) the police defendants' motions for judgment
as a matter of law, or in the alternative, for a new trial and
remittitur, and to strike Humbert's opposition, and (3)
Humbert's motion for attorneys' fees.  In light of the jury's
findings about the Victim's identification of Humbert, his
resemblance to the composite sketch, and the absence of actual
malice, among others, the Court will determine that the police

---

[1] They are: (1) whether the police defendants are entitled to
qualified immunity on the federal malicious prosecution claim,
and (2) whether Humbert has shown a lack of probable cause as
required for his Maryland malicious prosecution claim.

defendants have federal qualified immunity and are entitled to judgment as a matter of law on the state law claims; thus, judgment will be entered for the police defendants on all counts.  Additionally, the police defendants' motion to strike will be denied, and Humbert's motion for attorneys' fees will be denied as moot.

I.   Background[2]

This case arises from the April 30, 2008 rape of a woman[3] in her home in Baltimore's Charles Village neighborhood, Humbert's arrest and pre-trial detention on rape charges, and his release--15 months later--when the assigned prosecutor, former Assistant State's Attorney Joakim Tam, chose to *nolle prosequi* the case.

According to trial testimony, on April 30, 2008, Griffin and Jones went to the Victim's home shortly after several police officers had arrived.  Rough Trial Tr., Vol. II, 10:7-11.  The

---

[2] The facts are from the parties' trial exhibits, the rough transcript of trial testimony, and the jury's factual findings. For the police defendants' motion for judgment as a matter of law, the Court will "review the entire record, disregarding all evidence favorable to [the police defendants] that the jury [wa]s not required to believe." *Trademark Props., Inc. v. A & E Television Networks,* 422 F. App'x 199, 201 (4th Cir.2011) (internal quotation marks omitted).  For the motion for new trial, the Court "may weigh the evidence and consider the credibility of witnesses." *King v. McMillan,* 594 F.3d 301, 314 (4th Cir. 2010).

[3] Although the woman is referred to by name in the parties' submissions, because she is not a party to the lawsuit the Court will refer to her as the "Victim."

Victim recalled describing her attacker as 5'7", African-American, late 30s to early 40s, and fairly well-spoken.  *Id.*, Vol. II, 10:16-21.[4]  After taking her statement, Jones and Griffin transported the Victim and her friend--Kirsten Pickup--to a hospital for a physical examination.  *Id.*, Vol. II, 10:25-11:9.[5]  She was then taken to the police station to provide a recorded statement.  *Id.*, Vol. II, 11:20-23.

On May 1, 2008, Griffin transported the Victim and Pickup to the police station to meet with Officer Michael Brassell, a sketch artist.  *Id.*, Vol. IV, 86:23-25, 87:14-16.[6]  The Victim testified that she was unhappy with the generic sketch initially produced by Brassell, so she worked with him to redraw parts of it so that it looked as close to her attacker as possible.  *Id.*,

---

[4] Griffin recalled the Victim's description as 5'7" to 5'9", African American, medium build, 180 pounds, in his late 30s to 40s.  Rough Trial Tr., Vol. II, 96:18-21.  The Victim's recorded statement, which she testified was roughly the same as her statement at the scene, described her attacker as in his 30s, "probably 5'7"", medium build, clean cut, short hair, and no facial hair.  Def. Trial Ex. 17 at 6-9; Rough Trial Tr. Vol. II, 11:24-12:3.

[5] Griffin testified that he alone transported the Victim and Pickup to the hospital.  *Id.*, Vol. II, 87:9-12.  Griffin testified that after the examination, he drove the Victim and Pickup to the station for her recorded statement.  *Id.*, Vol. II, 87:18-25.

[6] The Victim testified that she had drawn her own sketch the night before completing the composite, but that it was unused because the police composite had to be done by a police sketch artist.  *Id.*, Vol. II, 13:5-7.

Vol. II, 13:14-24, 45:13-22, 49:3-9.  In particular, the Victim drew the attacker's nose, which she had described as one of his distinctive features.  *Id.*, Vol. II, 49:10-15.  The Victim testified that she had been satisfied with the final composite sketch,[7] and recognized it as the composite sketch on the wanted flyer.  *Id.*, Vol. II, 50:2-12.[8]

The Victim further testified that Jones and Griffin were present while she worked with Brassell, and, at some time, Jones had shown her a photograph of a man on his cellphone.  *Id.*, Vol. II, 13:23-24, 14:2-10.[9]  Griffin testified that he had been assisting officers to canvass the area while the Victim worked with the sketch artist.  *Id.*, Vol. IV, 87:6-8.  Jones testified that he did not believe he had been present while the Victim worked with the sketch artist; instead, he recalled visiting a

---

[7] Griffin testified that the composite sketch was consistent with the Victim's description and Humbert's photograph.  *Id.*, Vol. II, 98:7-11.  Smith testified that she believes the composite sketch looks like Humbert.  *Id.*, Vol. I, 151:2-12.

[8] The Victim previously swore that "[t]he features of my assailant from my sketch *and* my communications with the sketch artist were not incorporated into the composite sketch."  *See* Pl. Trial Ex. 1 ¶ 5.  At trial, she testified that Brassell worked with her for some time to complete the sketch, had been receptive to her changes, and that she had assisted him in the process, by, for example, drawing the nose.  Rough Trial Tr., Vol. II, 48:5-49:12.

[9] The Victim could not recall if Jones had shown her the photograph while she was completing the sketch or after it had been completed.  *Id.*, Vol. II, 14:7-9.

nearby school to review surveillance video. *Id.*, Vol. I, 78:6-19.  Jones testified that he did not recall showing the Victim a photograph on his cellphone.  *Id.*, Vol. I, 77:19-78:4. Investigative notes state that on May 1, 2008, the Victim had completed a composite sketch and that Jones and Griffin had reviewed surveillance video, but did not state when each event occurred.  *See* Def. Trial Ex. 28.[10]

The composite sketch was reproduced on flyers and distributed in the area near the Victim's home.  Rough Trial Tr., Vol. I, 152:6-10; Vol. II, 89:2-7.[11]  Smith testified that an officer stopped Humbert near the Victim's home and identified him as a suspect based on the Victim's physical description of her attacker and the composite sketch.  *Id.*, Vol. I, 150:1-16; Vol. IV, 35:8-13.[12]  The officer photographed Humbert; the

---

[10] The Victim testified that Jones and Griffin drove her and Pickup home after she had completed the composite sketch.  *Id.*, Vol. II, 15:10-11.  During the ride, Pickup mentioned having a get-together that evening.  *Id.*, Vol. II, 15:13-14.  Pickup contacted the Victim that evening and told her that Jones had asked for an invitation to the get-together.  *Id.*, Vol. II, 15:20-16:6.  Jones testified that he did not recall meeting Pickup and denied contacting her.  *Id.*, Vol. I: 84:7-25:2.

[11] *See also* Def. Trial Ex.'s 5, 6 (wanted flyers depicting composite sketch).

[12] Humbert testified that on May 7, 2008, an officer stopped him on Maryland Avenue, between 23rd Street and Charles Street, asked some questions, and asked if he could take Humbert's photograph, to which Humbert consented.  Rough Trial Tr., Vol. III, 4:19-23, 20:13-16.  The Victim's attack occurred at 2213 Saint Paul Place, *id.*, Vol. II, 45:9-14, which is about two

picture was included in a photo book of possible suspects to show the Victim. *Id.*, Vol. I, 150:16-19.

On May 8, 2008, Jones contacted the Victim about viewing photographs of potential suspects. *Id.*, Vol. II, 20:11-16.[13] About 20 minutes after the telephone call, Smith and Griffin arrived at the Victim's home and showed her photographs compiled from several leads--including Humbert's--and recently released offenders. *Id.*, Vol. I, 147:11-17, 149:18-25.[14]

Smith testified that the Victim pointed at Humbert's photograph, stated "that's him" several times, and became

---

blocks from where Humbert had been stopped, *see* Def. Trial Ex's 38, 40 (maps indicating the location of the attack and where Humbert had been stopped). Humbert further testified that when stopped, he was around 5'5" tall, 180 pounds, with short hair, and no facial hair. *Id.*, Vol. III 20:20-21:6. Humbert agreed that he was fairly well-spoken. *Id.*, Vol. III 21:6-11.

[13] This was the third time officers showed the Victim photographs of potential suspects. On the first occasion, the Victim told officers that the quality of the photographs made it difficult to determine skin tone, and to identify someone, she would need to see suspects in a lineup and hear their voices. *Id.*, Vol. II, 18:4-16. However, as to one of the photographs, the Victim wrote that the person "could be the suspect because his facial features match those of her attacker." Def. Ex. 7 (the Victim's statement and signature on form attached to photo array, which had also been signed by Smith and Griffin). On the second occasion, the Victim expressed the same concern that she was unable to identify anyone without a physical lineup or hearing suspects' voices. Rough Trial Tr., Vol. II, 19:3-13.

[14] Jones waited in the car while Smith and Griffin met with the Victim. *Id.*, Vol. II, 148:7-9.

visibly upset.  *Id.*, Vol. I, 154:1-8.[15]  The Victim, at Smith's
request, finished reviewing the photos and then returned to
Humbert's photograph, stating "that's him."  *Id.*, Vol. I, 154:4-
6.  Smith testified that she told the Victim to write, in her
own words, who the person was; the Victim wrote "that's him" on
the back of the photograph.  *Id.*, Vol. I, 154:10-13.  Smith did
not recall the Victim saying that she needed to see a physical
lineup or hear Humbert's voice to make a positive
identification.  *Id.*, Vol. I, 154:15-18.

    Griffin testified that the Victim pushed the photo book
away from her when she turned to the page with Humbert's
photograph, stated "that's him," and started crying.  *Id.*, Vol.
IV, 96:2-11.  The Victim wrote "that's him" on the back of the
photograph and signed her name.  *Id.*, Vol. IV, 97:10-15.
Griffin did not recall the Victim saying that she wanted to see
a physical lineup or hear Humbert's voice, or indicating doubt
about the identification.  *Id.*, Vol. IV, 98:14-25.  Jones
testified that when Smith and Griffin returned to the car, they
told him that the Victim had positively identified Humbert and
had become emotional when she saw his photograph.  *Id.*, Vol. I,
86:11-24.

---

[15] Smith's investigative notes also state that the Victim had
stated "that's him" several times, pointed at the photograph,
"became visibly shaken," and "put [her] hands over [her] eyes."
Def. Trial Ex. 25.

The Victim testified that she became very upset when she turned to the second person in the book because he looked like the person in Jones's cellphone picture, and looked like the person who had raped her. *Id.*, Vol. II, 21:3-12. She did not deny stating "that's him," and testified that Smith told her to write "that's him" on the back of Humbert's photograph. *Id.*, Vol. II, 21:13-23, 61:3-5. She acknowledged signing her name above Humbert's photograph and on the back of the photograph. *Id.*, Vol. II, 58:20-59:11; *see also* Def. Trial Ex. 9 at 5 (the Victim's signature above Humbert's photograph), at 6 (the Victim's handwritten statement--"that's him"--and signature, and Smith and Griffin's signatures, on the back of Humbert's photograph).[16]

The Victim further testified that she asked Smith and Griffin what would happen next, and told them that she needed to see Humbert in a lineup before she would be completely sure about her identification. *Id.*, Vol. II, 59:16-19. Neither Smith nor Griffin stated that they would provide a physical

---

[16] The Victim also testified that about a year before trial, she had a strong emotional reaction when viewing Humbert's photograph because he resembled her attacker. *Id.*, Vol. II, 78:3-17.

lineup; rather, they told her that they were following procedure.  *Id.*, Vol. II, 59:20-23.[17]

On May 9, 2008, Smith applied for an arrest warrant for Humbert.  *Id.*, Vol. I, 158:21-159:5; Pl. Trial Ex. 5 (application for statement of charges and arrest warrant).[18]  The warrant application summarized the Victim's description of the rape and noted that, during the investigation, "the victim completed a sketch of the suspect [that] was disseminated throughout the community."  Pl. Trial Ex. 5.  The application then stated that the sketch resulted in "[s]everal leads . . . one of which [led] to Marlow Humbert."  *Id.*  His photograph was then shown to the Victim, "along with several other similar photographs, when the victim positively identified him as her

---

[17] Jones testified that he did not recall the Victim asking to see Humbert in a lineup, but that his department did not have the facilities to do that.  *Id.*, Vol. III, 111:7-15. Further, probable cause would have been required to pick up Humbert for a lineup or to provide a voice identification; thus, he would have been unable to pick up Humbert before the Victim's identification.  *Id.*, Vol. III, 112:5-13.

[18] *See also* Def. Trial Ex. 26.  Jones testified that he was unsure whether he had reviewed the arrest warrant application. Rough Trial Tr., Vol. I, 88:14-20.  Smith testified that Jones probably would have reviewed the application but she could not recall if he had.  *Id.*, Vol. I, 169:21-170:1.  Griffin testified that he had known that the arrest warrant application was based on the Victim's positive identification of Humbert and that he matched the description of the attacker.  *Id.*, Vol. II, 95:9-17, 96:7-23.

attacker."  *Id.*  Based on this application, a judge issued a

warrant for Humbert's arrest.  *Id.*

On May 10, 2008, Humbert was arrested.  *Id.*, Vol. III,

3:14-23.[19]  The Victim testified that she learned about Humbert's

arrest from a friend.  Rough Trial Tr., Vol. II, 22:21.[20]  She

then called Jones and expressed concern that she had not been

informed, and that she could not identify her attacker without a

physical lineup.  *Id.*, Vol. II, 22:14-23:13.

The Victim attended Humbert's arraignment, but did not

recognize him.  *Id.*, Vol. II, 24:6-7, 20-21.  She testified that

she did not inform the prosecutor at the arraignment--or during

subsequent conversations--that she had been unable to recognize

Humbert.  *Id.*, Vol. II, 71:23-25, 73:3-6, 76:2-7.

The Victim testified that a few days after the arraignment,

she ran into Jones at a coffee shop; he told her they had the

person who had attacked her and would obtain DNA[21] to prove it.

---

[19] Humbert testified that during his arrest, an officer showed
him a picture and asked if that was Humbert; Humbert said that
it was.  *Id.*, Vol. III, 4:6-8.  Humbert testified that the
picture looked like a composite, but not an artist's rendering,
and he was unsure whether it was a composite or a black and
white photograph.  *Id.*, Vol. III, 5:10-19.

[20] The Victim previously swore that she learned about the arrest
from news reports.  Pl. Trial Ex. 5 ¶ 10.

[21] The Victim testified that her attacker had told her that he
was wearing a condom, but that she had not seen him put it on.
Rough Trial Tr., Vol. II, 47:13-16, 81:15-16.

*Id.*, Vol. II, 25:5-13.  The Victim told him that she was unsure about the identification,[22] but would testify against him if they had DNA evidence.  *Id.*, Vol. II, 25:14-18.[23]  Over the next 14 months, the Victim told the prosecutor on several occasions that she would testify; however, when she learned there was no DNA evidence, she told the prosecutor that she would not testify. *Id.*, Vol. II, 28:4-12, 29:2-4.  On July 30, 2009, Tan chose to *nolle prosequi* the case against Humbert, and Humbert was released.  *See* Def. Trial Ex. 43 ¶ 11.[24]

On February 17, 2011, Humbert filed a 19-count complaint alleging constitutional violations under 42 U.S.C. § 1983[25] and

---

[22] The Victim testified that although she had indicated throughout the process that she could not make an identification without a physical lineup, she had the most interaction with Jones and had told him on several occasions that she could not make a positive identification.  *Id.*, Vol. II, 25:12-24, 82:9-23.

[23] Jones testified that he did not recall seeing the Victim at a coffee shop.  *Id.*, Vol. I, 90:12-16.

[24] Tan averred that Humbert's case had been postponed four times at requests of him and Humbert's public defender.  Def. Trial Ex. 43 ¶ 10.

[25] Section 1983 provides:
>       Every person who, under color of any statute,
>   ordinance, regulation, custom, or usage, of any State
>   or Territory or the District of Columbia, subjects, or
>   causes to be subjected, any citizen of the United
>   States or other person within the jurisdiction thereof
>   to the deprivation of any rights, privileges, or
>   immunities secured by the Constitution and laws, shall
>   be liable to the party injured. . . .
42 U.S.C. § 1983 (2012).

state law claims against several police officers and others.[26]

ECF No. 1.[27]   On November 28, 2011, the Court dismissed counts

---

[26] Humbert sued: (1) Baltimore City police officers Chris Jones, Keith Merryman, Caprice Smith, Dominick Griffin, and Michael Brassell, in their individual and official capacities (together, the initial group of "police defendants"); (2) Martin O'Malley, individually and in his official capacity as Governor of the State of Maryland and former Mayor of the City of Baltimore; (3) the Mayor and City Council of Baltimore City; (4) Sheila Dixon, the former Mayor of Baltimore City, individually; (5) the Baltimore City Police Department (the "Police Department"); (6) Frederick Bealefeld, individually and in his official capacity as Police Commissioner of the Police Department; (7) Cinese Caldwell, individually and in her official capacity as a Baltimore City laboratory technician and police officer; and (8) Baltimore City police officers John and Jane Does 1-20s and Baltimore City police supervisors Richard and Jane Roes 1-20s, in their individual and official capacities.  ECF No. 1 at 8-14.

[27] The following claims were asserted against the police defendants: (1) § 1983 claims for malicious prosecution (count three), suggestive identification procedures (count seven), failure to disclose exculpatory evidence and fabrication of inculpatory evidence (count eight), and false arrest and imprisonment (count ten), in violation of Humbert's Fourth and Fourteenth Amendment rights; (2) § 1983 claim for failure to investigate, in violation of Humbert's Fourteenth Amendment rights (count nine); (3) violations of Articles 24 and 26  of Maryland's Declaration of Rights (count eleven); (4) battery (count twelve); (5) false arrest and imprisonment (count thirteen); (6) abuse of process (count fourteen); (7) negligence (count fifteen); (8) negligent failure to warn (count sixteen); (9) malicious prosecution (count eighteen); and (10) intentional infliction of emotional distress ("IIED") (count nineteen). ECF No. 1 at 45-47, 50-68, 70-74.  Humbert asserted three counts of violations of 42 U.S.C. § 1985 against all defendants (counts four through six).  *Id.* at 47-50.  Humbert also brought a § 1983 claim against the Police Department, O'Malley, Bealefeld, Dixon, Jones, Richard, and Jane Roes for supervisory misconduct in violation of his Fourth and Fourteenth Amendment rights (count two).  *Id.* at 44-45.

four to six for failure to state a claim.  ECF Nos. 35-36.[28]  On

March 27, 2012, the Court granted the defendants' motion to

bifurcate the case and stay discovery on all claims except those

asserted against the police defendants.  ECF Nos. 52-53.  On

March 25, 2014, the Court granted the police defendants' motion

for summary judgment on all claims against Brassell and

Merryman, and granted summary judgment on counts two, seven,

eight, nine, ten, twelve, thirteen, fourteen, and nineteen for

Smith, Jones, and Griffin--the remaining police defendants.  ECF

Nos. 138-39.[29]  The Court denied the police defendants' motion

for summary judgment on counts three, eleven, fifteen, sixteen,

and eighteen, in part, because there were triable issues of fact

about whether the police defendants were entitled to qualified

immunity on the § 1983 malicious prosecution and Maryland

negligence claims.  ECF No. 138 at 33 & n.40, 53.

From April 14-20, 2015, the parties tried counts three

(§ 1983 malicious prosecution), eleven (Articles 24 and 26 of

---

[28] The Court also dismissed all claims against O'Malley in his
official and individual capacity, and dismissed all claims
against Caldwell.  ECF No. 36.

[29] Humbert also brought a § 1983 claim against Jones for
supervisory misconduct in violation of his Fourth and Fourteenth
Amendment rights (count two).  The Court granted Jones summary
judgment on that count.  ECF No. 138 at 43.

Maryland's Declaration of Rights),[30] fifteen (negligence),[31] and

eighteen (Maryland malicious prosecution), and the police

defendants' qualified immunity defense.

On April 20, 2015, the jury returned a verdict for Humbert

against all three police defendants on the § 1983 malicious

prosecution claim and the negligence claim.[32]  The jury also made

factual findings relevant to the pending legal issues.[33]

---

[30] Because Article 24 of the Declaration of Rights is similar to
the Fourteenth Amendment of the United States Constitution and
Article 26 is similar to the Fourth Amendment of the United
States Constitution, Humbert proposed--and the police defendants
did not oppose--submitting the issues together on the verdict
sheet.  *See* ECF No. 189 at 4.

[31] Humbert abandoned count sixteen (negligent failure to warn) at
trial when he failed to provide authority for the claim; thus,
it was not submitted to the jury, and judgment will be entered
for the police defendants on that count.

[32] On the § 1983 claim, the jury awarded (1) $400,000 in
compensatory damages and $750,000 in punitive damages against
Jones, (2) $300,000 in compensatory damages and $500,000 in
punitive damages against Smith, and (3) $100,000 in compensatory
damages and $250,000 in punitive damages against Griffin.  On
the negligence claim, the jury awarded $10 in nominal damages
against each defendant.

[33] Because material factual disputes prevented a ruling at the
summary judgment stage on whether the police defendants were
entitled to qualified immunity on the § 1983 malicious
prosecution claim, those issues must be resolved by the Court
based on the jury's factual findings.  *See, e.g.*, *Willingham v.
Crooke*, 412 F.3d 553, 560 (4th Cir. 2005).  Further, Under
Maryland law of malicious prosecution, jurors do not decide
whether Humbert has shown the requisite absence of probable
cause (that is a legal question); instead, they decide the facts
that would underlie that determination.  *See, e.g.*, *Montgomery
Ward v. Wilson*, 339 Md. 701, 716, 664 A.2d 916, 923 (1995);

For each defendant, the jury found[34] that Humbert *had not* proven that:[35]

A. A reasonable officer, in [the police defendant's] place, would not have believed that he closely matched the description of the attacker given by the victim.

B. A reasonable officer, in [the police defendant's] place, would not have believed that he closely resembled the composite sketch completed by the victim.

C. When he was stopped by an officer he was not within blocks of the location where the victim's assault took place.

D. The address given to the officer when he was stopped was less than two miles away from the location where he was stopped.

E. [The police defendant] reasonably believed that when he was stopped by an officer he was not wearing a stocking cap made from a woman's stocking.

F. His record did not indicate that he was 5'7".

G. His record did not indicate that he weighed 180 pounds.

---

*Palmer Ford, Inc. v. Wood*, 298 Md. 484, 507, 471 A.2d 297, 309 (1984).

[34] The jury was instructed to apply a "preponderance of the evidence standard" to its findings.

[35] When qualified immunity is asserted, the plaintiff bears the burden of showing that a constitutional violation occurred. *Henry v. Purnell*, 501 F.3d 374, 377 (4th Cir. 2007); *Richter v. Maryland*, 590 F. Supp. 2d 730, 739 (D. Md. 2008) *aff'd sub nom. Richter v. Beatty*, 417 F. App'x 308 (4th Cir. 2011). Under Maryland law of malicious prosecution, the plaintiff bears the burden of proving that criminal proceedings were instigated without probable cause. *Mart of Waldorf, Inc. v. Alban*, 29 Md. App. 602, 605, 349 A.2d 685, 687 (1976).

H. When he was stopped by an officer he did not have a short haircut.

I. Upon seeing his photo in the photo book, the victim did not have a strong emotional reaction.

J. Upon seeing his photo in the photo book, the victim did not jab at the photo.

K. Upon seeing his photo in the photo book, the victim did not say "that's him" without prompting.

L. Upon seeing his photo in the photo book, the victim did not attempt to push it away from herself.

M. Upon seeing his photo in the photo book, the victim did not sign her name above his picture.

N. Upon seeing his photo in the photo book, the victim did not sign her name on the back of his picture.

O. Upon seeing his photo in the photo book, the victim did not write "that's him" on the back of his picture.

P. The victim was threatened, promised something, or otherwise coerced into writing "that's him" on the back of his picture.

Verdict Sheets, I:A-P.  For each defendant, the jury found that Humbert *had* proven that:

Q. The victim stated to [the police defendant] before Mr. Humbert's arrest that she could not positively identify him as her attacker.

R. The victim told [the police defendant] after Mr. Humbert was arrested that she could not positively identify him as her attacker.

Verdict Sheets, I:Q-R.  Additionally, the jury found that none

of the police defendants had acted with actual malice.  Verdict

Sheets, VII:A.

16

On April 23, 2015, the Court entered a briefing schedule
on all post-trial matters and stated that judgment would be
entered thereafter.  ECF No. 202.[36]  On May 8, 2015, the police
defendants moved for judgment as a matter of law, or in the
alternative, for a new trial and remittitur.  ECF No. 203.[37]
That day, Humbert briefed post-trial legal issues, and moved for
attorneys' fees.  ECF Nos. 204, 205.[38]  On May 11, 2015, Humbert
submitted exhibits in connection with his briefing of post-trial
legal issues.  ECF No. 206.

On May 22, 2015, the police defendants opposed Humbert's
brief about post-trial legal issues.  ECF No. 209.  That day,
the police defendants, without "waiv[ing] any objection or
opposition" to Humbert's motion for attorneys' fees, "join[ed]

---

[36] *See Hill v. McKinley, et al.*, Case No. 98-CV-30102 (S.D. Iowa
June 15, 2001) (ruling on all post-trial matters and entering
judgment), *aff'd in part, rev'd in part*, 311 F.3d 899 (8th Cir.
2002).  The Court ordered post-trial motions and briefing on the
issues of qualified immunity and the probable cause
determination the Court had to make under Maryland law to be
filed by May 8, 2015.  ECF No. 202 at 1.  Responses were due on
May 22, 2015, and replies were due on May 29, 2015.  *Id.*

[37] The police defendants incorporated their arguments for
judgment as a matter of law into their briefing of post-trial
legal issues.  ECF No. 203 at 28.

[38] Humbert "currently estimates that his claim [for attorneys'
fees] . . . will be under a million dollars," but the "amount is
likely to increase if the fee petition is extensively litigated
and/or the [police defendants] appeal the Judgment."  ECF No.
205 at 4.  Humbert seeks an award of attorneys' fees as a
prevailing party and a briefing schedule for evidentiary
submissions.  *Id.*

in what [was] essentially a motion to stay" Humbert's motion for
attorneys' fees, and consented to Humbert's motion for leave to
file evidentiary support.   ECF No. 208.

On May 25, 2015--three days after the responsive filing
deadline--Humbert filed a "notice of filing of lengthy exhibit,"
which stated that his response only existed in paper format and
would be served on the police defendants within 24 hours of
filing the notice.   ECF No. 210.   On May 26, 2015, Humbert
opposed the police defendants' motion for judgment as a matter
of law, or in the alternative, for a new trial and remittitur.
ECF No. 211.

On May 28, 2015, the police defendants moved to strike
Humbert's opposition.   ECF No. 212.   That day, Humbert requested
an extension of time for the police defendants to reply to his
opposition, ECF No. 213; however, Humbert has not otherwise
responded to the motion.[39]   Without resolving the motion to
strike, the Court granted the parties until June 1, 2015, to
file any replies.   ECF No. 214.

On June 1, 2015, Humbert replied to the police defendants'
opposition to his brief about post-trial legal issues, ECF No.

---

[39] Humbert's response was due June 15, 2015; as of today's date,
he has not responded.

215,[40] and the police defendants replied to Humbert's opposition to their motion for judgment as a matter of law, ECF No. 216.[41]

## II.  Analysis

### A.  Motion to Strike

Federal Rule of Civil Procedure 6(b)(1) provides that "[w]hen an act may or must be done within a specified time, the court may, for good cause, extend the time . . . on motion[42] made after the time has expired if the party failed to act because of excusable neglect."  To determine if the delay is excusable neglect, the court "consider[s] all relevant circumstances, including the danger of prejudice to the non-moving party, the

---

[40] The docket entry states that Humbert's filing is a reply to the police defendants' opposition to his brief *and* his motion for attorneys' fees and the police defendants' motion to strike. *See* ECF No. 215 (docket entry).  However, Humbert's reply does not address his motion for attorneys' fees, nor does it respond to the police defendants' motion to strike.

[41] On June 4, 2015, Humbert attempted to file a surreply in connection with the police defendants' motion for judgment as a matter of law, which was flagged as requiring leave of the Court.  *See* ECF Nos. 218, 220; *see also* Local Rule 105.2(a)(D. Md. 2014)("Unless otherwise ordered by the Court, surreply memoranda are not permitted to be filed."); *Khoury v. Meserve*, 268 F. Supp. 2d 600, 605 (D. Md. 2003), *aff'd*, 85 F. App'x 960 (4th Cir. 2004).  Humbert never sought leave of the Court to file the surreply; thus, it will not be considered.

[42] The Court will construe the tardy opposition and the notice of filing of lengthy exhibit as a motion for an extension of time to file the opposition.  *See, e.g.*, *Harty v. Commercial Net Lease LP Ltd.*, 5:09-CV-495-D, 2011 WL 807522, at *1 (E.D.N.C. Mar. 1, 2011) (construing "the filing of the [untimely] amended complaint and the notice of late filing as a motion for extension of time to file the amended complaint").

length of the delay and its potential impact on judicial
proceedings, the reason for the delay, including whether it was
within the reasonable control of the movant, and whether the
movant acted in good faith." *See Perry-Bey v. City of Norfolk,
Va.*, 679 F. Supp. 2d 655, 658-59 (E.D. Va. 2010) (*quoting
Pioneer Inv. Servs. Co. v. Brunswick Assocs. Ltd. P'ship,* 507
U.S. 380, 395, 113 S. Ct. 1489, 123 L.Ed.2d 74 (1993)).  The
reason for the delay is the most important factor. *See Thompson
v. E.I. DuPont de Nemours & Co., Inc.*, 76 F.3d 530, 534 (4th
Cir. 1996).  "'Excusable neglect' is not easily demonstrated,"
it should be found "only in the '*extraordinary cases* where
injustice would otherwise result.'"  *Id.* (emphasis in original).
The party seeking the extension has the burden of demonstrating
excusable neglect.  *Id.*

The police defendants moved to strike Humbert's opposition
because it was untimely and failed to adhere to several local
formatting rules.  ECF No. 212 at 1.  As noted above, Humbert
has not opposed the motion; however, his request for an
extension of time for the police defendants' reply states that
he had been unable to upload his response to the Court's
electronic filing system and, thus, had emailed his response to
defense counsel around noon on Tuesday, May 26, 2015.  ECF No.
213 at 1.

This Court previously denied the police defendants' motion to strike Humbert's untimely opposition to their summary judgment motion.  *See* ECF No. 139.  There, Humbert had been unable to upload the opposition through the Court's electronic filing system, presumably because of its size.  ECF No. 124 at 2.  The Court received Humbert's opposition six days after the filing deadline.  ECF Nos. 138 at 18; 121.  In denying the motion, the Court found that Humbert had demonstrated excusable neglect because there was no indication that Humbert's counsel knew in advance that he might have technical difficulties uploading the filing, and had acted promptly to correct the problem by mailing paper copies of the filing to defense counsel and the Court.  ECF No. 138 at 18-19.

Accordingly, Humbert cannot argue--and indeed he has not-- that his counsel lacked notice about potential problems uploading files.  Moreover, his notice of filing of lengthy exhibit[43] was filed three days after the filing deadline. Nonetheless, the Court does not want to punish Humbert for his

---

[43] Notices of filing of lengthy documents or exhibits are typically required when filings exceed the electronic filing system's 30 megabyte capacity, which usually occurs when filings are well over 100 pages.  *See* United States District Court for the Distric of Maryland Document Filing System, https://ecf.mdd.circ4.dcn/cgi-bin/ShowIndex.pl.  Humbert's opposition was 44 pages and did not include exhibits; thus, it is unclear whether size of the file prevented Humbert's counsel from uploading it.

counsel's lack of diligence.  Defense counsel and the Court
received Humbert's opposition on Tuesday, May 26, 2015, which--
because of a holiday weekend--is the same day it would have been
received had Humbert's counsel timely filed the notice of filing
of lengthy exhibit.  The extension of time for filing their
reply mitigated any prejudice to the police defendants, and
there is no indication of bad faith.

As to formatting, Local Rule 102(b) requires that court
documents "shall not exceed 8 1/2" x 11", with a top margin of
at least 1 1/2" and left-hand margin of 1" and a right-hand
margin of 1/2".  Lines of text shall be double-spaced except for
quotations and footnotes.  Pages shall be numbered at the bottom
of every page after the first page."  Humbert's opposition
appears to lack virtually any top or bottom margin and page
numbers, and is not double-spaced.  *See* ECF No. 211.  Although
at 44 pages it is less than the 50-page maximum stated in Local
Rule 105.3, presumably that is because of Humbert's counsel's
failure to use appropriate margins or double-space the text.
Additionally, Humbert's opposition lacks the table-of-contents
required by Local Rule 105.4 for documents longer than 25 pages.

Nonetheless, the Court declines to grant the police
defendants' motion on the basis of Local Rule violations.  *See*
*Oxford House, Inc. v. City of Raleigh*, No. 5:98-CV-113-BO(2),
1999 WL 1940013, at *2 (E.D.N.C. Jan. 26, 1999)(declining to

22

sanction parties for failing to comply with Local Rules).

Humbert's later filings are somewhat more compliant.  *See* ECF

No. 215.  However, Humbert's counsel is advised to familiarize

himself with this Court's Local Rules to avoid the future

possibility of sanctions detrimental to his client.  The police

defendants' motion to strike will be denied.

B.   Judgment as a Matter of Law

As a general rule, "a court should not 'disturb a jury

verdict unless without weighing the evidence or assessing

witness credibility, it concludes that reasonable people could

have returned a verdict only for the moving party.'"  *Willis v.*

*Youngblood*, 384 F. Supp. 2d 883, 886 (D. Md. 2005) (*quoting*

*Randall v. Prince George's County, Md.*, 302 F.3d 188, 201 (4th

Cir. 2002)).  "If a reasonable jury could reach only one

conclusion based on the evidence or if the verdict in favor of

the nonmoving party would necessarily be based upon speculation

and conjecture, judgment as a matter of law must be entered."

*Id.* (*citing Myrick v. Prime Ins. Syndicate, Inc.*, 395 F.3d 485,

489 (4th Cir. 2005)).  In reviewing such a motion, a court "must

view the evidence in the light most favorable to the Plaintiff,

and the Plaintiff receives the benefit of all inferences."  *Id.*

However, when--as here--material factual disputes prevent a

ruling on qualified immunity at the summary judgment stage, "the

district court should submit factual questions to the jury and

23

reserve for itself the legal question of whether the defendant
is entitled to qualified immunity on the facts found by the
jury." *Willingham v. Crooke*, 412 F.3d 553, 560 (4th Cir. 2005)
("[A] genuine question of material fact regarding [w]hether the
conduct allegedly violative of the right actually occurred ...
must be reserved for trial.")(first alteration added)(internal
quotation marks and citation omitted); *see also Gregg v. Ham*,
678 F.3d 333, 339 (4th Cir. 2012); *ACLU of Maryland v. Wicomico
County*, 999 F.2d 780, 784 (4th Cir. 1993) (when "the defendant's
entitlement to immunity turns on a factual dispute, that dispute
is resolved by the jury at trial").[44]

---

[44] Accordingly, Humbert's argument that the doctrine of the law
of the case precludes the Court's post-trial resolution of
qualified immunity is unavailing.  *See* ECF No. 204 at 17.  In
any event, the law of the case doctrine--which is discretionary
--is inapplicable when later proceedings produce additional
evidence.  *See TFWS, Inc. v. Franchot*, 572 F.3d 186, 191 (4th
Cir. 2009)(*citing United States v. Aramony*, 166 F.3d 655, 661
(4th Cir. 1999))); *see also Equal Rights Ctr. v. Equity
Residential*, 798 F. Supp. 2d 707, 721 (D. Md. 2011)(denial of
motion to dismiss may only be dispositive as law of the case
when a later motion presents the same facts); *MacGill v. Johns
Hopkins Univ.*, No. R-81-2127, 1983 WL 30330, at *3 (D. Md. Apr.
14, 1983)("[I]t is generally held that an initial denial of
summary judgment does not foreclose, as the law of the case, a
subsequent grant of summary judgment on an amplified record.").

Further, Humbert repeatedly asserts that the jury questions do
not apply to the federal malicious prosecution claim.  *See,
e.g.*, ECF No. 215 at 36.  Although it is true that the jury
decides whether the substantive elements of Humbert's § 1983
malicious prosecution claim have been met, *see Green v.
Zendrian*, 916 F. Supp. 493, 499-500 (D. Md. 1996), the Court
decides whether the police defendants are immune from liability
on that claim; as noted, resolution of that legal question

Further, under Maryland law of malicious prosecution, jurors do not decide whether probable cause was absent (that is a legal question); instead, they decide the facts that would underlie the probable cause determination that the Court must make. *See Montgomery Ward v. Wilson*, 339 Md. 701, 716, 664 A.2d 916, 923 (1995); *Palmer Ford, Inc. v. Wood*, 298 Md. 484, 507, 471 A.2d 297, 309 (1984); *see also Johnson v. Baltimore City Police Dep't*, No. CIV. WDQ-12-0646, 2014 WL 4476586, at *6 (D. Md. Sept. 9, 2014)("What facts are sufficient to show want of probable cause in any case, is, of course, a question of law for the court; but whether such facts are proved by the evidence is a question for the jury.")(*quoting Kennedy v. Crouch*, 191 Md. 580, 62 A.2d 582, 587 (Md. 1948)).

---

depends on the jury's factual findings, even when the determinations overlap, *see Willingham*, 412 F.3d at 560.  Thus, the Court will address the issue of qualified immunity before addressing the police defendants' arguments for judgment as a matter of law--which involves reviewing the entire record.  *See Ramos v. Sedgwick Cnty. Sheriff's Dep't*, 785 F. Supp. 1457, 1463 (S.D. Fla. 1991)("[T]he qualified immunity doctrine was meant to create immunity from suit rather than as a mere defense to liability.").

Additionally, the Court is unimpressed with Humbert's repeated attempts to conflate this case with recent events in Baltimore following the death of Freddie Gray, or his suggestion that judgment for the police defendants might "reignite[]" protests. *See* ECF Nos. 204 at 22, 215 at 3.  The Court will, as it must, apply the law to the facts as found by the jury and the evidence adduced at trial to resolve the pending issues.

1.   Federal Qualified Immunity

Government officials performing discretionary functions are shielded from liability for civil damages under § 1983 when their conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan,* 555 U.S. 223, 231, 129 S. Ct. 808, 815, 172 L. Ed. 2d 565 (2009) (internal quotation marks and citation omitted) (*citing Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S. Ct. 2727, 73 L.Ed.2d 396 (1982)). Qualified immunity "protects law enforcement officers from 'bad guesses in gray areas' and ensures that they are liable only 'for transgressing bright lines.'" *Wilson v. Layne,* 141 F.3d 111, 114 (4th Cir. 1998) *aff'd,* 526 U.S. 603, 119 S. Ct. 1692, 143 L. Ed. 2d 818 (1999) (*quoting Maciariello v. Sumner,* 973 F.2d 295, 298 (4th Cir. 1992)). Thus, it "gives ample room for mistaken judgments by protecting all but the plainly incompetent or those who knowingly violate the law. This accommodation for reasonable error exists because officials should not err always on the side of caution because they fear being sued." *Hunter v. Bryant,* 502 U.S. 224, 228-29, 112 S. Ct. 534, 537, 116 L. Ed. 2d 589 (1991)(internal quotation marks and citation omitted).

To determine if defendants are entitled to qualified immunity, the Court must decide: (1) whether the facts demonstrate a violation of a constitutional right; and (2)

whether the right at issue was "clearly established" at the time of the alleged misconduct. *Pearson*, 555 U.S. at 232, 129 S. Ct. at 815-16.

A constitutional right is clearly established "when its contours are sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Ridpath v. Bd. of Governors Marshall Univ.*, 447 F.3d 292, 313 (4th Cir. 2006) (*citing Hope v. Pelzer*, 536 U.S. 730, 739, 122 S. Ct. 2508, 2515, 153 L. Ed. 2d 666 (2002) (internal quotations and punctuation omitted)). "[T]he Fourth Amendment right to be arrested only on probable cause is clearly established . . . ." *Smith v. Reddy*, 101 F.3d 351, 356 (4th Cir. 1996). Also, the law is "clearly established" that the Fourth Amendment prohibits officers from deliberately or recklessly making material omissions or misstatements in warrant applications if the warrant would otherwise lack probable cause. *Miller v. Prince George's Cnty., MD*, 475 F.3d 621, 632 (4th Cir. 2007). "[A] reasonable officer cannot believe a warrant is supported by probable cause if the magistrate is misled by statements that the officer knows or should know are false." *Smith*, 101 F.3d at 355.

Here, the warrant application stated that Humbert was identified as a suspect based on a composite drawing produced by the Victim and her "positive[] identif[ication]" of Humbert as

her attacker.  Pl. Trial Ex. 5; Def. Trial Ex. 26.  Evidence

adduced at trial--considered in the light most favorable to

Humbert--indicated that Humbert had been stopped on the basis of

his resemblance to the composite sketch,[45] the Victim had been

shown his picture while or after completing the composite

sketch,[46] stated "that's him" and became upset when shown his

picture, wrote "that's him" on the back of the picture, signed

the picture, and told Smith and Griffin--and later Jones--that

to be sure about her identification she needed to see Humbert in

a physical lineup and his voice.  Against that backdrop, the

jury found that the Victim had told the police defendants that

she could not positively identify Humbert before--and after--his

arrest.  Verdict Sheets, I:Q-R.  However, the jury also found

that Humbert had not shown that the Victim did not emotionally

---

[45] Humbert did not introduce evidence demonstrating that he had
been stopped on any other basis, for example, by subpoenaing the
officer who stopped and photographed him.  Moreover, Smith and
Griffin testified that they thought Humbert resembled the
sketch.  Rough Trial Tr., Vol I, 151:2-12, Vol. II, 98:7-11.

[46] Because the Victim was unsure when Jones showed her the
cellphone picture, the Court will not infer that Jones showed
her the picture before the sketch had been completed.  Indeed,
there is no evidence that Humbert had been a suspect until he
was stopped on the basis of his resemblance to the composite
sketch.  However, even if the Court inferred that Jones had
shown the Victim the picture while she completed the sketch,
there is no evidence that the sketch was based on anything other
than the Victim's recollection of her attacker.  See, e.g.,
Rough Trial Tr., Vol. II, 49:3-12 (Victim's testimony that she
assisted Brassel with the sketch, and drew parts of it, because
she wanted it to look as close as possible to her attacker).

react to his photograph, point at it, attempt to push it away, sign her name above and on the back of his photograph, or write "that's him" on the back of the photograph.  *Id.*, I:I-J, L-O. The jury also found that Humbert had not shown that the Victim had been prompted to say "that's him," or was threatened, promised something, or coerced into writing "that's him" on the back of the photograph.  *Id.*, I:K,P.[47]

False statements or omissions are material if they were necessary to the judicial officer's determination of probable cause.  *Evans v. Chalmers*, 703 F.3d 636, 650 (4th Cir. 2012) (*citing Franks*, 438 U.S. at 155-56, 98 S. Ct. 2674).[48]  To determine materiality, the court "corrects" the warrant by removing any inaccuracies and inserting recklessly omitted facts and determines if the corrected warrant establishes probable cause.  *Miller*, 475 F.3d at 628.  Thus, the Court must decide whether a warrant application that correctly represented the Victim's identification established probable cause.[49]  *See Bolick*

---

[47] The jury further found that Humbert had not shown that a reasonable officer would not have believed that he closely resembled the composite sketch produced by the Victim.  Verdict Sheets, I:B.

[48] *See also United States v. Colkley*, 899 F.2d 297, 301 (4th Cir. 1990)("Omitted information that is potentially relevant but not dispositive is not [material].").

[49] For the purpose of evaluating whether a "corrected" warrant establishes probable cause, the Court will rely on the jury's findings about the composite sketch and the circumstances

29

*v. Rhodes*, No. 4:11-CV-02924-RBH, 2013 WL 1205214, at *3-4
(D.S.C. Mar. 25, 2013)(evaluating whether corrected affidavit
containing six omitted statements established probable cause).
If it does, the false statement or omission is not material, and
the police defendants are entitled to qualified immunity.

Preliminarily, the police defendants assert that they are
entitled to qualified immunity because they had, "at the very
least, *arguable probable cause*."  ECF No. 203 at 28 (emphasis
added).  Lower courts in the Fourth Circuit and elsewhere have
applied "arguable probable cause" as the standard for
determining whether officers are immune from liability,
distinguishing it from "actual" probable cause.  *See, e.g., Lea
v. Kirby*, 171 F. Supp. 2d 579, 583-84 (M.D.N.C. 2001) *aff'd in
part, dismissed in part*, 39 F. App'x 901 (4th Cir. 2002).[50]  The
Fourth Circuit Court of Appeals has not used the phrase
"arguable probable cause"; however, the Fourth Circuit has
stated that qualified immunity "is not contingent upon whether

surrounding the Victim's identification, as they relate to the
statements made in the arrest warrant application.  Additional
findings may be relevant to the probable cause determination
under Maryland law, or whether the police defendants are
entitled to judgment as a matter of law on the § 1983 malicious
prosecution claim.

[50] *See also Ramos*, 785 F. Supp. at 1459 (*quoting Gorra v. Hanson*,
880 F.2d 95, 97 (8th Cir. 1989)); *Plaster v. Boswell*, No. CIV.
6:05CV00006, 2007 WL 3231533, at *6 (W.D. Va. Oct. 30, 2007);
*Moore v. Cease*, No. 703-CV-144 FL 1, 2005 WL 5322794, at *13
(E.D.N.C. July 5, 2005).

probable cause actually existed." *White v. Downs*, 112 F.3d 512

(4th Cir. 1997)(*citing Hunter v. Bryant*, 502 U.S. 224, 226-27,

112 S.Ct. 534, 116 L.Ed.2d 589 (1991)).  The Court reasoned that

law enforcement officials will make the occasional mistake in

judgment," and should "not be denied qualified immunity for

making a mistake, so long as that mistake is reasonable given

the circumstances."  *Id.*(citations omitted).  However, because

probable cause is viewed through the lens of objective

reasonableness,[51] for the purpose of this inquiry the Court will

apply the familiar standard.[52]

"Probable cause to justify an arrest means facts and

circumstances within the officer's knowledge that are sufficient

to warrant a prudent person, or one of reasonable caution, in

believing, in the circumstances shown, that the suspect has

committed, is committing, or is about to commit an offense."

*United States v. Dickey-Bey*, 393 F.3d 449, 453 (4th Cir. 2004)

(*quoting Michigan v. DeFillipo*, 443 U.S. 31, 37, 99 S. Ct. 2627,

61 L. Ed. 2d 343 (1979) (internal quotations omitted)); *see also*

*United States v. Sowards*, 690 F.3d 583, 588 (4th Cir. 2012)

---

[51] *See, e.g.*, *Wilson v. Kittoe*, 337 F.3d 392, 398 (4th Cir. 2003).

[52] *See Yattoni v. Oakbrook Terrace*, 801 F. Supp. 140, 146 (N.D. Ill. 1992) aff'd, 14 F.3d 605 (7th Cir. 1993)(declining to "explore whatever subtle distinctions (if any at all) may exist between probable cause as grounds for immunity and probable cause as a substantive defense").

(totality-of-the-circumstances test applies to determine where there was probable cause for an arrest).

To determine if there was probable cause to arrest, the Court considers only "facts and circumstances known to the officer at the time of the arrest." *Wilson*, 3378 F.3d at 398 (internal quotations and punctuation omitted).  Probable cause does "not require officials to possess an airtight case before taking action," and officers "must be given leeway to draw reasonable conclusions" from information. *Taylor v. Farmer*, 13 F.3d 117, 121–22 (4th Cir. 1993).  Probable cause requires more than "bare suspicion," but "less than evidence necessary to convict." *Pleasants v. Town of Louisa*, 524 F. App'x 891, 897 (4th Cir. 2013) (internal quotations omitted).

The police defendants argue that the composite sketch and the Victim's identification established probable cause, and her subsequent statement that she could not positively identify Humbert without a physical lineup did not negate probable cause. ECF No. 203 at 10-11, 14-27.[53]  Humbert argues that whether he

---

[53] The police defendants also argue that the police defendants were entitled to rely on the Victim's statement "that's him" because it was an "excited utterance." ECF No. 203 at 19-22. Although it is true that--as a matter of evidentiary law-- excited utterances are deemed reliable, and, thus, admissible as an exception to the rule against hearsay, *see* Fed. R. Evid. 803(2), Humbert has not disputed the admissibility of the Victim's statement (though he argues--in a conclusionary fashion--that the police defendants "had reason to believe the Victim was unreliable"). ECF No. 204 at 19.  In any event, the

matched the sketch is "moot against the backdrop of the Victim's testimony that the sketch artist was not incorporating her input into her rendering and was instead drawing a generic looking African American," and the Victim testified that she had been shown a photograph of Humbert before completing the sketch.  ECF Nos. 204 at 23; 215 at 35; *see also* ECF No. 211 at 27.  Humbert further argues that the only reason the Victim expressed emotion when she viewed Humbert's photograph, jabbed at it, pushed it away, and said "that's him," was because Humbert's photograph looked like the person in Jones's cellphone picture.  ECF Nos. 204 at 23; 211 at 29-30, 33.[54]

The police defendants counter that Humbert's arguments ignore the jury's findings.  ECF No. 209 at 15.  Humbert asserts that he has not ignored the jury's findings, but rather the

---

cases cited by the police defendants in connection with the reliability of the Victim's statement are inapposite as they do not address probable cause.

[54] Humbert initially argued that the jury had found that the Victim was induced into writing "'that's him' when [Jones] showed her the picture of a man that looked like [him.]"  ECF No. 204 at 23.  Although it is unclear, presumably by "when," Humbert means "because."  However, the jury made no explicit findings about whether Jones had shown the Victim a photograph on his cellphone; further, the jury *did not* find that the Victim had been coerced to write "that's him" or prompted to say "that's him."  Verdict Sheets, I:K,P.  Upon request by the police defendants, the Court clarified the jury's finding on that issue, *see* ECF No. 207 (sealed); Humbert has amended his position on that finding, *see* ECF No. 211 at 16.

police defendants "just [do not] like the substance of the testimony adduced at trial."  ECF No. 215 at 35-37.

As noted above, for the purpose of resolving qualified immunity, the Court must rely on the jury's answers to the questions on the Verdict Sheet.  *See Willingham*, 412 F.3d at 560; *ACLU of Maryland*, 999 F.2d at 784.  Nonetheless, Humbert's characterization of the record merits brief comment.

First, the Victim testified at trial that the sketch artist *had* incorporated her input--in fact, she drew the nose, one of her attacker's distinctive features--and was satisfied with the final sketch.  *See* Rough Trial Tr., Vol. II, 13:14-24, 45:13-22, 49:3-5, 50:2-12.[55]  Second, the Victim testified that she could not recall if Jones had shown her the cellphone picture while she was completing the sketch *or after* it had been completed. *Id.*, Vol. II, 14:7-9.  Finally, the Victim testified that she became upset when she saw Humbert's photograph because he looked like Jones's cellphone picture *and* because he looked like the

---

[55] Although she previously averred that her comments had not been incorporated into the composite sketch, *see* Pl. Trial Ex. 1, the jury was free to credit the Victim's trial testimony over her prior sworn statement.  However, it is unclear whether the jury relied on the Victim's testimony, the police defendants' testimony, or their own assessment of the likeness between the sketch (submitted as Def. Trial Ex's 5 and 6) and Humbert to find that Humbert had not shown that a reasonable officer would not have believed that Humbert did not resemble the sketch.

person who had raped her.  *Id.*, Vol. II, 21:3-12.[56]  Crucially,
however, there is no evidence that the Victim communicated the
apparent partial source of her distress to Smith or Griffin.
"Courts evaluate probable cause not on the facts as an
omniscient observer would perceive them but on the facts as they
would have appeared to a reasonable person in the position of
the arresting officer-seeing what he [or she] saw, hearing what
he [or she] heard."  *Kelley v. Myler*, 149 F.3d 641, 646 (7th
Cir. 1998)(internal quotation marks and citation omitted).

As to the merits, the identification of a suspect from a
composite sketch "makes a finding of probable cause more likely
than not"; in conjunction with a tentative identification,
probable cause may be established.  *Ramos v. Sedgwick Cnty.
Sheriff's Dep't*, 785 F. Supp. 1457, 1460, 1463 (S.D. Fla. 1991).
In *Ramos*, one of several cases relied on by the police
defendants, three officers stated that the defendant resembled
the composite prepared by the victim, and although the victim
"expressed some doubts" she identified the defendant as her
attacker and asked to see him "face-to-face with a hat on," 785
F. Supp. at 1458-63.  In holding the officers immune from
liability, the Court stated that the victim's

---

[56] About five years after the Victim learned that there was no
DNA evidence implicating Humbert as her attacker and his charges
had been dropped, the Victim still had a strong emotional
reaction when viewing Humbert's photograph because he resembled
her attacker.  Rough Trial Tr., Vol. II, 78:3-17.

> request to see the Plaintiff face-to-face with a hat
> on does not undermine the identification. When coupled
> with [the officers'] positive identification of [the]
> Plaintiff . . . from the composite identikit created
> by the rape victim . . . , the fact that [the victim]
> picked Plaintiff's picture out of a good photo spread
> and signed it, we believe, is sufficient to clearly
> warrant a finding of probable cause.

*Id.* at 1461.

Humbert distinguishes *Ramos* on the basis that the Victim told the police defendants "in no uncertain terms that . . . . she could not identify anyone." ECF No. 211 at 29. However, the Victim's identification was not so unequivocal. Whereas in *Ramos* the victim testified that she had told the officers that "this might be him, [but] I'm not sure," F. Supp. at 1461, here, the evidence demonstrates--and Humbert has not disproven--that the Victim told Smith and Griffin "that [is] him," had a strong emotional reaction to Humbert's photograph, jabbed at it and tried to push it away from herself, wrote "that's him" on the back of his picture, and signed it--albeit with the caveat that she was not certain absent a physical lineup and hearing his voice. In connection with the jury's finding that Humbert has not shown that he did not resemble the composite sketch, *Ramos* favors a finding of probable cause.

The police defendants also rely on several cases in which courts found that probable cause had been established by an affirmative identification notwithstanding circumstances

relevant to--but not completely destroying--probable cause.  For
example, in *Yattoni v. Oakbrook Terrace*, 801 F. Supp. 140, 146
(N.D. Ill. 1992) *aff'd*, 14 F.3d 605 (7th Cir. 1993), a robbery
victim identified the plaintiff in two photospreads--
"tentatively the first time, but without doubt or hesitation the
second time."  *Id.*  During the first identification, the victim
stated

> there was another guy that I was unsure of that maybe
> had some of the same, a few characteristics the same
> and I wasn't really a hundred percent sure. But I
> questioned it a little bit, but I had picked out [the
> plaintiff] more. I said this [picture of {the
> plaintiff}] looks like it but there's a little
> question that it was someone else.

*Id.* at 143.  The victim "complained that the black-and-white
photos left her unable to judge hair color or skin tone," and
agreed to view a color photospread.  *Id.*  The Court found that
probable cause had been established by the second affirmative
identification, notwithstanding the victim's earlier tentative
identification, that the plaintiff was the only person
represented in each photospread, the victim's stress during the
robbery, her changing descriptions of the robber, and
differences between the plaintiff and a composite sketch.  *Id.*
at 146-48.  The Court reasoned that when a victim "points to a
picture and cries, 'That's the one!', the 'reasonable and
prudent' person . . . will naturally tend to believe that the
person so identified is guilty."  *Id.* at 146.

37

In *Phillips v. Allen*, 743 F. Supp. 2d 931, 953 (N.D. Ill. 2010), another case relied on by the police defendants, the victim of an armed robbery and shooting testified that she overheard a conversation between a police officer and an acquaintance indicating that the plaintiff was suspected of attacking her. *Id*. at 938. Later that day, the victim viewed several photosheets. *Id*. She initially identified one person as her attacker, then upon seeing the plaintiff's picture, stated "that's him." *Id*. at 939. When the officer asked if she was positive, she said "yes." *Id*. *Phillips* found that probable cause had been established by the victim's identification even if she had overheard the acquaintance give the officer the plaintiff's name. *Id*. at 943.

*Yattoni* and *Phillips* are minimally persuasive. Although the Victim in this case stated "that's him," thus approximating the "that's the one!" cried out in *Yattoni*, the jury found that she had qualified her statement; thus, this case is more like the tentative identification (though it is not as tentative) that preceded the affirmative identification establishing probable cause in *Yattoni*. Unlike the *Phillips* victim who stated that she was "positive" about her identification, the Victim here was not positive. Neither *Yattoni* nor *Phillips* addressed whether additional factors--such as an emotional

reaction and resemblance to a composite sketch--bolster probable cause in connection with a tentative identification.

*Braxton v. State*, 123 Md. App. 599, 720 A.2d 27, 35, 50 (1998), which involved a search and seizure warrant based on a victim's identification, is more persuasive.  In *Braxton*, then Maryland Court of Special Appeals Judge Ellen L. Hollander[57] applied *Franks*[58] to affirm the trial court's denial of a motion to suppress the warrant on the basis of material misrepresentations about the strength of the identification. *Id.* at 616, 646, 720 A.2d at 35, 50.  There, the trial court characterized as "a question of semantics" an officer's characterization of a victim's statement as a "positive[] identifi[cation]" when the victim actually stated that "this is the individual. Looks very close to the guy that robbed me." *Id.* at 617, 720 A.2d at 35-36 (alteration omitted).  Although critical of the officer's choice of words, the trial court held that an affidavit accurately representing the victim's statement would have established probable cause.  *Id.* at 618, 720 A.2d at 36.  In affirming the warrant, Judge Hollander agreed that "this dispute was largely a matter of semantics."  *Id.* at 646, 720

---

[57] Judge Hollander is now a U.S. District Judge for the District of Maryland.

[58] The standard stated in *Franks* for evaluating motions to suppress also defines the scope of qualified immunity.  *See, e.g.*, *Evans*, 703 F.3d at 650; *Smith v. Reddy*, 882 F. Supp. 497, 499 (D. Md. 1995), *aff'd*, 101 F.3d 351 (4th Cir. 1996).

A.2d at 50.  The degree of certainty in *Braxton* is similar to that of the Victim's here.

There are few cases addressing the unique circumstances present here: an arguably strong, affirmative identification of a suspect followed by a desire to see the suspect in a physical lineup and to hear his voice to be completely sure.  As one court has recognized, however, "[w]hile absolute certainty of an identification is ideal, it is unnecessary during the investigative stage."  *United States v. Waxman*, 572 F. Supp. 1136, 1140-42 (E.D. Pa. 1983) *aff'd*, 745 F.2d 49 (3d Cir. 1984)(characterizing as "positive" and "certain" identifications made by two witnesses, even though one witness was only "85 percent" sure the defendant's photograph depicted the person who committed the crime, and the other witness stated that the defendant's photograph resembled the suspect, but that two other pictures of the defendant did not; "for all he knew, the other two pictures could be of someone else").

Thus, considering the totality of the facts and circumstances known to the police defendants when the arrest warrant application was sworn, a "corrected" warrant stating Humbert's resemblance to the composite sketch, the Victim's strong emotional reaction to Humbert's photograph, including jabbing at it and attempting to push it away from herself, her signature above and on the back of Humbert's photograph, her

unprompted written statement "that's him," and her oral statement "that's him," taken together with her statement that she needed a physical lineup or to hear his voice to be completely sure, would have established probable cause. *See Yattoni*, 801 F. Supp. at 146 ("Probable cause is . . . "less than a rule of more-likely-than-not, but how much less depends on the circumstances"--that is, on the factual and practical considerations of everyday life on which reasonable and prudent [people], not legal technicians, act.")(internal citations and quotation marks omitted). Accordingly, the omissions in the arrest warrant application were neither material nor reckless.

That it may be a close call does not prevent a finding of qualified immunity. *See Martin v. Mendoza*, 230 F.Supp.2d 665, 671 (D. Md. 2002) ("[E]ven if it is assumed that the existence of probable cause to arrest for disorderly conduct is a 'close call' on the present record, this is exactly the point of the qualified immunity defense. To deny [the defendant] the benefit of the qualified immunity defense, I would have to be persuaded that no reasonably competent officer could have concluded that probable cause existed . . . ."). "Qualified immunity is lost only if 'the warrant application is [or would be] so lacking in indicia of probable cause as to render official belief in its existence unreasonable.'" *Smith*, 101 F.3d at 356 (*quoting*

41

*Malley v. Briggs*, 475 U.S. 335, 344–45, 106 S. Ct. 1092, 1098 (1986)).[59]

That the jury found that the Victim told the police defendants after Humbert's arrest that she could not positively identify him does not change the outcome.  An officer's failure to disclose exculpatory evidence after a suspect is arrested based on a determination of probable cause "does not render the continuing pretrial seizure of a criminal suspect unreasonable under the Fourth Amendment."  *See Taylor v. Waters*, 81 F.3d 429, 435-37 (4th Cir. 1996) (Fourth Amendment jurisprudence did not clearly render unconstitutional an officer's failure to disclose exculpatory evidence to the prosecution; "[i]nstead, other constitutional guarantees contained in the Bill of Rights--such as the right to a speedy trial--protect the accused");[60] *see also*

---

[59] The jury's finding that none of the defendants had acted with actual malice in connection with Humbert's negligence claim-- which they were instructed may "be inferred from an arrest that was so lacking in probable cause and legal justification as to render [the defendant officers'] stated belief in its existence unreasonable and lacking in credibility"--buttresses the Court's conclusion.  *See McDaniel v. Arnold*, 898 F. Supp. 2d 809, 850 (D. Md. 2012); Verdict Sheets VII:A.  That permissible inference is strikingly similar to the standard for qualified immunity on the federal malicious prosecution claim.  *See Smith*, 101 F.3d at 356.

[60] The Fourth Circuit has held that a police officer who withholds exculpatory information from a prosecutor can be liable for a due process violation under § 1983 *only when* the officer's failure to disclose "deprived the § 1983 plaintiff[ ] of [his] right to a fair trial," *Taylor*, 81 F.3d at 436 n. 5;

*Scott ex rel. Davis v. Parr*, No. CIV.A. 5:04CV00054, 2005 WL
711967, at *3-*4 (W.D. Va. Mar. 29, 2005)(granting summary
judgment for defendant police officer on plaintiff's § 1983
unlawful arrest claim when the officer initiated criminal
proceedings against the plaintiff based on witness
identifications, but later learned--and failed to inform the
prosecutor--that the witnesses could no longer affirmatively
identity the plaintiff and none of the actual perpetrators had
implicated the plaintiff, because "the court must only consider
the facts and circumstances known to the [defendant] at the time
of the arrest").   Accordingly, the police defendants are
entitled to qualified immunity on the federal malicious
prosecution claim, and judgment will be entered in their favor
on count three.[61]

    2.   Maryland Malicious Prosecution

    Malicious prosecution is "the unlawful use of legal
procedure to bring about a legal confinement." *Montgomery Ward
v. Wilson*, 339 Md. 701, 724, 664 A.2d 916, 927 (1995).   The
elements of malicious prosecution in Maryland are: "(a) a

---

*Goodwin v. Metts*, 885 F.2d 157, 162 (4th Cir. 1989).   Here,
Humbert was never tried for the Victim's rape.

[61] Thus, the jury's award of compensatory and punitive damages
will be stricken.   Because the Court has resolved this claim in
the police defendants' favor, it need not address the police
defendants' alternative motion for a remittitur, and Humbert's
motion for attorneys' fees will be denied as moot as he is not a
prevailing party, *see* 42 U.S.C. § 1988 (2012).

criminal proceeding instituted or continued by the defendant against the plaintiff, (b) termination of the proceeding in favor of the accused, (c) absence of probable cause for the proceeding, and (d) 'malice', or a primary purpose in instituting the proceeding other than that of bringing an offender to justice." *Id.* at 714, 664 A.2d at 922.  A person who obtains an arrest warrant "thereby initiates legal process against the person to be arrested[,]" and may be liable for malicious prosecution.  *See id.* at 724, 664 A.2d at 927.

In Maryland, probable cause "is a nontechnical conception of a reasonable ground for belief of guilt." *DiPino v. Davis*, 354 Md. 18, 32, 729 A.2d 354, 361 (1999)(*quoting Collins v. State*, 322 Md. 675, 679, 589 A.2d 479, 481 (1991)); *see also Okwa v. Harper*, 360 Md. 161, 183-84, 757 A.2d 118, 130 (2000)("Probable cause, as the term suggests, is a concept based on probability.").  It is determined "in terms of facts and circumstances 'sufficient to warrant a prudent [person] in believing that the [suspect] had committed or was committing an offense.'" *DiPino*, 354 Md. at 32, 729 A.2d at 361 (*quoting Gerstein v. Pugh*, 420 U.S. 103, 111, 95 S.Ct. 854, 862, 43 L.Ed.2d 54, 64 (1975)).

In addition to the evidence discussed above,[62] evidence adduced at trial--considered in the light most favorable to Humbert--indicated that Humbert had been stopped near the Victim's home, and at the time he weighed 180 pounds, was around 5'5" tall, had short hair, and was well-spoken.  Against that backdrop, the jury found that Humbert had not shown that (1) he did not have a short haircut or had been within blocks of where the Victim's attack took place when he was stopped and photographed by the officer, and (2) his record did not indicate that he was 5'7" or weighed 180 pounds at the time.

Probable cause exists when a suspect resembles a composite sketch or a witness's description and is found shortly after the crime in the same area.  *See, e.g., Chambers v. Maroney*, 399 U.S. 42, 46-47, 90 S. Ct. 1975, 1978-1979, 26 L.Ed.2d 419 (1970) (police had "ample" probable cause to arrest suspects whose clothing and car matched a witness's description); *Shriner v. Wainwright*, 715 F.2d 1452, 1454 (11th Cir. 1983)(finding probable cause when officer testified that the plaintiff bore a "striking resemblance" to the composite and plaintiff was stopped "one day after the two crimes in the same county").  Further, as discussed above, identification of a suspect based on a composite sketch may establish probable cause in connection with a tentative identification.  *See Ramos*. 785 F. Supp. at

---

[62] *See supra* Section II.B.1.

1460, 1463.  Thus, in addition to finding that a corrected warrant would have established probable cause, the Court also finds that the police defendants had probable cause to arrest Humbert; thus, judgment will be entered in their favor as to count eighteen.[63]

     3.   Negligence

The police defendants argue they are entitled to judgment on the negligence claim because the jury found that none of the defendants had acted with actual malice.  ECF No. 203 at 30. Humbert argues that for his "negligence [claim] to stand, there would have to be a finding of 'malice[,]'" thus, "the jury's finding of 'actual malice' is immaterial."  ECF No. 211 at 38.

"Negligence is 'any conduct, except conduct recklessly disregardful of an interest of others, which falls below the standard established by law for protection of others against

---

[63] For the same reasons, the Court finds that the police defendants are also entitled to judgment as a matter of law on the federal malicious prosecution claim.  *See Pinder v. Knorowski*, 660 F. Supp. 2d 726, 735-36 (E.D. Va. 2009)(to establish a § 1983 malicious prosecution claim, the plaintiff must show that "he was seized without probable cause and that he obtained a favorable termination of the proceedings against him"); *see also Lambert v. Williams*, 223 F.3d 257, 261 (4th Cir. 2000)(a "malicious prosecution claim under § 1983 is properly understood as a Fourth Amendment claim for unreasonable seizure")(*citing Brooks v. City of Winston-Salem*, 85 F.3d 178 (4th Cir. 1996)).  Because the Maryland Declaration of Rights is interpreted together with the United States Constitution, judgment will also be entered for the police defendants on count eleven (violations of Articles 24 and 26 of the Maryland Declaration of Rights).

unreasonable risk of harm.'"  *Mayor & City Council of Baltimore v. Hart*, 395 Md. 394, 410, 910 A.2d 463, 472 (2006) (*quoting Holler v. Lowery*, 175 Md. 149, 157, 200 A. 353, 357 (1938)).  In Maryland, however, a public official is immune from tort liability in negligence if: "(1) he or she [is] a *public official;* and (2) his or her tortious conduct . . . occurred while performing *discretionary* acts in furtherance of official duties;[64] and (3) the acts [were] done without malice."  *Williams v. Mayor & City Council of Baltimore*, 359 Md. 101, 140-41, 753 A.2d 41, 62 (2000) (emphasis in original).

In this context, malice means "actual malice," *Shoemaker v. Smith*, 353 Md. 143, 163, 725 A.2d 549, 560 (1999), which is intentional conduct "without legal justification or excuse, but with an evil or rancorous motive influenced by hate, the purpose being to deliberately and willfully injure the plaintiff," *Thacker v. City of Hyattsville,* 135 Md. App. 268, 762 A.2d 172, 189 (Md. Ct. Spec. App. 2000).  Although actual malice may not be inferred from a lack of probable cause alone, it may "be inferred from an arrest that was so lacking in probable cause and legal justification as to render [the defendant officers']

---

[64] "[A]ctions of police officers within the scope of their law enforcement function are quintessential discretionary acts." *Williams v. Prince George's Cnty.*, 112 Md. App. 526, 550, 685 A.2d 884, 896 (1996) (*citing Robinson v. Bd. of County Comm'rs*, 262 Md. 342, 346-47, 278 A.2d 71 (1971)).

stated belief in its existence unreasonable and lacking in credibility." *McDaniel v. Arnold*, 898 F. Supp. 2d 809, 850 (D. Md. 2012) (*citing Thacker*, 135 Md. App. at 308, 762 A.2d at 193-94).

Although the jury found that the police defendants had breached a duty of care owed to Humbert, proximately causing him injury, the jury further found that none of the police defendants had acted with actual malice. *See* Verdict Sheets VI-VII. As discussed above, "malice" in this context means "actual malice." *Shoemaker*, 353 Md. at 163, 725 A.2d at 560. Thus, Humbert' argument is unavailing;[65] the police defendants are entitled to judgment as a matter of law as to count fifteen.[66]

III. Conclusion

For the reasons stated above, judgment will be entered for the police defendants on all counts, the police defendants'

---

[65] Further, the definition of actual malice (conduct "without legal justification or excuse, but with an evil or hostile motive influenced by hate, the purpose being to deliberately and willfully injure the plaintiff") given to the jury had been proposed by Humbert. *Compare* Verdict Sheets, VII.I, *with* ECF No. 181 at 12.

[66] The jurors awarded Humbert $10 in nominal damages against each defendant on the negligence claim. However, the Verdict Sheets instructed the jury that damages may only be awarded if they answered "yes" to the question on actual malice. *See* Verdict Sheets, VIII.1-2. Thus, the jury should not have awarded nominal damages; it will be stricken. Accordingly, the Court need not address the police defendants' alternative motion for a new trial.

motion to strike will be denied, and Humbert's motion for

attorneys' fees will be denied as moot.


_____6/22/15_____

Date

_____

William D. Quarles, Jr.
United States District Judge